**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DOCKETED
NOV 1 6 2004

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

      **Plaintiff,**

      **v.**

CONRAD M. BLACK, F. DAVID RADLER
AND HOLLINGER, INC.

      **Defendants.**

: 04C 7377
:
: CIVIL ACTION
: FILE NO. JUDGE HART
:
: JURY TRIAL DEMANDED

MAGISTRATE SIDNEY I. SCHENKIER

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S**
**COMPLAINT FOR PERMANENT INJUNCTION AND**
**OTHER EQUITABLE RELIEF**

Plaintiff United States Securities and Exchange Commission ("Commission")

alleges as follows:

**NATURE OF THE ACTION**

1.      During the period from at least 1999 to at least 2003, Defendants

Conrad M. Black ("Black") and F. David Radler ("Radler") engaged in a fraudulent and

deceptive scheme to divert cash and assets from Hollinger International, Inc. ("Hollinger

International"), a public company that owns and operates newspaper publishing

businesses in the United States and abroad, and to conceal their self-dealing from

Hollinger International's public shareholders.

2.      Black, Hollinger International's former Chairman and Chief Executive

Officer ("CEO"), and Radler, its former Deputy Chairman, President and Chief Operating

Officer ("COO"), conducted their scheme through a series of related party transactions

involving, among other things, purported "non-competition payments" by which Black and Radler diverted to themselves, to Defendant Hollinger, Inc., a Canadian public holding company controlled by Black, and to other corporate insiders approximately $85 million of the proceeds from Hollinger International's sale of newspaper publications to third parties.

3.       Black and Radler also orchestrated the sale of Hollinger International's newspaper publications at below-market prices to another privately-held company owned and controlled by Black and Radler, including a $1.00 transaction.

4.       In addition, in February 2003, Black authorized the investment of $2.5 million of Hollinger International's funds in a venture capital fund with which Black and two other directors of Hollinger International were affiliated.

5.       Moreover, in November 2003, Black approved a press release issued by Hollinger International in which he misled the investing public about his intention to devote his time to an effort to sell Hollinger International assets for the benefit of all of Hollinger International shareholders (the "Strategic Process") and not to undermine that process by engaging in transactions for the benefit of himself and Hollinger, Inc.

6.       To perpetrate their scheme, Black and Radler misrepresented and omitted to state material facts regarding the related party transactions to Hollinger International's Audit Committee and Board of Directors. Black and Radler also misrepresented and omitted to state material facts regarding these related party transactions in Hollinger International's filings with the Commission and during Hollinger International shareholder meetings.

7.      Black and Radler, directly and indirectly, have engaged and, unless enjoined, will continue to engage in acts, practices, and courses of business that violate Sections 10(b), 13(b)(5) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78n(a)] and Rules 10b-5, 13b2-1, 14a-3 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.14a-3 and 240.14a-9] thereunder, and, as control persons of Hollinger International, Sections 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

8.      Black, directly and indirectly, has also engaged and, unless enjoined, will continue to engage in acts, practices, and courses of business that violate Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.13a-14].

9.      Hollinger, Inc., directly and indirectly, has engaged and, unless enjoined, will continue to engage in acts, practices, and courses of business that violate Sections 10(b), 13(a), 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(5)] and Rules 10b-5, 13a-1, 13a-16 and13b2-1 [17 C.F.R. §§ 240.10b-5, 240.13a-1, 240.13a-16 and 240.13b2-1] thereunder and, as a control person of Hollinger International, Sections 13(a) and 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9] thereunder.

10.     The Commission brings this action to enjoin such acts, practices and courses of business pursuant to Sections 20(a), 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78t(a), 78u(d), and 78u(e)].

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78aa] and 28 U.S.C. § 1331. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.     The acts, practices and courses of business constituting the violations alleged herein have occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.

13.     Black, Radler and Hollinger, Inc. (collectively "Defendants"), directly and indirectly, made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

14.     Defendants will, unless enjoined, continue to engage in the acts, practices and courses of business set forth in this complaint, and acts, practices and courses of business of similar purport and object.

## DEFENDANTS

## CONRAD M. BLACK

15.     Black, age 60, is a British citizen who has residences in London, England, Palm Beach, Florida and Toronto, Canada. From approximately 1978 until November 19, 2003, Black was the CEO of Hollinger International. From approximately October 1995 until January 17, 2004, Black was the Chairman of the Board of Directors

of Hollinger International ("Board") and was a member of the Board's Executive Committee (the "Executive Committee").

16.     During the period from at least 1998 through November 2, 2004, Black was the Chairman of the Board of Directors and CEO of Hollinger, Inc. Black, through his personal holding company The Conrad Black Capital Corporation, owns 65.1% of The Ravelston Corporation Limited ("Ravelston"), a private Canadian corporation. Ravelston, directly and indirectly, owns approximately 78% of Hollinger, Inc.'s stock. Black is the Chairman and CEO of Ravelston.

17.     Black is also a member of the Strategic Advisory Board of Trireme Partners LP, a venture capital fund. In 2003, Hollinger International made a $2.5 million investment in Trireme Associates LLC, the general partner of Trireme Partners, LP.

18.     From at least 1999 through 2003, Black signed Hollinger International's annual reports on Forms 10-K as Chairman, CEO and a Director of Hollinger International. From approximately August 2002 to August 2003, Black also certified Hollinger International's annual and quarterly reports filed with the Commission pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act").

19.     In 1982, in SEC v. Norcen Energy Resources, Ltd. and Conrad M. Black, Exchange Act Release No. 9719, 1982 SEC LEXIS 1253 (July 20, 1982), Black consented to the entry of a Final Judgment of Permanent Injunction enjoining him from further violations of Sections 10(b), 13(d) and 14(e) of the Exchange Act and Rules 10b-5, 12b-20, 13d-1 and 13d-2 thereunder in connection with the common stock of M.A. Hanna Company or any security of any other issuer.

## F. DAVID RADLER

20.     Radler, age 61, is a Canadian citizen and resides in Vancouver, Canada.  During the period 1999 through November 2003, Radler resided in Chicago, Illinois and worked out of the Chicago Sun-Times building in Chicago, Illinois.  From at least 1998 until his resignation on November 17, 2003, Radler was Deputy Chairman, President, COO and a Director of Hollinger International.  Radler was also a member of Hollinger International's Executive Committee.

21.     Radler is also the Deputy Chairman and COO of Hollinger, Inc. Radler owns approximately 14.2% of Ravelston stock through F.D. Radler Limited.  He is also the President of Ravelston.

22.     From at least 1999 through 2003, Radler signed Hollinger International's annual reports on Forms 10-K as Deputy Chairman, President, COO and Director of Hollinger International.

## HOLLINGER, INC.

23.     Hollinger, Inc. is a publicly-held Canadian company with its principal place of business located in Ontario, Canada.  Hollinger, Inc. is a foreign private issuer registered with the Commission pursuant to Section 12(g) of the Exchange Act. Hollinger, Inc.'s shares are traded on the Toronto Stock Exchange under the symbol HLG.

24.     Hollinger, Inc. failed to file its 2003 Form 20-F with the Commission. Hollinger, Inc.'s 2003 Form 20-F was due on June 30, 2004.

25.     Hollinger, Inc. is a mutual fund company whose primary holding is its shares of Hollinger International stock. During the relevant period, Hollinger, Inc. had no operations.

26.     During the period from at least 1998 through the present, Hollinger, Inc. has been the controlling shareholder of Hollinger International through its direct and indirect ownership of all of the shares of Hollinger International's Class B Common Stock, which has a 10-to-1 voting preference over shares of Hollinger International's Class A Common Stock.

27.     Other shareholders hold the majority of the Class A shares and together own the majority of the equity in Hollinger International. As of the date of the filing of this action, Hollinger, Inc. owns approximately 18.2% of the combined equity but holds approximately 68% of the combined voting power in Hollinger International.

## OTHER RELATED ENTITIES AND INDIVIDUALS

28.     **Hollinger International** is a Delaware corporation, with its principal place of business in Chicago, Illinois. Hollinger International is a public company that owns and operates newspaper publishing businesses in the United States and abroad. Hollinger International's shares are registered with the Commission under Section 12(b) of the Exchange Act, and its Class A common stock shares are traded on the New York Stock Exchange under the symbol HLR. Hollinger International's Class B Common Shares are directly and indirectly owned by Hollinger, Inc.

29.     From approximately 1998 through June 2004, Hollinger International owned, through its wholly-owned subsidiaries, the Chicago Sun-Times, The Daily Telegraph in London, England, The Jerusalem Post in Israel and several other

publications. On July 30, 2004, Hollinger International sold The Daily Telegraph for approximately $1.3 billion to Press Acquisitions Limited ("Press Acquisitions"), a company owned by David Barclay and Frederick Barclay (the "Barclays"), two brothers who own several media and retail assets in England and Europe.

30.     **Ravelston** is a privately-held Canadian corporation. Ravelston beneficially owns approximately 78% of Hollinger, Inc.'s stock. Ravelston is the controlling shareholder of Hollinger, Inc. Ravelston is owned and controlled by Black and Radler, who, through the Conrad Black Capital Corporation and F.D. Radler, Limited, indirectly own 65.1% and 14.2% of Ravelston, respectively. Black is the Chairman and CEO of Ravelston. Radler is the President of Ravelston.

31.     **Horizon Publications, Inc.** ("Horizon") is a private Delaware corporation. Since its formation in 1999, Black and Radler, directly or indirectly, have owned approximately 75% of Horizon. Horizon has several wholly-owned subsidiaries which are directly or indirectly controlled by Black and Radler. Black is the Chairman and CEO of Horizon. Radler is the President and COO of Horizon.

32.     **Trireme Associates LLC** is the general partner of **Trireme Partners LP**, a venture capital fund. Trireme Associates LLC receives approximately 20% of the profits of Trireme Partners LP, after initial invested capital repayments are made. Trireme Associates LLC controls Trireme Partners LP. Trireme Partners LP is managed by **Trireme Management LLC** which has its principal office in New York.

33.     **Peter Y. Atkinson** ("Atkinson"), age 57, is a Canadian citizen who resides in Canada. From 1996 until April 27, 2004, Atkinson served as an Executive Vice President and Director of Hollinger International. During the period 1996 through

2001, Atkinson was the Vice President and General Counsel of Hollinger, Inc. In 2002 or 2003, Atkinson became the Executive Vice President of Hollinger, Inc. and remained in that position until January 2004, when he resigned. Atkinson directly or indirectly owns approximately 0.98% of Ravelston.

34.     **John A. Boultbee** ("Boultbee"), age 61, is a Canadian citizen who resides in Canada. From 1990 until 1995, Boultbee served as a Director of Hollinger International. From 1995 through 2002, Boultbee served as Hollinger International's Chief Financial Officer ("CFO"), and in 1998, Boultbee became Executive Vice President of Hollinger International. During the period 1999 through 2002, Boultbee signed many of Hollinger International's quarterly reports on Forms 10-Q as Executive Vice President and CFO of Hollinger International.

35.     From 1998 through the present, Boultbee has been a member of Hollinger, Inc.'s Board of Directors and has held various positions as an officer, including Vice President of Finance and Treasury, Executive Vice President and CFO. Boultbee is also an Executive Vice President of Ravelston. Boultbee directly or indirectly owns 0.98% of Ravelston.

36.     **Mark S. Kipnis** ("Kipnis"), age 56, resides in Northbrook, Illinois. From January 1998 until November 2003, Kipnis served as the Secretary and Vice President, Law of Hollinger International. Kipnis also served as general counsel for Hollinger International's Chicago owned and operated papers.

37.     Kipnis signed Hollinger International's proxy statements and the Notices of Annual Meeting of Stockholders which were filed with the Commission.

Kipnis also signed Hollinger International's filings on Forms 8-K as Vice President, Corporate Counsel and Secretary of Hollinger International.

38.     **Richard N. Perle** ("Perle"), age 63, resides in Chevy Chase, Maryland. Perle has been a Director of Hollinger International since 1994. From 1994 until 1998, Perle served on the Audit and Compensation Committees of Hollinger International's Board. From 1994 until November 2003, Perle served on the Executive Committee of Hollinger International, which was comprised of Perle, Black and Radler. From 1996 through November 2003, Perle was the Co-Chairman of Hollinger Digital, a subsidiary of Hollinger International.

39.     Perle is a member of Trireme Management LLC, the company that manages Trireme Partners LP. Perle is entitled to receive approximately 5% of the 20% share of the profits that Trireme Associates LLC receives from Trireme Partners LP. Perle solicited Dr. Henry A. Kissinger ("Kissinger"), an outside director on Hollinger International's Board, to become a member of the Strategic Advisory Board of Trireme Partners LP, along with Black.

## BLACK CONTROLS HOLLINGER INTERNATIONAL THROUGH AN INTRICATE OWNERSHIP AND CORPORATE STRUCTURE

40.     Black, through The Conrad Black Capital Corporation, owns approximately 65.1% of Ravelston. Black is also the Chairman and CEO of Ravelston. Black controls Ravelston.

41.     Ravelston owns approximately 78% of Hollinger, Inc.'s common stock and controls Hollinger, Inc. Black, through Ravelston, controls Hollinger, Inc. Until November 2, 2004, Black also controlled Hollinger, Inc. as its Chairman and CEO.

42.     From at least 1998 to the present, Hollinger, Inc. has been the controlling shareholder of Hollinger International through its direct and indirect ownership of all of Hollinger International's Class B Common Stock, which has a 10-to-1 voting preference over shares of Hollinger International's Class A Common Stock. During the period 1998 through the present, Hollinger, Inc. also held several million shares of Hollinger International's Class A Common Stock.

43.     By virtue of its ownership of Hollinger International's stock, Hollinger, Inc. is in a position to direct management policy, strategic decisions and financial decisions of Hollinger International and to control substantially all actions requiring the approval of Hollinger International shareholders.

44.     Black, through his ownership and control of Ravelston, controls Hollinger, Inc., and through his ownership and control of Hollinger, Inc., controlled Hollinger International through at least 2003.

45.     From at least 1998 through at least 2003, Black held himself out to the world as being able to control Ravelston, Hollinger, Inc. and Hollinger International.

## THE FRAUDULENT NON-COMPETITION TRANSACTIONS

46.     From approximately 1999 through 2001, Black and Radler fraudulently diverted at least $85 million from Hollinger International to themselves, Hollinger, Inc., Ravelston and other corporate insiders in the form of purported "non-competition" payments.

47.     The purported non-competition payments were made in connection with Hollinger International's sales of its U.S. and Canadian newspaper properties in a series of transactions known as the American Trucker; Community Newspaper Holdings,

Inc. ("CNHI I"); Horizon; Forum Communications Company ("Forum"); PMG Acquisition Corporation ("Paxton"); Newspaper Holdings, Inc. ("CNHI II"); and CanWest Global Communications Corporation ("CanWest") transactions.

48.     As a result of these purported non-competition payments, portions of the sale proceeds which should have gone to Hollinger International were diverted to Black, Radler, Hollinger, Inc. and their associates.

49.     In 1999 and 2000, Hollinger, Inc. received purported non-competition payments totaling $16.55 million in connection with Hollinger International's sale of U.S. newspaper properties. During this period, Hollinger, Inc. was a Canadian mutual fund company with no operations. The purchasers of these newspaper properties did not request that Hollinger, Inc. execute non-competition agreements.

50.     Of the $16.55 million in total purported non-competition payments made to Hollinger, Inc., $15.2 million was received in 1999. This $15.2 million constituted approximately 15.6% and 27% of the reported total income and net income, respectively, on Hollinger, Inc.'s unconsolidated statement of income and expenses for the 1999 fiscal year. Hollinger, Inc. used this money to repay debt it owed to Hollinger International.

51.     In 2000 and 2001, Black and Radler each received purported non-competition payments totaling approximately $19 million in connection with the sales of Hollinger International's U.S. and Canadian newspaper properties. Atkinson and Boultbee each received purported non-competition payments totaling approximately $1.9 million. Ravelston received a purported non-competition payment of approximately $26.3 million.

52.     None of the purchasers of Hollinger International's U.S. newspaper properties requested that any individual officer of Hollinger International sign a non-competition agreement. Black, Radler, Atkinson and Boultbee did not execute non-competition agreements in connection with certain of the U.S. newspaper sale transactions. On one occasion, Black and Radler engineered purported non-competition payments to themselves for their agreements not to compete with a wholly-owned subsidiary of Hollinger International in the absence of any purchase or sale of newspapers.

53.     The $15.2 million in purported non-competition payments made to Hollinger, Inc. in 1999 constituted approximately 3.7% of Hollinger International's reported earnings before income taxes, minority interest and extraordinary items ("pretax income") and 6.2 % of its reported net earnings for the 1999 fiscal year.

54.     Approximately $63.4 million in purported non-competition payments were made to Hollinger, Inc., Ravelston, Black, Radler, Atkinson and Boultbee in 2000. These payments constituted approximately 11.6% of Hollinger International's reported pretax income and 54.2% of its reported net earnings for the 2000 fiscal year.

55.     Black, Radler, Boultbee and Atkinson received a total of at least $6,100,000 in purported non-competition payments in 2001. In 2001, Hollinger International reported a pretax loss of ($361,620,000) and net loss of ($337,506,000).

56.     The approximately $84.7 million in total purported non-competition payments constituted approximately 14.1% of Hollinger International's total pretax income and 340.1% of its net earnings for the three-year period from 1999 through 2001.

57.     Pursuant to Hollinger International policy and practice, related party transactions were to be reviewed and approved by the Audit Committee of Hollinger International's Board of Directors ("Audit Committee").

58.     To perpetrate their scheme, Black and Radler made misstatements and omissions of material fact, as described in greater detail below, regarding the purported non-competition payments to Hollinger International's Audit Committee and to Hollinger International's Board.

59.     Black and Radler also signed Hollinger International's filings with the Commission which contained misstatements and omissions of material fact regarding the purported non-competition payments.

60.     Hollinger, Inc. made misstatements and omissions of material fact regarding the purported non-competition payments in its responses to Hollinger International's proxy questionnaires and in Hollinger, Inc.'s filings with the Commission.

## THE AMERICAN TRUCKER TRANSACTION

61.     On or about May 11, 1998, Hollinger International and a Hollinger International subsidiary entered into an asset purchase agreement to sell certain assets, including the American Trucker publication, to Intertec Publishing Corporation ("Intertec") for approximately $75 million (the "American Trucker transaction").

62.     Hollinger International and the subsidiary executed a non-competition agreement as part of the American Trucker transaction. The asset purchase agreement provided that $2 million would be paid to Hollinger International as consideration for the non-competition agreement at closing.

63. Radler signed the asset purchase agreement and the non-competition agreement on behalf of the subsidiary and Hollinger International.

64. Hollinger, Inc. was not a party to and did not sign the asset purchase agreement or the non-competition agreement.

65. The transaction closed in May 1998, and $2 million was paid to Hollinger International as consideration for the non-competition agreement.

66. On or about May 1, 1998, the Hollinger International Executive Committee, consisting of Black, Radler and Perle, approved the proposed sale to Intertec for approximately $75 million and Hollinger International's execution of a non-competition agreement in exchange for consideration of approximately $2 million.

67. In or about February 1999, Radler caused $2 million to be paid by Hollinger International to Hollinger, Inc. as a purported non-competition payment in connection with the American Trucker transaction.

68. Hollinger, Inc. used this payment to repay debt it owed to Hollinger International.

69. Hollinger, Inc. failed to disclose the $2 million purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 1999 fiscal year.

70. Black and Radler failed to disclose the $2 million purported non-competition payment to Hollinger, Inc. to Hollinger International's independent directors or to its Audit Committee.

71.     The $2 million purported non-competition payment to Hollinger, Inc. was not disclosed in any of Hollinger International's filings with the Commission until it was disclosed in a November 17, 2003 press release filed with a Form 8-K.

72.     Black, Radler and Hollinger, Inc. knew or were reckless in not knowing that Hollinger International's filings with the Commission were materially false and misleading because they failed to disclose the $2 million purported non-competition payment to Hollinger, Inc.

## THE CNHI I TRANSACTION

73.     On or about February 1, 1999, Hollinger International entered into an asset exchange agreement to sell certain of its assets to Community Newspaper Holdings, Inc. and its subsidiary, Newspaper Holdings, Inc. (collectively, "CNHI"), for approximately $450 million, $50 million of which was allocated as consideration for a non-competition agreement (the "CNHI I transaction").

74.     Hollinger, Inc. was not a party to the asset exchange agreement. However, Hollinger, Inc. was identified in the asset exchange agreement as a party to the non-competition agreement along with Hollinger International.

75.     CNHI did not request a non-competition agreement from Hollinger, Inc.

76.     However, in or about January 1999, Radler caused Hollinger, Inc. to be added as a party to the non-competition agreement. Radler signed the non-competition agreement on behalf of Hollinger, Inc.

77.     Neither the asset exchange agreement nor the non-competition agreement specified how, if at all, the $50,000,000 in consideration was to be allocated

between the seller, Hollinger International, and Hollinger, Inc. Radler caused Hollinger, Inc. to be paid $12 million of the $50 million as consideration for the non-competition agreement.

78. In February 1999, Hollinger, Inc. received a purported non-competition payment of $12 million in connection with the CNHI I transaction.

79. Hollinger, Inc. used this payment to repay debt it owed to Hollinger International.

80. Hollinger, Inc. failed to disclose the $12 million purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 1999 fiscal year.

81. Radler presented the CNHI I transaction and Hollinger International's non-competition agreement to Hollinger International's Board for approval on November 30, 1998. Black was present at this Board meeting. The Hollinger, Inc. non-competition agreement and the $12 million purported non-competition payment to Hollinger, Inc. were not disclosed to or approved by Hollinger International's independent directors or its Audit Committee.

82. Later, during a February 26, 1999 Board meeting, Black told the Hollinger International Board that the CNHI transaction was successfully concluded. Radler was also present at this meeting. Neither Black nor Radler disclosed to Hollinger International's Board that Hollinger, Inc. had signed a non-competition agreement and had received $12 million as a purported non-competition payment in connection with the CNHI transaction.

83.     The $12 million purported non-competition payment to Hollinger, Inc. was not disclosed in any of Hollinger International's filings with the Commission until it was disclosed in a November 17, 2003 press release filed with a Form 8-K.

84.     Black, Radler and Hollinger, Inc. knew or were reckless in not knowing that Hollinger International's filings with the Commission were materially false and misleading because they failed to disclose the $12 million purported non-competition payment to Hollinger, Inc.

## THE HORIZON TRANSACTION

85.     On or about March 31, 1999, Hollinger International entered into an agreement to sell certain of its newspaper publications to Horizon, a company owned and controlled by Black and Radler, for a purchase price of approximately $46 million, $5 million of which was allocated to a non-competition agreement (the "Horizon transaction").

86.     Hollinger, Inc. was not a party to the asset exchange agreement. However, Hollinger, Inc. was identified in the asset exchange agreement as a party to the non-competition agreement along with Hollinger International.

87.     Radler caused Hollinger, Inc. to be inserted as a party to the non-competition agreement.

88.     Neither the asset exchange agreement nor the non-competition agreement specified how, if at all, the $5,000,000 in consideration was to be allocated between the seller, Hollinger International, and Hollinger, Inc.

89.     Radler caused Hollinger, Inc. to receive $1.2 million of the $5 million as consideration for the non-competition agreement.

90.     In or around August 1999, Hollinger Inc. received from Horizon $1.2 million of the total non-competition agreement allocation related to the Horizon transaction.

91.     Hollinger, Inc. failed to disclose the $1.2 million purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 1999 fiscal year.

92.     Radler presented the Horizon transaction to Hollinger International's Board for approval on November 30, 1998. Black was present at this Board meeting. The Hollinger, Inc. non-competition agreement and $1.2 million purported non-competition payment to Hollinger, Inc. were not disclosed to or approved by Hollinger International's independent directors or its Audit Committee.

93.     The $1.2 million purported non-competition payment to Hollinger, Inc. was not disclosed in any of Hollinger International's filings with the Commission until it was disclosed in a November 17, 2003 press release filed with a Form 8-K.

94.     Black, Radler and Hollinger, Inc. knew or were reckless in not knowing that Hollinger International's filings with the Commission were materially false and misleading because they failed to disclose the $1.2 million purported non-competition payment to Hollinger, Inc.

## CNHI II TRANSACTION

95.     On or about September 28, 2000, Hollinger International entered into an asset purchase agreement to sell to Newspaper Holdings, Inc. certain newspapers for a purchase price of approximately $90 million, $3 million of which was allocated as consideration for a non-competition agreement (the "CNHI II transaction").

96.     Hollinger, Inc. was not a party to the asset purchase agreement. However, Hollinger, Inc. was identified in the asset purchase agreement as a party to the non-competition agreement along with Hollinger International.

97.     CNHI did not request a non-competition agreement from Hollinger, Inc. However, Radler caused Hollinger, Inc. to be included as a party to a non-competition agreement in the asset purchase agreement.

98.     At Radler's direction, the asset purchase agreement allotted Hollinger, Inc. 25%, or $750,000, of the amount allocated to the non-competition agreement, and Hollinger International was allotted the remaining 75%, or $2.25 million.

99.     On September 15, 2000, Hollinger International's Executive Committee, consisting of Black, Radler and Perle, approved the disposition of assets to CNHI and execution of a non-competition agreement by Hollinger International and Hollinger, Inc. for an aggregate purchase price of approximately $90 million after assignment by CNHI to Horizon of the right to acquire two California newspapers, the Bishop and Blackfoot properties.

100.     CNHI did not request that any individuals be added as parties to the non-competition agreement. However, at or around the time of closing, Radler caused Black, Radler, Atkinson and Boultbee to be included as parties to the non-competition agreement. No dollar amounts were mentioned in the revised non-competition agreement.

101.     Black and Radler caused $9.5 million in purported non-competition payments to be made to Black, Radler, Atkinson and Boultbee.

102.     The $9.5 million in purported non-competition payments to Black, Radler, Atkinson and Boultbee were not made at the request of CNHI and were not required under the asset purchase agreement or non-competition agreement. The additional $9.5 million in purported non-competition payments did not increase the total purchase price paid by CNHI.

103.     The $9.5 million was initially to be paid as follows: $4.5 million to Black, $4.5 million to Radler, $250,000 to Atkinson and $250,000 to Boultbee. Black and Radler subsequently reduced the purported non-competition payments to themselves to $4.3 million each and increased the payments to Boultbee and Atkinson to $450,000 each. Radler authorized a bonus to Kipnis in the amount of $100,000.

104.     Checks were issued to the individuals in these amounts on or about November 21, 2000.

105.     Hollinger, Inc. received a $750,000 purported non-competition payment in connection with the CNHI II transaction when the transaction closed.

106.     Black and Radler failed to disclose the $4.3 million purported non-competition payments to themselves in their responses to Hollinger International's proxy questionnaires for the 2000 fiscal year.

107.     Hollinger, Inc. failed to disclose the $750,000 purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 2000 fiscal year.

## FORUM TRANSACTION

108.     On or about September 30, 2000, Hollinger International entered into an asset purchase agreement to sell certain of its assets to Forum Communications

21

Company ("Forum") for approximately $14 million, of which $400,000 was allocated as consideration for a non-competition agreement (the "Forum transaction").

109.     Hollinger, Inc. was not a party to the asset purchase agreement. However, Hollinger, Inc. was identified in the asset purchase agreement as a party to the non-competition agreement along with Hollinger International.

110.     Forum did not request that Hollinger, Inc. be included as a party to the non-competition agreement. However, Radler caused Hollinger, Inc. to be included as a party to the non-competition agreement.

111.     At Radler's direction, the asset purchase agreement allotted Hollinger, Inc. 25%, or $100,000, of the amount allocated to the non-competition agreement, and Hollinger International was allotted the remaining 75%, or $300,000.

112.     On September 19, 2000, Hollinger International's Executive Committee, consisting of Black, Radler and Perle, approved the disposition of assets to Forum and the execution of a non-compete agreement by Hollinger International and "certain executive officers of [Hollinger] International" for an aggregate purchase price of approximately $14 million.

113.     Neither the asset purchase agreement nor the non-competition agreement provided for non-competition agreements with or non-competition payments to any individual executive officers of Hollinger International.

114.     In or about October 2000, Hollinger, Inc. received a non-competition payment of $100,000 in connection with the Forum transaction.

115.     Hollinger, Inc. failed to disclose the $100,000 purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 2000 fiscal year.

## PAXTON TRANSACTION

116.     On or about October 2, 2000, Hollinger International entered into an asset purchase agreement to sell certain of its assets to PMG Acquisition Corporation ("Paxton") for approximately $59 million, $2 million of which was allocated as consideration for a non-competition agreement (the "Paxton transaction").

117.     Hollinger, Inc. was not a party to the asset purchase agreement. However, Hollinger, Inc. was identified in the asset purchase agreement as a party to the non-competition agreement along with Hollinger International.

118.     Paxton did not request that Hollinger, Inc. be included as a party to the non-competition agreement. However, Radler caused Hollinger, Inc. to be included as a party to the non-competition agreement.

119.     At Radler's direction, the asset purchase agreement allotted Hollinger, Inc. 25%, or $500,000, of the amount allocated to the non-competition agreement, and Hollinger International was allotted the remaining 75%, or $1.5 million.

120.     On September 18, 2000, Hollinger International's Executive Committee, consisting of Black, Radler and Perle, approved the disposition of assets to Paxton and the execution of a non-compete agreement by Hollinger International and "certain executive officers of Hollinger International."

121.     Neither the asset purchase agreement nor the non-competition agreement provided for non-competition agreements with or non-competition payments to any individual executive officers of Hollinger International.

122.     In or about October 2000, Hollinger, Inc. received a non-competition payment of $500,000 in connection with the Paxton transaction.

123.     Hollinger, Inc. failed to disclose the $500,000 purported non-competition payment in its response to Hollinger International's proxy questionnaire for the 2000 fiscal year.

## BOARD "RATIFICATION" REGARDING THE CNHI II, FORUM AND PAXTON TRANSACTIONS

124.     Black presented the Executive Committee's authorization and approval of the sale of certain assets to CNHI (CNHI II), Forum and Paxton to Hollinger International's Board for confirmation and ratification on December 4, 2000.   Radler was present at this Board meeting.

125.     Neither Black nor Radler disclosed to the Board that Hollinger, Inc. had executed a non-competition agreement in connection with the CNHI II, Forum and Paxton transactions, that individuals had executed a non-competition agreement in connection with the CNHI II transaction, or that Hollinger, Inc. or any executive officers of Hollinger International had or would receive purported non-competition payments in connection with the transactions.

126.     Although the Board minutes purport to incorporate by reference the September 15, 18, and 19, 2000 Executive Committee consents, the Board was not given a copy of the resolutions.   The purported non-competition payments to Hollinger, Inc.,

Black, Radler, Atkinson and Boultbee were not reviewed or approved by the Audit Committee or Board.

## ADDITIONAL NON-COMPETITION PAYMENTS FROM FORUM AND PAXTON RESERVES

127.     In early 2001, Hollinger International and/or its subsidiaries maintained unallocated accounting reserves from certain of its transactions, including reserves from the Forum and Paxton transactions.

128.     In 2001, Black and Radler caused additional purported non-competition payments to be made from the reserves of the Forum and Paxton transactions to themselves in the amount of $285,000 each, and to Atkinson and Boultbee in the amount of $15,000 each. None of these payments were made at the request of Forum or Paxton.

129.     Black and Radler received these payments on or about April 9, 2001, several months after these transactions closed.

130.     Neither Black, Radler, Atkinson nor Boultbee executed a non-competition agreement in connection with their receipt of these payments.

131.     Black and Radler did not present the purported non-competition payments to themselves, Atkinson and Boultbee to Hollinger International's Board or to its Audit Committee for review or approval.

132.     The purported non-competition payments made to Black, Radler, Atkinson and Boultbee in connection with the CNHI II, Forum and Paxton transactions were not disclosed in any of Hollinger International's public filings with the Commission until April 1, 2002, when Hollinger International filed its 2001 Form 10-K. However, as

discussed below, the disclosure in Hollinger International's 2001 Form 10-K regarding these payments contained misstatements and omissions of material fact.

## THE AMERICAN PUBLISHING COMPANY "TRANSACTION"

133.     In or around February 2001, Black and Radler caused themselves, Atkinson and Boultbee to receive approximately $5.5 million in additional purported non-competition payments pursuant to purported non-competition agreements with American Publishing Company (the "American Publishing transaction"). American Publishing Company was a wholly-owned subsidiary of Hollinger International.

134.     There was no reason for the individuals to execute the non-competition agreements or to receive payment of any consideration for their agreements not to compete with American Publishing Company. These payments were not made in connection with any sale or transfer of newspapers by Hollinger International.

135.     In February 2001, Black, Radler, Atkinson and Boultbee executed these purported non-competition agreements, which were backdated to December 31, 2000.

136.     Radler caused Hollinger International to issue checks for $2,612,500 each to himself and Black and $137,500 each to Atkinson and Boultbee in connection with the purported "non-competition" agreements with American Publishing Company in February 2001. The checks for these purported "non-competition" payments were backdated to December 31, 2000.

137.     Black and Radler did not present the American Publishing Company purported non-competition payments to themselves, Atkinson and Boultbee to Hollinger International's Board or to its Audit Committee for review or approval.

## MISSTATEMENTS AND OMISSIONS IN HOLLINGER INTERNATIONAL'S FILINGS REGARDING THE NON-COMPETITION PAYMENTS TO HOLLINGER, INC. AND THE INDIVIDUALS

138.     The purported non-competition payments made to Hollinger, Inc. in connection with the CNHI II, Forum and Paxton transactions were not disclosed in any of Hollinger International's filings with the Commission until they were disclosed in a November 17, 2003 press release filed with a Form 8-K.

139.     Black, Radler and Hollinger, Inc. knew or were reckless in not knowing that Hollinger International's filings with the Commission were materially false and misleading because they failed to disclose the $1,350,000 in purported non-competition payments made to Hollinger, Inc. in connection with the CNHI II, Forum and Paxton transactions.

140.     The purported non-competition payments made to Black, Radler, Atkinson and Boultbee in connection with the CNHI II transaction were not disclosed in Hollinger International's proxy statement for the 2000 fiscal year or in its 2000 Form 10-K.

141.     Black and Radler knew or were reckless in not knowing that Hollinger International's filings with the Commission prior to April 1, 2002, including its 2000 Form 10-K filed April 2, 2001 and 2001 proxy statement filed March 27, 2001, were materially false and misleading because they failed to disclose the $8.6 million in total purported non-competition payments to themselves and $900,000 in total purported non-competition payments to Atkinson and Boultbee.

142.     The non-competition payments made to Black, Radler, Atkinson and

Boultbee in connection with the above-mentioned transactions were first disclosed in

Hollinger International's 2001 Form 10-K, which states:

> In connection with the sales of United States newspaper properties in 2000, to
> satisfy a closing condition, the Company, Lord Black and three senior executives
> entered into non-competition agreements with the purchasers to which each
> agreed not to compete directly or indirectly in the United States with the United
> States businesses sold to purchasers for a fixed period, subject to certain limited
> exceptions, for aggregate consideration paid in 2001 of $0.6 million.  These
> amounts were in addition to the aggregate consideration paid in respect of these
> non-competition agreements in 2000 of $15 million. Such amounts were paid to
> Lord Black and the three senior executives. The Company's independent directors
> have approved the terms of these payments.

143.     Hollinger International's 2002 Form 10-K contained disclosures

concerning the non-competition payments that were nearly identical to the disclosure

contained in its 2001 Form 10-K.

144.     Hollinger International's 2002 Form 10-K states:

> During 2000, we sold most of our remaining U.S. community newspaper
> properties, for total proceeds of approximately $215 million. In connection with
> those sales, to satisfy a closing condition, the Company, Lord Black and three
> senior executives entered into non-competition agreements with the purchasers to
> which each agreed not to compete directly or indirectly in the United States with
> the United States businesses sold to purchasers for a fixed period, subject to
> certain limited exceptions, for aggregate consideration paid in 2001 of
> $0.6 million. These amounts were in addition to the aggregate consideration paid
> in respect of these non-competition agreements in 2000 of $15 million. Our
> independent directors approved the terms of these payments;

> and

> In connection with the sales of United States newspaper properties in 2000, to
> satisfy a closing condition, the Company, Lord Black and three senior executives
> entered into non-competition agreements with the purchasers pursuant to which
> each agreed not to compete directly or indirectly in the United States with the
> United States businesses sold to the purchasers for a fixed period, subject to
> certain limited exceptions, for aggregate consideration paid in 2001 of $600,000.
> These amounts were in addition to the aggregate consideration paid in respect of
> these non-competition agreements in 2000 of $15,000,000. Such amounts were

paid to Lord Black and the three senior executives. The Company's independent directors have approved the terms of these payments.

145.    The disclosures in Hollinger International's 2001 and 2002 Forms 10-K contained misstatements and omissions of material fact because, among other things:

(a)    The purported non-competition payments made in connection with the American Publishing Company transaction were not in connection with the sale of newspaper properties;

(b)    Black, Radler, Atkinson, and Boultbee did not enter into non-competition agreements with purchasers in connection with the American Publishing Company, Forum or Paxton transactions;

(c)    Black, Radler, Atkinson and Boultbee did not enter into any non-competition agreements "to satisfy a closing condition" of any purchaser of Hollinger International's U.S. newspapers because none of the purchasers requested that any of the individuals enter into non-competition agreements;

(d)    Approximately $9.5 million was paid in 2000 and another approximately $6 million was paid in 2001 as consideration for the purported non-competition agreements; and

(e)    The payments were not approved by Hollinger International's independent directors.

146.    Black and Radler signed Hollinger International's 2001 and 2002 Forms 10-K.

147.    Black also certified Hollinger International's 2002 Form 10-K pursuant to Section 302 of the Sarbanes-Oxley Act as the CEO of Hollinger International.

148.     Hollinger International also disclosed the payments in its proxy statement filed on or about April 2, 2002, which states:

> In connection with the sales of United States newspaper properties in 2000, to satisfy a closing condition, Hollinger Inc., the Company, Lord Black and Messrs. Radler, Atkinson and Boultbee entered into non-competition agreements with the purchasers pursuant to which each agreed not to compete directly or indirectly in the United States with the United States businesses sold to the purchasers for a fixed period, subject to certain limited exceptions, for aggregate consideration paid in 2001 and 2000 of $15,600,000, consisting of $7,197,500 paid to Lord Black, $7,197,500 paid to Mr. Radler, $602,500 paid to Mr. Atkinson and $602,500 paid to Mr. Boultbee.

149.     Hollinger International's 2002 proxy statement contained misstatements and omissions of material fact for the reasons stated in paragraph 145(a)-(e), above. In addition, this disclosure identified Hollinger, Inc. as a party to a non-competition agreement(s), but failed to disclose that any purported non-competition payments were made to Hollinger, Inc., leading the reader to believe that no non-competition payments were made to Hollinger, Inc., when, in fact, it received over $16 million in purported non-competition payments in connection with the sale of Hollinger International U.S. newspaper assets.

150.     Black and Radler knew or were reckless in not knowing that Hollinger International's 2001 and 2002 Forms 10-K and 2002 proxy statement filed on or about April 2, 2002, were materially false and misleading because they contained the misstatements and omissions of material fact discussed above.

151.     The misstatements and omissions in Hollinger International's 2001 and 2002 Forms 10-K and 2002 proxy statement were not disclosed in any of Hollinger International's filings with the Commission until they were disclosed in a November 17, 2003 press release filed with a Form 8-K.

## MISSTATEMENTS AND OMISSIONS DURING HOLLINGER
## INTERNATIONAL'S MAY 2002 SHAREHOLDER MEETING

152.     During a Hollinger International shareholder meeting held in May

2002, at which Radler was present, Black responded to a shareholder's question

regarding the purported non-competition agreements as follows:

> You're right that there were some non-competes in the American Community
> sales, but that wasn't as dissimilar as it seems from the Canadian situation. In
> those papers, they wanted some assurance that we wouldn't come back with
> shoppers, which is always a threat to those small newspapers and indeed, there's
> been some incidence in the history of that business of people doing just that...

153.     Black's statement contained misstatements and omissions of material

fact because, among other things, Black, Radler, Atkinson and Boultbee did not enter into

non-competition agreements or receive the purported non-competition payments at the

request of the purchasers and did not execute non-competition agreements in connection

with the Forum and Paxton transactions. In addition, there was no sale of newspapers

associated with the purported non-competition agreements and payments in the American

Publishing Company transaction.

154.     Black and Radler knew or were reckless in not knowing that Black's

statements to Hollinger International's shareholders were materially false and misleading.

## MISSTATEMENTS AND OMISSIONS IN HOLLINGER, INC.'S
## FILINGS REGARDING THE NON-COMPETITION PAYMENTS

155.     On or about April 23, 2002, Hollinger, Inc. disclosed the non-

competition payments made to Black, Radler, Atkinson and Boultbee in connection with

the U.S. newspaper sales in its proxy statement filed on Form 6-K.

156.     Hollinger, Inc.'s 2002 proxy statement reads:

> In connection with the sales of United States newspaper properties in
> 2000, to satisfy a closing condition, Hollinger [Inc.], Hollinger

International, Lord Black and Messrs. Radler, Atkinson and Boultbee entered into non-competition agreements with the purchasers pursuant to which each agreed not to compete directly or indirectly in the United States with the United States businesses sold to the purchasers for a fixed period, subject to certain limited exceptions, for aggregate consideration paid in 2001 and 2000 of U.S.$15,600,000, consisting of U.S.$7,197,500 paid to Lord Black, U.S.$7,197,500 paid to Mr. Radler, U.S.$602,500 paid to Mr. Atkinson and U.S.$602,500 paid to Mr. Boultbee.

157.    This disclosure contained misstatements and omissions of material fact for the reasons stated in paragraph 145(a)-(e), above. In addition, this disclosure identified Hollinger, Inc. as a party to a non-competition agreement(s), but failed to disclose that any purported non-competition payments were made to Hollinger, Inc., leading the reader to conclude that no non-competition payments were made to Hollinger, Inc. when, in fact, it received over $16 million in purported non-competition payments in connection with the sale of Hollinger International U.S. newspaper assets.

158.    Hollinger, Inc.'s 2001 Form 40-F filed with the Commission on or about May 22, 2002 contains the following disclosure regarding the non-competition payments:

In connection with the sales of United States newspaper properties in 2000, to satisfy a closing condition, Hollinger International, Lord Black and three senior executives entered into non-competition agreements with the purchasers pursuant to which each agreed not to compete directly or indirectly in the United States with the United States businesses sold to the purchasers for a fixed period, subject to certain limited exceptions, for aggregate consideration paid in 2001 of US $600,000 ($917,000). These amounts were in addition to the aggregate consideration paid in respect of these non-competition agreements in 2000 of US $15.0 million ($22.5 million). All such amounts were paid to Lord Black and the three senior executives. The independent directors of Hollinger International have approved the terms of these payments.

159.    Similar disclosures were made in Hollinger, Inc.'s 2002 Form 20-F and amended 2002 Form 20-F filed on or about June 27, 2003, and September 17, 2003, respectively. The disclosures in Hollinger, Inc.'s 2001 Form 40-F and 2002 Form 20-F

and amended 2002 Form 20-F contained misstatements and omissions of material fact for the reasons stated in paragraph 145(a)-(e), above. In addition, these disclosures failed to disclose that any purported non-competition payments were made to Hollinger, Inc., leading the reader to conclude that no non-competition payments were made to Hollinger, Inc. when, in fact, it received over $16 million in purported non-competition payments in connection with the sale of Hollinger International U.S. newspaper assets.

160.    Hollinger, Inc. knew or was reckless in not knowing that its 2002 proxy statement and its 2001 Form 40-F and 2002 Forms 20-F were materially false and misleading.

## THE CANWEST TRANSACTION

161.    On July 30, 2000, Hollinger International and its subsidiaries executed a transaction agreement to sell several of its Canadian newspapers to CanWest for a purchase price of approximately Cdn. $3.8 billion (approximately U.S. $2.6 billion), of which Cdn. $80 million (approximately U.S. $51.6 million) was allocated as consideration for non-competition agreements (the "CanWest transaction"). An amending agreement was executed at the time of closing on or about November 15, 2000.

162.    Hollinger, Inc., Ravelston, Black, Radler, Atkinson and Boultbee were not parties to the transaction agreement. However, Hollinger, Inc., Ravelston, Black, Radler, Atkinson and Boultbee were identified in the transaction agreement as parties to the non-competition agreement along with Hollinger International.

163.    Neither the asset purchase agreement nor the non-competition agreement specified that the Cdn. $80 million was to be paid to anyone other than the seller, Hollinger International.

164.     At no time did CanWest negotiate or specify an amount as to the value of the non-competition agreements, nor did CanWest specify that Ravelston or any of the individuals would receive any consideration allocated to the non-competition agreements.

165.     Black personally negotiated the CanWest transaction on behalf of Hollinger International.

166.     Black and Radler determined the amounts that were allocated to the various individuals and entities.

167.     CanWest did not request a non-competition agreement from Atkinson or Boultbee. Rather, Atkinson asked Black if he and Boultbee could be given "non-competition" payments to serve as bonuses for their work on the CanWest transaction. Black agreed to add Atkinson and Boultbee to the non-competition agreement so that they could be given "non-competition" payments to serve as bonuses for their work on the CanWest transaction.

168.     On or about July 25, 2000, the Hollinger International Board received a summary of the proposed CanWest transaction. The summary stated that "The purchase price was increased as a result of a reduction of Management Services Fees to be charged to Ravelston with respect to the ongoing management of the Newspaper Assets. Prior to closing, Ravelston and the Audit Committee will negotiate an appropriate sharing of such purchase price increase."

169.     The summary also included a reference to the non-competition agreements and stated that Ravelston, Hollinger, Inc., Black and Radler were required to execute non-competition agreements and that "consistent with prior transactions," the Audit Committee would negotiate what portion of the purchase price should be allocated

to the non-competition agreements prior to closing. The Audit Committee had not previously negotiated what portion of a purchase price would be allocated to a non-competition agreement, and it did not do so in the CanWest transaction.

170.     On July 26, 2000, Black confirmed that the Board had received the summary and made a general presentation about the CanWest transaction to the Hollinger International Board. The minutes reflect that Black stated that certain monetary allocations would be made to Ravelston and those parties required to sign non-competition agreements and that related party issues would be resolved prior to closing by the Audit Committee.

171.     The transaction agreement was signed on July 30, 2000. The CanWest transaction did not close and fund until November 2000.

### THE SEPTEMBER 2000 REPRESENTATIONS TO THE AUDIT COMMITTEE AND BOARD

172.     On or about September 1, 2000, Kipnis sent the Hollinger International Audit Committee a memorandum concerning the non-competition agreements in preparation for the September 11, 2000 Audit Committee meeting.

173.     The memorandum stated that "Conrad M. Black, F. David Radler, Hollinger International, Ravelston, Peter Atkinson, and Jack Boultbee have each been requested to execute non-competition agreements. The total portion of the purchase price allocated to the non-competition agreements is Cdn. $50 million, approximately 1.4% of the Cdn. $3.5 billion purchase price (allocated Cdn. $19 million each to Messrs. Black and Radler, Cdn. $4 million each to Hollinger and Ravelston, and Cdn. $2 million each to Messrs. Atkinson and Boultbee)."

174.    The memorandum also stated that Ravelston had a long-term management agreement in place with Hollinger International, that the CanWest purchase price was based upon earnings before income taxes, depreciation and amortization ("EBITDA"), and that during the negotiations, Ravelston had agreed to reduce its ongoing management fee by approximately $11 million and the CanWest purchase price was accordingly adjusted upward by approximately Cdn. $110 million. The memorandum proposed that Ravelston receive a purchase price allocation of Cdn. $30 million, approximately 0.9% of the purchase price, "in consideration for Ravelston reducing its management fee and consenting to CanWest having an early termination of its management arrangements."

175.    The CanWest payments were discussed at the September 11, 2000 Audit Committee meeting. Radler was present at and participated in this meeting.

176.    According to the minutes of the September 11, 2000 Audit Committee meeting, Kipnis told the Audit Committee that "the execution of a non-competition agreement by Messrs. Black and Radler, individually, was a requirement of CanWest and that CanWest originally insisted that Messrs. Black and Radler each receive Cdn. $26 million... Black and Radler negotiated Cdn. $12 million be reallocated to cover bonuses for senior management, which reallocations would save the Company additional bonus costs."

177.    Kipnis further informed the Committee that Ravelston "would be willing to reduce its service fees...which would have the effect of increasing the Canadian Group's EBITDA figure (thereby increasing the purchase price the Company would receive for the CanWest Transaction by 10 times the amount forgiven)" and would

be willing to waive the six month's notice it was entitled to under the Services Agreement and that in consideration for these concessions, Ravelston was requesting an early termination fee equal to approximately 0.9% (Cdn. $30 million) of the purchase price.

178.     Based on the September 11, 2000 memorandum and meeting, the Audit Committee approved the fairness of the non-compete allocations and "early termination fee."

179.     The Cdn. $50 million non-competition payment and Cdn. $30 million "early termination" fee were subsequently presented to the Board by Audit Committee Chairman James R. Thompson ("Thompson"). Radler was present at this meeting. Based upon the Audit Committee's recommendation, the Board approved the fairness of these allocations.

180.     The September 11, 2000 Audit Committee and Board approval of the non-competition payments were based on misstatements and omissions of material fact, because, among other things:

(a)     CanWest did not demand non-competition agreements from Atkinson or Boultbee and the payments to Atkinson and Boultbee were bonuses;

(b)     CanWest did not specify an amount as to the value of the non-competition agreements;

(c)     The amounts allocated to the various individuals and entities were not determined by CanWest but by Black and Radler;

(d)     CanWest did not demand that Ravelston or the individuals receive any money or any specific amounts of money as a non-competition payment; and

(e)     the explanation provided for the "early termination fee" to Ravelston was baseless.

181.     The CanWest transaction closed on or about November 15, 2000. Black and Radler each received approximately Cdn. $18.4 million (U.S. $11.9 million), Ravelston received approximately Cdn. $40.9 million (U.S. $26.3 million) and Atkinson and Boultbee each received approximately Cdn. $2.0 million (U.S. $1.3 million) in non-competition payments. These amounts included an additional (aggregate) Cdn. $1.7 million (U.S. $1.1 million) in interest payments calculated from the initial July 30, 2000 transaction agreement.

182.     Black began the December 4, 2000 Hollinger International Board meeting with a brief summary of the concluded CanWest transaction. He also presented to the Board a resolution approving and adopting the minutes of the September 11, 2000 Board meeting as accurately reflecting the meeting. Radler was also present at this meeting.

183.     Black and Radler did not disclose that there were any errors in the information provided to the Audit Committee or Board in September 2000. The Board approved the September 11, 2000 Board minutes at the December 4, 2000 Board meeting.

### THE MAY 2001 REPRESENTATIONS TO
### THE AUDIT COMMITTEE AND BOARD

184.     Hollinger International did not disclose the CanWest non-competition payments in its 2000 Form 10-K filed on or about April 2, 2001 or in its 2001 Proxy statement filed on or about March 27, 2001.

185.    In a memorandum dated May 1, 2001, Hollinger International's Board was informed that "in a number of inadvertent respects" the September 11, 2000 materials "did not reflect the documentation for the CanWest Transaction" because it "could be deemed to imply that Non-Competition Consideration received by certain individuals was in lieu of compensation and that the Non-Competition Consideration received by Ravelston was an 'early break fee' in respect of its management services agreement with the Corporation and its principal Canadian subsidiary."

186.    The memorandum stated that the Transaction Agreement "established an amount of Cdn. $80 million as consideration for the receipt by CanWest of non-competition agreements.  No allocation of the Non-Competition Consideration among the recipients was made by CanWest."   The memorandum further stated that "[t]he Non-Competition Consideration was allocated by the recipients among Ravelston and the other Obligors on what they determined to be a fair and appropriate basis under the circumstances" and that Ravelston received Cdn. $38 million, Black and Radler received Cdn. $19 million and Atkinson and Boultbee received Cdn. $2 million.

187.    According to the memorandum, "[T]he Non-Competition Consideration paid by CanWest to the individual Obligors does not, and because it was paid by CanWest cannot, have the character of compensation to the recipients thereof contrary to a comment which so suggests in the September 11th Audit Committee meeting."

188.    The memorandum also stated that the "Non-Competition Consideration paid by CanWest to Ravelston does not represent any compromise of rights or entitlements of Ravelston pursuant to its existing Management Services

Agreements with the Corporation or its subsidiaries contrary to the discussion thereof in the minutes of the September 11th meetings" and that the minutes and memorandum "incorrectly characterized the Non-Competition Consideration received by Ravelston as an 'early break fee.'" The memorandum advised that "[n]o amendment or termination of these Management Services Agreements was made or contemplated as a consequence of the CanWest transaction. The management fee for the year 2000 was established early in 2000 as Cdn. $18.5 million and this amount was paid without reduction."

189.    The memorandum finally requested that the Audit Committee conclude that the non-competition consideration was fair under the circumstances because, among other things, "the delivery of the non-competition agreements by the Obligor was a critical condition of the completion of the Corporation's sale to CanWest" and "the Non-Competition Consideration was established in the Transaction Agreement and reflected the value attributed by CanWest to the Obligors' non-competition agreements."

190.    Black and Radler received and reviewed the May 1, 2001 memorandum.

191.    The May 1, 2001 memorandum corrected some of the misstatements and omissions in the September 11, 2000 representations, but it, too, contained misstatements and omissions of material fact because, among other things:

(a)    CanWest did not request non-compete agreements from Boultbee and Atkinson and the payments to Atkinson and Boultbee did have the character of compensation;

(b)     the non-competition consideration did not reflect the value attributed by CanWest to the non-competition agreements because CanWest did not specify an amount as to the value of the non-compete agreements, or that any payment would be made to Ravelston or any individuals for their agreement to not compete;

(c)     the memorandum failed to disclose that the individuals and Ravelston received Cdn. $1.7 million in interest on the non-competition payments; and

(d)     it falsely characterized the misrepresentations on September 11, 2000 as "inadvertent."

192.     Based upon the information in the May 1, 2001 memorandum, the Audit Committee and Board both ratified the fairness of the payments on May 17, 2001.

193.     Radler attended the May 17, 2001 Audit Committee meeting.  Black and Radler both attended the Board meeting.  Black and Radler did not correct any of the misrepresentations or omissions of material fact in the May 1, 2001 memorandum.

### MISSTATEMENTS AND OMISSIONS IN HOLLINGER INTERNATIONAL'S FILINGS REGARDING THE CANWEST NON-COMPETITION PAYMENTS

194.     Hollinger International first disclosed the non-competition payments made in connection with the CanWest transaction in its Form 10-Q for the quarter ended March 31, 2001, which provided:

> Also, as required by CanWest as a condition to the transaction, Ravelston, Hollinger Inc. and Messrs. Black, Radler, Boultbee and Atkinson, entered into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to CanWest for a five year period, subject to certain limited exceptions, for aggregate consideration received by Ravelston and the executives of Cdn. $80 million ($53 million) paid by CanWest in addition to the purchase price referred to above, consisting of Cdn. $38 million paid to Ravelston, Cdn. $19 million paid to Mr. Black, Cdn. $19

million paid to Mr. Radler, Cdn. $2 million paid to Mr. Boultbee and Cdn. $2 million paid to Mr. Atkinson.

195.      Hollinger International's 2001 Form 10-K contained similar

disclosures regarding the CanWest non-competition agreements:

> Also, as required by CanWest as a condition to the transaction, the Company, Ravelston, Hollinger Inc., Lord Black and three senior executives entered into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian business sold to CanWest for a five-year period, subject to certain limited exceptions, for aggregate consideration of Cdn. $80 million ($53 million) paid by CanWest in addition to the purchase price referred to above of which Cdn. $38 million ($25.2 million) was paid to Ravelston and Cdn. $42 million ($27.8 million) was paid to Lord Black and the three senior executives. The Company's independent directors have approved the terms of these payments.

196.      Hollinger International's 2002 Form 10-K filed on or about March 31,

2003 also contained similar disclosures concerning the CanWest transaction:

> Further, CanWest required as a condition to the transaction that the Company, Ravelston, Hollinger Inc., Lord Black and three senior executives entered into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian business sold to CanWest for a five-year period, subject to certain limited exceptions, for aggregate consideration of Cdn. $80 million ($53 million) paid by CanWest in addition to the purchase price referred to above of which Cdn. $38 million ($25.2 million) was paid to Ravelston and Cdn. $42 million ($27.8 million) was paid to Lord Black and the three senior executives. The Company's independent directors approved the terms of these payments.

> and

> Further, CanWest required as a condition to the transaction, that the Company, Ravelston, Hollinger Inc., Lord Black and three senior executives enter into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to CanWest for a five-year period, subject to certain limited exceptions, for aggregate consideration of Cdn. $80,000,000 ($53,000,000) paid by CanWest in addition to the purchase price referred to above. Of that consideration, Cdn. $38,000,000 ($25,200,000) was paid to Ravelston and Cdn. $42,000,000 ($27,800,000) was paid to Lord Black and the three senior executives. The Company's independent directors approved the terms of these payments.

197.     Hollinger International's Form 10-Q for the quarter ended March 31, 2001 and its 2001 and 2002 Forms 10-K contained misstatements and omissions of material fact because, among other things:

(a)     The Cdn. $80 million non-competition payment was not made "in addition" to the purchase price; rather, it was allocated from the purchase price and thus reduced the amount of the total purchase price received by Hollinger International;

(b)     CanWest never required that Boultbee or Atkinson enter into non-competition agreements. Rather, Black included them at Atkinson's request in order to pay them tax-free bonuses;

(c)     The disclosures lead the reader to conclude that CanWest required the payment of these amounts to Ravelston and the individuals. However, CanWest did not determine the amount of the non-competition payment, the amount to be paid to Ravelston and the individuals, or that any amount would be paid to Ravelston or any individuals;

(d)     The disclosures also failed to include that additional interest totaling Cdn. $1.7 million was received by the individuals and Ravelston;

(e)     The specific amounts of money received by the individuals in Canadian dollars were incorrect; and

(f)     The disclosures failed to state that the Board's "approval" was based upon misstatements and omissions of material fact.

198.     Black and Radler knew or were reckless in not knowing that Hollinger International's 2001 and 2002 Forms 10-K and Form 10-Q for the quarter ended March

31, 2001 were materially false and misleading because they contained the misstatements

and omissions of material fact discussed above.

## MISSTATEMENTS AND OMISSIONS DURING HOLLINGER
## INTERNATIONAL'S MAY 2002 SHAREHOLDER MEETING

199.     During an annual Hollinger International shareholder meeting held in

May 2002, at which Radler was present, Black made the following statements about the

CanWest non-competition payments:

> Mr. Asper demanded that there be a non-compete arrangement and
> effectively the independent directors of this company determined that
> since he wished — that it was something that he was paying valuable
> consideration for and some of that should come to us and not to this
> company. And that was not a matter negotiated directly by us.

> . . . we leave the determination of these matters in the hands of
> disinterested people, who do, as I said in my remarks, conduct whatever
> analysis they think is appropriate. It's not for us to tell them what to do. . .

> [CanWest] attached significant commercial value to a non-compete
> agreement with us. Not with [Hollinger] . . . . And, I accept that there's a
> conundrum as to the division between the company's interest and our own
> in a thing like that, so we effectively handed it to the independent directors
> to determine, stayed above the 10 times multiple, shrunk our own
> incomes, undoubtedly saved all of the shareholders a tremendous
> inconvenience by doing these deals that have enable this company to sail
> relatively painlessly through a difficult time. . . .

> And in all of the circumstances, the independent directors felt this was the
> fair thing to do and I must say, I agree. . . .

> You're dealing with a best efforts attempt to accommodate to industry
> practice and do what's equitable as determined by independent directors
> who are as a group quite a distinguished group.

200.     During that meeting, Black also told Hollinger International's

shareholders that the non-competition payments in the CanWest transaction did not

reduce the amount of money paid to Hollinger International, stating:

[t]he answer is that it was in our opinion not[,] technically speaking[,] a reduction of the compensation paid to this company. The consideration was not reduced there by the acquirer in the principle case that you're referring to, the CanWest deal. …Now the issue of it and the extent to which it was an allocation of ultimate purchase price was factored into the overall negotiations, starting from the premise of a 10 times multiple.

201.     Contrary to Black's statements to Hollinger International's shareholders:

(a)     the non-competition payments were not negotiated by the Audit Committee; rather, Black and Radler determined the amounts of the payments and to whom they would be made;

(b)     all, not "some," of the non-competition consideration was paid to Black, Radler, Ravelston and the other individuals; none of it was retained by Hollinger International;

(c)     CanWest did not specify the amounts of the non-competition payments or that Ravelston or the individuals should receive non-competition payments;

(d)     The "approval" of the payments by Hollinger International's Audit Committee and Board was based on misstatements and omissions of material fact; and

(e)     the non-competition payments reduced the sale proceeds to Hollinger International by approximately U.S. $53 million.

202.     Black and Radler knew or were reckless in not knowing that Black's statements to Hollinger International's shareholders were materially false and misleading.

## THE DIVERSION OF HOLLINGER INTERNATIONAL NEWSPAPERS TO HORIZON

203.     As part of their scheme to defraud, Black and Radler also diverted newspaper assets from Hollinger International to their privately-held corporation, Horizon.

204.     Among other things, Horizon engaged in a transaction with Hollinger International in which it received a newspaper for $1 after Black and Radler misled the Hollinger International Audit Committee and Board about the paper's worth and the existence of other buyers.  In addition, in at least one instance, Black and Radler caused Horizon to obtain newspapers without any review by the Hollinger International Board or Audit Committee.

205.     Black and Radler also made misstatements and omissions of material fact regarding these transactions in Hollinger International's filings with the Commission.

### THE BISHOP/BLACKFOOT ASSIGNMENT

206.     In September 2000, Hollinger International sold newspaper properties located in Bishop Lakes, California ("Bishop") and Blackfoot, Idaho ("Blackfoot") to Horizon through a pre-arranged assignment from CNHI (the "Bishop/Blackfoot Assignment").

207.     By obtaining these newspapers through an assignment from CNHI, Black and Radler circumvented the review of this related party transaction by Hollinger International's Audit Committee and Board.

208.     In May 2000, Morgan Stanley, who was assisting Hollinger International in selling its newspapers, advised Hollinger International that the Bishop and Mammoth Lakes ("Mammoth") newspapers should be considered one unit for purposes of selling the papers.  The papers were in close proximity and Bishop's printing facility was used to print the Mammoth paper.

209.    On or about July 27, 2000, Hollinger International received an offer to purchase Mammoth and Bishop for $3 million, plus another possible $1 million contingent on the profits of the papers.

210.    On August 2, 2000, a representative of Hollinger International told the potential purchaser that its offer could not be accepted because "[a] company affiliated with Hollinger decided to purchase Bishop…" The representative also stated that this affiliated company decided not to buy Mammoth Lakes because of other commitments.

211.    In September 2000, Bishop (but not Mammoth) was sold to Horizon through CNHI in the CNHI II transaction. However, CNHI had not sought to purchase the Bishop and Blackfoot papers as part of the CNHI II transaction.

212.    At Radler's direction, CNHI was solicited to accept the Bishop and Blackfoot newspapers as part of the CNHI II transaction whereby pursuant to an assignment clause, CNHI would assign those papers to Horizon. CNHI agreed to do the assignment so long as it had no obligation to pay for and keep the properties.

213.    Provisions were added to the CNHI II asset purchase agreement wherein Bishop and Blackfoot were included among the properties to be purchased by CNHI but CNHI could prior to the closing, assign its rights and obligations with respect to Bishop and Blackfoot. While the total purchase price in the contract was listed as $95.2 million, including Bishop and Blackfoot, CNHI was to pay, after the assignment, only $90 million, leaving the remaining $5.2 million to be paid by the assignee.

214.    On September 15, 2000, Hollinger International's Executive Committee, consisting of Black, Radler and Perle, approved the disposition of assets to

CNHI for an aggregate purchase price of approximately $90 million after assignment by CNHI to Horizon of the right to acquire the Bishop and Blackfoot properties.

215.     CNHI and Hollinger International closed the deal at the end of September 2000. CNHI assigned Bishop and Blackfoot to Horizon. However, Horizon paid only $4.1 million to Hollinger International, and not the $5.2 outlined in the CNHI purchase agreement.

216.     Prior to the transaction, there was no disclosure to the Audit Committee or Board that Bishop and Blackfoot would be sold to Horizon.

217.     Several months later, on December 4, 2000, Black presented the September 15, 2000 Executive Committee approval of the CNHI II transaction to the Board for ratification. Radler was present at the Board meeting.

218.     Black and Radler failed to disclose to the Board and Audit Committee that the Bishop and Blackfoot properties had been assigned to Horizon as part of the CNHI II transaction. They also failed to disclose that another purchaser had offered $3 million for the Mammoth and Bishop properties.

219.     Although the Board minutes purport to incorporate by reference the September 15, 2000 Executive Committee consents, the Board was not given a copy of the consents. Thus, the Bishop and Blackfoot assignment to Horizon was never presented to the Audit Committee or Board.

220.     Black disclosed in his response to Hollinger International's 2001 proxy questionnaire that he "indirectly through Conrad Black Capital Corporation, a stockholder of a privately held company, Horizon Publications, Inc., which through its

subsidiaries: (i) acquired the right from Newspaper Holdings, Inc. (*an unaffiliated party*) to purchase newspaper assets from the company...."

221.     Radler disclosed in his response to Hollinger International's 2001 proxy questionnaire that he "indirectly through F.D. Radler Ltd., a stockholder of a privately held company, Horizon Publications, Inc., which through its subsidiaries (i) acquired the right from Newspaper Holdings, Inc. *an unaffiliated party*, to purchase newspaper assets from the company...."

222.     Black's and Radler's responses failed to disclose that they decided to purchase Bishop and Blackfoot for Horizon prior to the CNHI II transaction and that Radler had arranged for CNHI to act as a mere conduit to convey the properties to Horizon as part of the CNHI II transaction. They also failed to disclose that they paid less than the value assigned to the properties in the CNHI II asset purchase agreements and that the assignment was never presented to the Audit Committee or Board for review and approval.

### MISSTATEMENTS AND OMISSIONS IN HOLLINGER INTERNATIONAL'S FILINGS REGARDING THE BISHOP AND BLACKFOOT TRANSACTIONS

223.     Hollinger International disclosed the Bishop/Blackfoot assignment in its 2001 proxy statement, which stated:

> Effective November 1, 2000, Horizon acquired two properties in California and Idaho in a transaction valued at approximately $4.1 million. The Company had previously contracted to sell such properties to Newspaper Holdings, Inc. as part of a larger transaction, but conveyed title to those two properties directly to Horizon pursuant to an assignment to Horizon from Newspaper Holdings, Inc.

224.    The proxy statement described Horizon as "a company formed by a former Vice President of American Publishing and having certain members of the Board of Directors and senior management of the Company as shareholders."

225.    This proxy statement was incorporated by reference into Hollinger International's 2000 Form 10-K.

226.    The disclosure regarding the Bishop and Blackfoot transaction contained misstatements and omissions of material fact because, among other things, it: (a) stated that Hollinger International had previously contracted to sell the properties to CNHI, when in fact Radler arranged for CNHI to act as a mere conduit to convey the properties to Horizon; (b) failed to disclose that the assignment was never presented to the Audit Committee or Board for review and approval; (c) failed to disclose that Bishop and Blackfoot were valued at $5.2 million in the CNHI II asset purchase agreement; and (d) failed to specifically state that Horizon was owned and controlled by Radler and Black.

227.    Black and Radler knew or were reckless in not knowing that Hollinger International's 2001 proxy statement and 2000 Form 10-K were materially false and misleading because they contained the misstatements and omissions of material fact discussed above.

### THE MAMMOTH TIMES

228.    On August 1, 2001, Black and Radler, through Horizon, purchased Mammoth for $1.00 and no working capital adjustment, and secured the more valuable pairing of Bishop and Mammoth.

229.     Hollinger International had purchased Mammoth in 1999 for $1.75 million.

230.     In May 2000, Morgan Stanley advised Hollinger International that following its acquisition of Mammoth in 1999, Mammoth generated revenue of $400,000 and EBITDA of nearly $27,000 through the end of the year. Morgan Stanley also stated that although this represented an EBITDA margin of only 6%, margins were expected to grow to 20% in 2000 with revenues of over $1.7 MM.

231.     As discussed above, on July 27, 2000, Hollinger International had received a previous offer for Mammoth and Bishop for $3 million, plus another possible $1 million contingent on the operating profits of the papers.

232.     Black and Radler knew that there was an offer for Mammoth for over $1 million. On August 1, 2000, a few days after the offer, Radler, in a memorandum to Black and others, stated there was a possible $2 million sale for "Monmouth"[sic].

233.     In the August 2, 2000 letter rejecting its offer to purchase both Bishop and Mammoth, the potential purchaser was told by a representative of Hollinger International that "Mammoth has great potential, but is too far from our office to allow for much managerial involvement, and therefore we are going to sell it as a stand-alone property. This property is budgeted to generate revenues of $1.766MM in 2000 with an operating margin of approximately $325,000. There are a lot of efficiencies to be realized at this property which have not been realized as yet."

234.     In November of 2000, the same potential purchaser sent another letter offering to purchase only Mammoth for $1.25 million.

235.     The Mammoth transaction was not reviewed by the Audit Committee or Board prior to the closing date in August of 2001. The Mammoth transaction was presented to the Audit Committee for ratification on September 10, 2001, after the transaction had closed.

236.     Radler attended the September 10, 2001 Audit Committee meeting, and directly or through one of his assistants, reported that Mammoth was sold for $1 and that Mammoth lost $70,000 the year before the sale and $6,000 the month before the sale. The Audit Committee was also told that there were no other buyers found. The Audit Committee then ratified the sale of Mammoth to Horizon for $1.00.

237.     At a Board meeting held that same day, Thompson reviewed the "disposition of the Mammoth Times," and referred the Board to the resolutions that stated that Mammoth was being sold for $1.00 and that it lost $70,000 the year before the sale and $6,000 the month before the sale. The Board confirmed and approved the Audit Committee's ratification of the Mammoth transaction.

238.     Black and Radler were present at the September 10, 2001 Board meeting. Black and Radler did not inform the Audit Committee or Board of the full prospects for the paper or that there had been another buyer willing to pay $1.25 million for the paper.

## THE SKAGIT VALLEY ARGUS AND SAN JUAN JOURNAL TRANSACTIONS

239.     On or about May 1, 2000 (effective March 31, 2000), Horizon purchased from Hollinger International The Skagit Valley Argus ("Argus") and The Journal of the Island of San Juan ("San Juan Journal") newspaper publications for $1.00 "plus or minus a working capital adjustment."

240.     On or about February 1, 2000, one of Radler's assistants sent Hollinger International's Audit Committee a memorandum recommending the disposition of the Argus, San Juan Journal and another paper to Horizon.

241.     The February 1, 2000 memorandum stated that the San Juan Journal had lost $63,000 the previous year and was unlikely to meet its budget for the year 2000. The memorandum further stated that the Argus had lost a considerable amount of money for each of the last few years and should be closed or sold. The memorandum stated that a loss of approximately $215,000 could be expected for the three papers together in 2000, and that even that would be a big achievement. It further stated that it was in the best interests of Hollinger International to accept the offer from Horizon to acquire these papers for the "value of the working capital" and that the proposed transaction would save the cost of severance and undesired publicity of closing newspapers.

242.     However, seven months earlier, in July 1999, Radler received a memorandum from the same assistant discussing these papers in a more favorable light. That memorandum stated that the San Juan Journal was "coming along nicely," that the "EBITDA has improved from a loss of $40,000 last year to a profit of $27,000 this year," and that there was no need to "discuss major changes to this operation at this time." The memorandum also stated that the Argus' losses had increased from the prior year but attributed some of this result to poor management and discussed possibly acquiring a neighboring publication to solve the newspaper's problems. The memorandum stated that "if we are to make a go of the Skagit Valley Argus, the combination of our activity together with the [neighboring publication] will give us a revenue base of approximately $1.5 million."

243.    The Argus and San Juan Journal transactions were presented to the Audit Committee and Board on February 22, 2000. Radler attended the Audit Committee meeting on February 22, 2000. Radler's assistant recommended "the proposed disposition of three (3) losing papers to Horizon Publications Inc. for the value of their working capital" to the Audit Committee. The Audit Committee approved the transfer of these papers to Horizon.

244.    Black and Radler were present at a Board meeting later that same day at which Thompson presented the Audit Committee's approval of the sale of these newspapers to Horizon to the Board. The Board and Audit Committee were not told of the full prospects for the newspapers.

245.    In late April 2000, another potential purchaser made an offer to buy the assets of the San Juan Journal at a purchase price equal to one times revenue. The San Juan Journal's revenue was approximately Cdn. $1.1 million in 1999. This offer was made after the transaction with Horizon was first presented to the Audit Committee but before the Argus and San Juan Journal sale to Horizon closed.

246.    The transaction closed on or about May 1, 2000. A negative working capital adjustment resulted in Hollinger International owing Horizon approximately $162,000 to take the papers from Hollinger International.

247.    In or about October 2000, Horizon sold the Argus to Skagit Valley Publishing. On information and belief, the Argus was sold for approximately $450,000.

248.    The Argus and San Juan Journal dispositions were again presented to the Audit Committee for ratification in February 2001, several months after the transaction had closed. Radler was present at the February 2001 Audit Committee

meeting. During the meeting, one of Kipnis's assistants presented for approval the "small dispositions" of the "Saagit [sic] Valley Argus . . . and the Journal of the San Juan Islands," for a purchase price of "$1 plus or minus working capital adjustments." The Audit Committee was told that "each [was] a cash flow drain and [that] we believe that fair market value was obtained."

249.     The Audit Committee was not told that a negative working capital adjustment resulted in Hollinger International owing Horizon approximately $162,000 to take the papers from Hollinger International; that an alternate buyer had offered to buy the San Juan Journal for a significant sum prior to the closing of the transaction; or that Horizon sold the Argus for approximately $450,000 in October 2000.

250.     The Audit Committee "approved and ratified" the sale of the Argus and San Juan Journal to Horizon.

### MISSTATEMENTS AND OMISSIONS IN HOLLINGER INTERNATIONAL'S FILINGS REGARDING THE MAMMOTH, SKAGIT VALLEY ARGUS AND SAN JUAN JOURNAL TRANSACTIONS

251.     The Argus and San Juan Journal transactions were not disclosed in Hollinger International's 2000 Form 10-K.

252.     Hollinger International's 2001 proxy statement stated only that Hollinger International had "sold the stock of Westbourne Investments, Inc. to Horizon," and failed to disclose material facts regarding the transactions because it failed to describe the transaction with any specificity and for the reasons stated below.

253.     The Mammoth, Skagit Valley Argus and San Juan Journal transactions were disclosed in Hollinger International's proxy statement filed on or about April 2, 2002, which stated:

The Company consummated two transactions with Horizon Publications Inc., a company formed by a former Vice President of American Publishing Company and controlled by certain members of the Board of Directors and senior management of the Company as shareholders, which were unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions. American Publishing Company transferred assets in Saagit [sic] Valley and San Juan Islands, Washington and Mammoth Lakes, California in exchange for net working capital.

254. The disclosure contained misstatements and omissions of material fact regarding the transactions because, among other things:

(a) The Mammoth sale was for $1, not net working capital;

(b) it failed to disclose that Hollinger International's Board and Audit Committee were falsely told that the newspapers were of little value in the market, when, in fact, they were economically viable;

(c) it failed to disclose that third parties had offered significant sums for these properties and that the Board and Audit Committee were not made aware of these offers to purchase the papers; and

(d) it failed to disclose that the "net working capital" adjustment in the sale of the Skagit Valley Argus and San Juan Journal resulted in Hollinger International owing Horizon approximately $162,000 to take the newspapers; and

(e) it failed to specifically state that Horizon was owned and controlled by Radler and Black.

255. This proxy statement was incorporated by reference into Hollinger International's 2001 Form 10-K.

256. Black and Radler knew or were reckless in not knowing that Hollinger International's 2002 proxy statement and 2001 Form 10-K were materially false and

misleading because they contained the misstatements and omissions of material fact discussed above.

## HOLLINGER INTERNATIONAL'S INVESTMENT IN TRIREME ASSOCIATES LLC

257.     From approximately October 2002 through December 2002, Black and Perle, a Hollinger International director and member of Hollinger International's Executive Committee, negotiated an investment by Hollinger International in Trireme Associates LLC, the general partner of a venture capital fund known as Trireme Partners LP (the "Trireme investment").   On December 25, 2002, Perle executed a subscription agreement purportedly committing Hollinger International to invest $25 million in Trireme Associates LLC.

258.     The investment was scaled back to $2.5 million.  On February 12, 2003, Black authorized Atkinson to sign a commitment on behalf of Hollinger International to invest $2.5 million in Trireme Associates LLC with the possibility of further investment up to $25 million.

259.     Prior to the investment, Black was informed by Atkinson that the Trireme investment would require the approval of the independent directors of Hollinger International.

260.     Black ignored this advice and authorized the Trireme investment without seeking or obtaining approval from Hollinger International's Board or Audit Committee.

261.     Hollinger International transferred $2.5 million to Trireme Associates LLC on or about March 28, 2003.

262.     At the time of the investment, Trireme Associates LLC, as general partner of Trireme Partners LP, was to receive 20% of the profits of Trireme Partners LP ("the Distribution") after repayment of invested capital. The Distribution was to be made to holders of Trireme Associates LLC Class B units. As a result of the investment, Hollinger International held 25% of the Class B units. The remaining 80% of the profits of Trireme Partners LP was to be distributed to Trireme Associates LLC and the limited partners of Trireme Partners LP based upon their invested capital.

263.     At the time of the Trireme investment, Perle, who was a Hollinger International director, Executive Committee member and Co-Chairman of Hollinger International's subsidiary, Hollinger Digital, was also an equity holder in Trireme Associates LLC holding an approximate 5% interest in the Distribution to Trireme Associates LLC.

264.     Trireme Management LLC, the designated manager of Trireme Partners LP, was to receive a management fee from Trireme Partners LP. Perle was a member of management of Trireme Management LLC.

265.     At the time of the investment, Black and another Hollinger International director, Kissinger, were members of the Strategic Advisory Board of Trireme Partners LP.

266.     The Trireme investment was a related party transaction that required approval from the outside directors on Hollinger International's Board or its Audit Committee.

## MISSTATEMENTS AND OMISSIONS IN HOLLINGER
## INTERNATIONAL'S FILINGS REGARDING
## THE TRIREME INVESTMENT

267.    In March 2003, Hollinger International filed its 2003 proxy statement for its annual shareholder meeting on May 22, 2003. The proxy statement did not contain any disclosure concerning the Trireme investment.

268.    Similarly, Hollinger International's 2002 Form 10-K, which was filed on or about March 31, 2003, after the investment was made, did not contain any disclosure concerning the Trireme investment.

269.    Hollinger International first disclosed the Trireme investment in its Form 10-Q for the quarter ended March 31, 2003, which stated: "[d]uring the quarter, the Company made a venture capital investment of $2.5 million in a fund in which a director of the Company has a minority interest."

270.    In its Form 10-Q for the quarter ended June 30, 2003, Hollinger International again discussed the Trireme investment, stating:

> During the first quarter of 2003, the Company made an investment of $2.5 million in a limited liability company in which a director of the Company is a principal and has a minority interest. The funds invested are to be used for a subsequent investment in a venture capital limited partnership.

271.    Both of these disclosures misstated and omitted to state material facts because, among other things, they did not identify the investment by name, did not identify the director who had an interest in the fund, did not disclose Black's or Kissinger's involvement in Trireme, and did not disclose that the investment was not reviewed or approved by Hollinger International's Audit Committee or the independent members of Hollinger International's Board.

272.     Black certified Hollinger International's Forms 10-Q for the quarters

ended March 31, 2003 and June 30, 2003 pursuant to the Section 302 of the Sarbanes-

Oxley Act of 2002. He also certified Hollinger International's 2002 Form 10-K.

273.     Black knew or was reckless in not knowing that Hollinger

International's 2002 Form 10-K and Forms 10-Q for the quarters ended March 31, 2003

and June 30, 2003 were materially false and misleading for the reasons stated above.

**THE SPECIAL COMMITTEE INVESTIGATES**

274.     On or about June 17, 2003, after other Hollinger International

shareholders raised allegations of unauthorized transfers of corporate assets, Hollinger

International's Board established a Special Committee of independent directors (the

"Special Committee") to investigate possible misconduct, initiate and prosecute litigation

based on its investigation, recover misappropriated assets, and protect the interest of all

Hollinger International shareholders.

275.     On November 6, 2003, the Special Committee sent letters to Black,

Radler, Atkinson and Boultbee requesting information concerning each non-competition

payment made in connection with the American Trucker, CNHI I, Horizon, CNHI II,

Forum, Paxton and American Publishing Company transactions and informing them that

the Special Committee was not aware of any form of proper authorization for the transfer

of these funds out of Hollinger International.

276.     In a letter dated November 10, 2003, Black, through his counsel,

provided his version of how the non-competition payments were made. Black also

proposed that Hollinger International's Board should engage in a strategic process to

evaluate proposals for a range of financial alternatives, including the sale of some or all of Hollinger International's assets, and should announce the process to the public.

277.    Hollinger International's Board decided to engage in a strategic process in order to evaluate Hollinger International's alternatives to sell some or all of its assets ("the Strategic Process"). Black and Hollinger International made a formal contract to address Black's obligations with respect to the non-competition payments and the Strategic Process.

278.    In a Restructuring Proposal executed on November 15, 2003, Black admitted that the $16.55 million in non-competition payments paid to Hollinger, Inc. and the $7.2 million that Black and Radler received "was not properly authorized on behalf of the Company." Black agreed to repay Hollinger International the full amount that he received, and to seek repayment from Hollinger, Inc. of the amounts it received.

279.    Black also agreed that he would resign as CEO of Hollinger International but would stay on as Chairman and "devote his principal time and energy to pursuing the Strategic Process with the advice and consent of the Executive Committee and Board;" and that "during the pendency of the Strategic Process, in his capacity as the majority stockholder of [Hollinger, Inc.], [he] will not support a transaction involving ownership interests in [Hollinger, Inc.] if such transaction would negatively affect [Hollinger International's] ability to consummate a transaction resulting from the Strategic Process unless the [Hollinger, Inc.] transaction [was] necessary to enable [Hollinger, Inc.] to avoid a material default or insolvency. In any such event, [he] shall give the Company as much advance notice as reasonably possible of any such proposed [Hollinger, Inc.] transaction."

## BLACK CONTINUES TO MISLEAD THE PUBLIC

280.     On November 17, 2003, Hollinger International issued a press release ("the November 17, 2003 Press Release"). Among other things, the press release announced the Special Committee's then-current findings concerning its investigation.

281.     The press release stated that a total of $32.15 million in payments styled as "non-competition payments" were made to Hollinger, Inc., Black, Radler, Atkinson and Boultbee in connection with the sale of Hollinger International's U.S. newspaper properties that were not authorized or approved by either the Audit Committee or the full Board of Directors of Hollinger International. The press release also stated that Hollinger International's prior public disclosure regarding these matters was incomplete or inaccurate in some respects.

282.     The press release stated that the $16.55 million in payments to Hollinger, Inc. were not previously disclosed in the notes to Hollinger International's financial statements or in its filings with the Commission. The press release further stated that although the $15.6 million in payments to the four individuals were disclosed in Hollinger International's Form 10-K filed in March 2002, this prior disclosure stated that the payments in question had been authorized by the independent directors of the Board, which did not occur, and that the payments were made "to satisfy a closing condition," which was not accurate. In addition, $5.5 million of such payments were reported to have occurred in 2000 rather than in 2001, when such payments were actually made.

283.     The press release further announced that Black and Radler had agreed in writing to repay Hollinger International the full amount of unauthorized payments

received by them, with interest, and that Black had agreed to seek repayment in full from

Hollinger, Inc. of the amounts received by it, with interest, no later than June 1, 2004.

284.     The November 17, 2003 press release also announced the Strategic

Process.  The press release announced that Hollinger International's Board had retained

Lazard LLC to review and evaluate its strategic alternatives, including a possible sale of

Hollinger International, a sale of one or more of its major properties, or other possible

transactions.

285.     The November 17, 2003 Press Release further stated that:

(a)     Lord Conrad M. Black of Crossharbour... has advised the board
        that, in light of the Strategic Process, he will retire as [CEO] . . .
        and that he will devote his time and attention primarily to pursuing
        the Strategic Process.

(b)     Lord Black said: "Now is the appropriate time to explore strategic
        opportunities to maximize value for all shareholders of Hollinger
        International. We are delighted that Bruce Wasserstein and his
        team at Lazard will be working with us to ensure the market is well
        aware of the substantial value of [Hollinger International's] assets.
        Reflecting my full support of this process, I will be devoting my
        attention in coming months to achieving a successful outcome for
        all Hollinger shareholders. . . ."

(c)     Lord Black has also agreed that during the pendency of the
        Strategic Process, in his capacity as the majority stockholder of
        [Hollinger, Inc.], he will not support a transaction involving
        ownership interests in [Hollinger, Inc.] if such transaction would
        negatively affect [Hollinger International's] ability to consummate
        a transaction resulting from the Strategic Process unless any such
        transaction involving [Hollinger, Inc.] meets certain limited
        conditions, and after reasonable prior notice to Hollinger
        [International].

286.     Black assisted in the drafting of and approved the November 17, 2003

Press Release prior to its publication.  Black understood that the press release would

constitute a public disclosure of his intentions with respect to the Strategic Process as of November 17, 2003.

287.     When Black approved the November 17, 2003 Press Release, he was not and had no intention of devoting his time and attention primarily to pursuing the Strategic Process.

288.     The Barclays had for years been interested in purchasing Hollinger International's London Daily Telegraph, but Black had repeatedly rebuffed their offers.

289.     In or about September 1, 2003, David Barclay, in a letter to Black, renewed his interest in purchasing the Telegraph and, in connection with that, offered to discuss helping Hollinger, Inc. with its financing and becoming an investor in Hollinger, Inc. and suggested a meeting between Black and himself or his son, Aidan Barclay. Black responded that although he was willing to meet with the Barclays, the Telegraph was not for sale.

290.     On or about October 31, 2003, David Barclay again wrote to Black reaffirming his interest in the Telegraph and proposing to meet. On November 3, 2003, Black wrote back to David Barclay that the Telegraph was not for sale. However, on November 11, 2003, the day after he responded to the Special Committee's letter, Black wrote to David Barclay that Black had a "thought worthy of discussion."

291.     Shortly thereafter, during the week before the press release was issued, Black met with Aidan Barclay to discuss effectuating a transaction at the Hollinger, Inc. level which would allow the Barclays to control Hollinger International's Daily Telegraph newspaper. Black did not inform Hollinger International's Board of his dealings with the Barclays.

292.     As of November 15, 2003, the date that Black executed the Restructuring Proposal with Hollinger International, Black worked ceaselessly to effectuate a transaction to sell his interest in Hollinger, Inc. for his own benefit rather than for the benefit of all of Hollinger International's shareholders. As of November 15, 2003, Black was secretly negotiating to sell his interest in Hollinger, Inc. to the Barclays, among others.

293.     On January 17, 2004, Black unveiled a transaction with the Barclays which, if consummated, would have prevented Hollinger International from realizing the benefits of the Strategic Process by ending the process before the bidding had even begun. Black revealed that he and the Ravelston intended to enter an agreement with Press Holdings under which Press Holdings would purchase Ravelston's controlling interest in Hollinger, Inc. and make a tender offer to purchase all of the shares of Hollinger, Inc. (the "Barclay Transaction")

294.     On or about January 19, 2004, Hollinger International filed suit (the "Delaware Action") against Black, Hollinger, Inc. and Press Holdings to, among other things, obtain a preliminary injunction to prevent the Barclay Transaction and to prevent Black and Hollinger, Inc. from circumventing the Strategic Process.

295.     On February 26, 2004, following a three-day trial and based upon a voluminous evidentiary record, Vice Chancellor Strine issued a comprehensive 130-page decision finding in favor of Hollinger International and against Hollinger, Inc. and Black on all of the claims that were the subject of the evidentiary proceeding. Hollinger International, Inc. v. Conrad M. Black, 844 A.2d 1022 (Del Ch. 2004).

296.     Among other things, Vice Chancellor Strine found that from November 15, 2003 through at least January 18, 2004, Black, by and through Hollinger, Inc., "persistently and seriously" violated his fiduciary duties and the Restructuring Proposal to the detriment of International and its non-controlling, majority shareholders. Vice Chancellor Strine further found that "... on November 17, 2003, Black began to turn the Barclays away from their interest in a direct purchase of The Daily Telegraph and towards a purchase of [Hollinger,] Inc."

297.     Vice Chancellor Strine further found that "[s]tated bluntly, Black steered the Barclays toward doing an end-run around the Strategic Process . . . ." Vice Chancellor Strine concluded that ". . . .Black was supposed to be devoting his principal time and energy to direct the [Hollinger] International Strategic Process in order to maximize the value of the Telegraph and other assets owned by [Hollinger] International for all [Hollinger] International stockholders. Instead, he devoted his principal energy to crafting methods by which he could sell [Hollinger] Inc. to the Barclays and assure them that they would be able to stymie any sale of the Telegraph by International's board."

## COUNT I

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder

### (Defendants Black, Radler and Hollinger, Inc.)

298.        Paragraphs 1 through 297 are realleged and incorporated by reference herein.

299.        From at least 1999 through at least 2003, Defendants Black, Radler and Hollinger, Inc., in connection with the purchase and sale of Hollinger International's securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and course of business which operated or would operate as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of such securities.

300.        Defendants knew or were reckless in not knowing of the facts and circumstances described in paragraphs 298 and 299 above.

301.        The knowledge of Black and Radler is imputed to Hollinger, Inc.

302.        By reason of the activities described in paragraphs 298 through 301 above, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9] Thereunder

### (Defendants Black and Radler)

303. Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

304. From at least 1999 through at least 2003, Defendants Black and Radler, by the use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange or otherwise: solicited or permitted the use of their names to solicit proxies, consents, authorizations or notices of meetings in respect of Hollinger International's securities which contained statements which were false and misleading with respect to material facts or omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading and which failed to furnish information required under Exchange Act Rule 14a-3.

305. By reason of the activities described in paragraphs 303 and 304 above, Black and Radler violated Section 14(a) of the Exchange Act [15 U.S.C. §78n(a)] and Rules 14a-3 and 14a-9 [§§240.14a-3 and 240.14a-9] thereunder.

## COUNT III

**Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78t(a)]
and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,
and 240.13a-13] Thereunder by Black, Radler and Hollinger, Inc. as control persons
under Section 20(a) of the Exchange Act [15 U.S.C. § 20(a)]**

### (Defendants Black, Radler and Hollinger Inc.)

306. Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

307. From at least 1999 through at least 2003, Hollinger International, under the control of Black, Radler and Hollinger, Inc., directly and indirectly, failed to file or caused a failure to file with the Commission, in accordance with such rules and regulations that the Commission has prescribed as necessary and appropriate in the public interest and for the protection of investors, Hollinger International's annual and periodic reports on Forms 10-Q and 10-K and annual proxy statements, and also failed to include in those reports such further material information, as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

308. By reason of the activities described in paragraphs 306 and 307 above, Hollinger International violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] promulgated thereunder.

309. By reason of the activities described in paragraphs 306 through 308 above, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Black, Radler and Hollinger, Inc. are liable for Hollinger International's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] promulgated thereunder.

## COUNT IV

**Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
[15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(A)] by Black, Radler and Hollinger, Inc.
as Control Persons under Section 20(a) of the Exchange Act [15 U.S.C. § 20(a)]**

**(Defendants Black, Radler and Hollinger, Inc.)**

310.     Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

311.     From at least 1999 through at least 2003, Hollinger International, under the control of Black, Radler and Hollinger, Inc., directly and indirectly, failed to make and keep books, records, records and accounts, which in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Hollinger International.

312.     From at least 1999 through at least 2003, Hollinger International, under the control of Black, Radler and Hollinger, Inc., directly and indirectly, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements.

313.     By reason of the activities described in paragraphs 310 through 312 above, Hollinger International violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A) and 78m(b)(2)(A)] promulgated thereunder.

314.     By reason of the activities described in paragraphs 310 through 313 above, and pursuant to Section 20(a) of the Exchange Act, Black, Radler, and Hollinger, Inc. are liable for Hollinger International's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## COUNT V

### Violations of Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1]

### (Defendants Black, Radler and Hollinger, Inc.)

315. Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

316. From at least 1999 through at least 2003, Defendants Black, Radler and Hollinger, Inc., directly and indirectly, falsified or caused to be falsified books, records, and accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

317. By reason of the activities described is paragraphs 315 and 316 above, Black, Radler and Hollinger, Inc. violated Rule 13b2-1 [17 C.F.R. § 240.13b2-1] promulgated under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

## COUNT VI

### Violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]

### (Defendants Black, Radler and Hollinger, Inc.)

318. Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

319. From at least 1999 through at least 2003, Defendants Black, Radler and Hollinger, Inc. knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified books, records, and accounts described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

320.     By reason of the activities described in paragraphs 318 and 319 above, Black, Radler and Hollinger, Inc. violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## COUNT VII

### Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 13a-1 and 13a-16 [17 C.F.R. § 240.13a-1 and 17 C.F.R. § 240.13a-16] Thereunder

### (Defendant Hollinger, Inc.)

321.     Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

322.     Hollinger, Inc. failed to file or caused a failure to file with the Commission, in accordance with such rules and regulations that the Commission has prescribed as necessary and appropriate in the public interest and for the protection of investors, Hollinger, Inc.'s 2001 Form 40-F, 2002 Forms 20-F and 2002 proxy statement on Form 6-K, and also failed to include in those reports such further material information, as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

323.     Hollinger, Inc. failed to file with the Commission, in accordance with such rules and regulations that the Commission has prescribed as necessary and appropriate in the public interest and for the protection of investors, Hollinger, Inc.'s 2003 Form 20-F.

324.     By reason of the activities described in paragraphs 321 through 323 above, Hollinger Inc., violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]

and Rules 13a-1 and 13a-16 [17 C.F.R. §§ 240.13a-1 and 240.13a-16] promulgated thereunder.

## COUNT VIII

### Violations of Exchange Act Rule 13a-14
### [17 C.F.R. § 240.13a-14]

### (Defendant Black)

325.     Paragraphs 1 through 297 are realleged and incorporated by reference as if set forth in full herein.

326.     From at least March 31, 2003 until at least August 2003, Black certified Hollinger International reports filed on Forms 10-Q and Form 10-K pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 and Rule 13a-14 promulgated thereunder, stating that: he had reviewed each report; based upon his knowledge, the reports did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; and based upon his knowledge, the financial statements and information contained in each report fairly present in all material respects the financial condition, results of operations and cash flows of the issuer.

327.     Black knew or was reckless in not knowing that the reports he certified contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which the statements were made, not misleading.

328.     By reason of the activities described in paragraphs 325 through 327 above, Black violated Rule 13a-14 [17 C.F.R. § 240.13b2-1] promulgated under Section 302 of the Sarbanes-Oxley Act of 2002.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

### I.

Finding that each of the Defendants Black, Radler and Hollinger, Inc. committed the violations alleged above;

### II.

A.      Permanently enjoining Defendants Black and Radler from further violations of Sections 10(b), 13(b)(5) and 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78m(b)(5), and 78n(a)] and Rules 10b-5, 13b2-1, 14a-3 and 14a-9 [17 C.F.R. §§ 240.10b-5, 240.13b2-1, 240.14a-3 and 240.14a-9] thereunder, and, as control persons, Sections 13(a) and 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder;

B.      Permanently enjoining Defendant Black from further violations of Exchange Act Rule 13a-14 [17 C.F.R. §§ 240.13a-14]; and

C.      Permanently enjoining Defendant Hollinger, Inc. from further violations of Sections 10(b), 13(a), 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(5)] and Rules 10b-5, 13a-1, 13a-16 and13b2-1 [17 C.F.R. §§ 240.10b-5, 240.13a-1, 240.13a-16 and 240.13b2-1] thereunder and, as a control person, Sections 13(a) and 13(b)(2)(A), 13(b)(2)(B) and 14(a) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B), 78n(a)] and Rules 12b-20, 13a-1, 13a-13, 14a-3 and

14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13, 240.14a-3 and 240.14a-9] thereunder.

III.

Ordering each of the Defendants Black, Radler and Hollinger, Inc. to disgorge any ill-gotten gains and/or unjust enrichment realized by each of them, including the salaries defendants Black and Radler received from Ravelston during the period from at least 1999 through the end of their employment with Hollinger International, plus prejudgment interest thereon;

IV.

Ordering each of the Defendants Black, Radler and Hollinger, Inc. to each pay an appropriate civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

V.

Barring Defendants Black and Radler from serving as an officer or director of any issuer required to file reports with the Commission under Sections 12(b), 12(g), or 15(d) of the Exchange Act [15 U.S.C. §§ 78*l*(b), 78*l*(g), and 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

VI.

Imposing a voting trust upon the shares of Hollinger International held, directly or indirectly, by Defendants Black and Hollinger, Inc.;

VII.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

VIII.

Granting such other and additional relief as this Court deems just and proper.


Plaintiff demands a trial by jury.


Respectfully submitted,

Timothy L. Warren
Kathryn A. Pyszka
Peter K. M. Chan
Tina K. Diamantopoulos
Carol L. Tate
Rebecca R. Goldman

Attorneys for Plaintiff
U.S. Securities and Exchange
Commission
Midwest Regional Office
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604
(312) 353-7390


Dated: November 15, 2004



Civil Cover Sheet



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# <u>Civil Cover Sheet</u>04C  7377

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

JUDGE HART

---

**Plaintiff(s): Securities & Exchange Commission**

County of Residence:

Plaintiff's Atty:    Kathryn A. Pyszka
Securities & Exchange Commission
175 W. Jackson, Ste 900, Chicago
IL
312-353-7390

**Defendant(s):Conrad M. Black, F. David Radler and Hollinger, Inc.**

County of Residence:

Defendant's Atty:

MAGISTRATE SIDNEY I. SCHENKIER

FILED-EDA
2004 NOV 15 AM 10: 21
CLERK
U.S. DISTRICT COURT

---

II. Basis of Jurisdiction:          **1. U.S. Gov't Plaintiff**

III. Citizenship of Principal Parties
**(Diversity Cases Only)**

Plaintiff:-**N/A**
Defendant:-**N/A**

IV. Origin :          **1. Original Proceeding**

V. Nature of Suit:          **850 Securities / Commodities / Exchange**

VI.Cause of Action:          **Securities fraud pursuant to Section 10(b) [15 U.S.C. 78j(b)], Section 14(a) [15 U.S.C. 78n(a)], Section 13(a) [15 U.S.C. 78t(a)], and Section 13(b) [15 U.S.C. 78m(b)] of the Securities Exchange Act of 1934**

VII. Requested in Complaint

Class Action:
Dollar Demand:
Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

Signature: _____

Date: _11/15/04_

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Securities & Exchange Commission v. Conrad M. Black, F. David Radler, and Hollinger, Inc.

Case Number: 04C 7377

DOCKETED NOV 16 2004

JUDGE HART
MAGISTRATE SIDNEY I. SCHENKIER

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR

Securities and Exchange Commission

| (E) | | (F) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME | Rebecca R. Goldman | NAME | Carol L. Tate |
| FIRM | Securities & Exchange Commission | FIRM | Securities & Exchange Commission |
| STREET ADDRESS | 175 W. Jackson Blvd, Suite 900 | STREET ADDRESS | 175 W. Jackson Blvd, Suite 900 |
| CITY/STATE/ZIP | Chicago, IL 60604 | CITY/STATE/ZIP | Chicago, IL 60604 |
| TELEPHONE NUMBER 312-353-7416 | FAX NUMBER 312-353-7398 | TELEPHONE NUMBER 312-886-8176 | FAX NUMBER 312-353-7398 |
| E-MAIL ADDRESS | goldmanr@sec.gov | E-MAIL ADDRESS | tatec@sec.gov |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | 6277546 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | 6239310 |
| MEMBER OF TRIAL BAR? | YES ☐ NO X | MEMBER OF TRIAL BAR? | YES ☐ NO X |
| TRIAL ATTORNEY? | YES ☐ NO X | TRIAL ATTORNEY? | YES ☐ NO X |
| | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ |

FILED 2004 JAN 23 U.S. DISTRICT CLERK

| (G) | | (H) | |
|---|---|---|---|
| SIGNATURE | | SIGNATURE | |
| NAME | | NAME | |
| FIRM | | FIRM | |
| STREET ADDRESS | | STREET ADDRESS | |
| CITY/STATE/ZIP | | CITY/STATE/ZIP | |
| TELEPHONE NUMBER | FAX NUMBER | TELEPHONE NUMBER | FAX NUMBER |
| E-MAIL ADDRESS | | E-MAIL ADDRESS | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | |
| MEMBER OF TRIAL BAR? | YES ☐ NO ☐ | MEMBER OF TRIAL BAR? | YES ☐ NO ☐ |
| TRIAL ATTORNEY? | YES ☐ NO ☐ | TRIAL ATTORNEY? | YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ NO ☐ |



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

n the Matter of

Securities & Exchange Commission v. Conrad M. Black, F. David Radler and Hollinger, Inc.

**DOCKETED**

**NOV 1 6 2004**

Case Number:

**040 7377**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR

Securities and Exchange Commission

JUDGE HART

MAGISTRATE SIDNEY I. SCHENKIER

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Kathryn A. Pyszka | NAME Timothy L. Warren |
| FIRM Securities & Exchange Commission | FIRM Securities & Exchange Commission |
| STREET ADDRESS 175 W. Jackson Blvd, Suite 900 | STREET ADDRESS 175 W. Jackson Blvd., Suite 900 |
| CITY/STATE/ZIP Chicago, IL 60604 | CITY/STATE/ZIP Chicago, IL 60604 |
| TELEPHONE NUMBER 312-353-7416   FAX NUMBER 312-353-7398 | TELEPHONE NUMBER 312-353-7394   FAX NUMBER 312-353-7398 |
| E-MAIL ADDRESS pyszkak@sec.gov | E-MAIL ADDRESS warrent@sec.gov |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6202224 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6190197 |
| MEMBER OF TRIAL BAR? YES X  NO ☐ | MEMBER OF TRIAL BAR? YES ☐  NO X |
| TRIAL ATTORNEY? YES X  NO ☐ | TRIAL ATTORNEY? YES ☐  NO X |
|  | DESIGNATED AS LOCAL COUNSEL? YES ☐  NO ☐ |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME Peter K.M. Chan | NAME Konstantina K. Diamantopoulos |
| FIRM Securities & Exchange Commission | FIRM Securities & Exchange Commission |
| STREET ADDRESS 175 W. Jackson Blvd, Suite 900 | STREET ADDRESS 175 W. Jackson Blvd, Suite 900 |
| CITY/STATE/ZIP Chicago, IL 60604 | CITY/STATE/ZIP Chicago, IL 60604 |
| TELEPHONE NUMBER 312-353-7410   FAX NUMBER 312-353-7398 | TELEPHONE NUMBER 312-353-6313   FAX NUMBER 312-353-7398 |
| E-MAIL ADDRESS chanp@sec.gov | E-MAIL ADDRESS Diamantopoulosk@sec.gov |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6206718 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6224788 |
| MEMBER OF TRIAL BAR? YES ☐  NO X | MEMBER OF TRIAL BAR? YES X  NO ☐ |
| TRIAL ATTORNEY? YES ☐  NO X | TRIAL ATTORNEY? YES X  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐  NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐  NO ☐ |