IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 04 C 7377 |
| CONRAD M. BLACK, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

### I. BACKGROUND

This is a civil enforcement action brought by the Securities and Exchange Commission ("SEC") alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules issued thereunder. From 1999 through 2003, defendants Conrad Black and David Radler allegedly engaged in a fraudulent and deceptive scheme to divert cash and assets from Hollinger International, Inc. ("International") to themselves and others, both directly and through defendant Hollinger, Inc. ("Inc."). Radler and Inc. have each settled with the SEC and have entered into separate consent judgments. Discovery as to the claims against Black was stayed while a related criminal proceeding was pending against Black before a different judge of this court.

Following a jury trial in the criminal proceeding, Black was found guilty on three mail fraud charges in violation of 18 U.S.C. § 1341 and one obstruction of justice charge in violation of 18 U.S.C. § 1512(c). On nine other counts, including wire fraud, tax violations, and a RICO charge, Black was acquitted by the jury. A money laundering charge against Black was dismissed by the government before reaching the jury. Black's conviction and sentence have been affirmed by the Seventh Circuit. See United States v. Black, 530 F.3d 596 (7th Cir. 2008) ("Criminal Appeal").[1] In a proceeding in the Delaware

---

[1] On August 13, 2008, Black's and his codefendants' petition for rehearing and for rehearing en banc was denied. On August 21, 2008, the Seventh Circuit's mandate issued. Briefing on the pending collateral estoppel motion was completed prior to the Seventh Circuit's affirmance. While the SEC brought the affirmance to this court's attention, neither party has moved to supplement the briefs based on the Seventh Circuit affirmance. To the extent the parties rely on rulings of the trial court in the criminal proceeding that are directly or indirectly addressed in the Seventh Circuit's opinion, the Seventh Circuit's opinion is currently the final word on such subjects and has been considered. The time for seeking certiorari from the Supreme Court has not yet run. Even if Black seeks certiorari and the Supreme Court grants it, the collateral estoppel effect of the criminal judgment is not affected by a pending appeal. See Ross ex rel. Ross v. Board of Educ. of Twp. High Sch. Dist. 211, 486 F.3d 279, 284 (7th Cir. 2007); Prymer v. Ogden, 29 F.3d 1208, 1213 n.2 (7th Cir. 1994) ( dictum noting that "it is clear that the [Seventh Circuit] has adhered to the general rule in American jurisprudence that a final judgment of a court of first instance can be given collateral estoppel effect even while an appeal is pending"); Lara-Unzueta v. Monica, 2004 WL 856570 *5 (N.D. Ill. April 20, 2004). Collateral estoppel is only affected if and when the Supreme Court--or a court in a collateral proceeding (see, e.g., 28 U.S.C. § 2255)--modifies the judgment that has been entered.

Chancery Court, International successfully obtained injunctive, declaratory, and monetary relief against Black based on conduct that overlaps with allegations contained in the SEC's Complaint in this case. See Hollinger Int'l, Inc. v. Black, 844 A.2d 1022 (Del. Ch. 2004) ("Delaware Ruling"), aff'd, 872 A.2d 559 (Del. 2005) ("Delaware Appeal"). The Delaware proceeding concerned Black's attempted sale to third parties of his controlling interest in Inc., breaches of a "Restructuring Proposal," bylaw amendments attempted by Black, and a shareholder rights plan implemented by International. Based on the claimed collateral estoppel effect of the three mail fraud convictions and the Delaware judgment, supplemented by some additional factual support, the SEC moves for summary judgment as to liability and certain injunctive relief.

The SEC seeks a finding of liability as to all counts against Black, but limits its present motion to the particular transactions that underlie the criminal convictions and a press release that was addressed in the Delaware proceeding. The transactions that are the subject of the pending motion are the sale of assets to a third party, Forum Communications Company ("Forum"), see 1st Am. Compl. ¶¶ 108-15; the sale of assets to another third party, PMG Acquisitions Corporation ("Paxton"), see id. ¶¶ 116-23; and $5,500,000 in non-competition payments to

Black and related persons[2] by American Publishing Company

("APC"), a subsidiary of International, see id. ¶¶ 133-37. As to

the Forum and Paxton transactions, it is alleged that unallocated

proceeds from those transactions were placed in a reserve and

$600,000 of that amount was later used to make supplemental

non-competition payments (the "Supplemental Payments") to Black

and related persons.[3] See id. ¶¶ 127-32. The mail fraud

convictions that are the basis for summary judgment based on

collateral estoppel do not involve transactions in which money

was funneled to Black or his co-schemers through Inc.[4]

Central to the SEC's allegations is the contention

that Black made misrepresentations regarding the purported

non-competition payments. Although the purchasing parties

did not request non-competition agreements, Black and the

others allegedly included the agreements and/or payments in

the transactions as a means of diverting funds to Black and

the others instead of the funds being paid directly to

International. During most of the pertinent time period,

_____

[2]Black himself allegedly received $2,612,500.

[3]Black himself allegedly received $285,000 of this
amount.

[4]There are allegations that certain proceeds from the
Forum and Paxton transactions were paid to Inc. as non-
competition payments, see 1st Amend. Compl. ¶¶ 111, 119;
Information ¶¶ 17-18, but the mailing in criminal Count Seven
does not concern that aspect of those transactions.

Black was International's CEO[5] and controlled approximately 70%
of its voting shares, but directly or indirectly owned stock
representing less than 20% of International's equity.  Through
Ravelston Corporation Limited, Black indirectly owned more than
50% of Inc.  Including non-competition payments in the sale of
International's assets allowed Black to receive a higher portion
of the proceeds of the sales than if the proceeds had instead
been paid directly to International as part of the sales price.
The non-competition payments from APC did not involve a sale of
APC.  There allegedly was no legitimate basis for those payments.

It is also alleged that, when non-competition payments
were discovered by a Special Committee of International's Board,
Black and International entered into a November 2003
Restructuring Proposal under which Black agreed to resign as CEO,
repay a specified amount of the non-competition payments, and
devote his principal time and energy to cooperatively
participating in a Strategic Process to sell International's
assets.  It is further alleged that Black joined in a
November 17, 2003 press release disclosing this agreement to the
investing public, but, at the time, he had no intention of
devoting such time and energy to the Strategic Process and was

---

[5]It is undisputed that Black was International's CEO
until November 19, 2003.

instead in the process of attempting to negotiate a transaction that would benefit himself and undermine the Strategic Process.

This conduct is alleged to prove violations of securities law based on false representations or omissions made in corporate filings and other public documents. The SEC's counts against Black allege violations of the following: (I) § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (II) § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rules 14a-3 and 14a-9, 17 C.F.R. §§ 240.14a-3, 240.14a-9; (III) § 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, and 13a-13, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13 as a control person under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (IV) §§ 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(2)(B), as a control person under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (V) Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1;⁶ (VI) § 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5); and (VIII) Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.

There is no dispute as to the contents of the verdict in the criminal proceeding and rulings in the criminal and Delaware proceedings, nor is there a dispute as to the pleadings in those

---

⁶In its summary judgment briefs, the SEC refers to Count VI as containing allegations of Rule 13b2-1 violations.

proceedings. The parties' disagreements concern what facts were
necessary to the judgments entered in those proceedings and what
facts may be accorded a collateral estoppel effect. It must be
determined what facts, if any, pertinent to the SEC's claims are
conclusively established by the prior judgments and whether those
facts are sufficient to establish every element of any of the
SEC's claimed violations. Alternatively, partial summary
judgment could be entered that certain facts are conclusively
established even if they are not all the facts necessary to
establish every element of a particular claim.

## II.  COLLATERAL ESTOPPEL

The law of the forum entering a judgment determines the
collateral estoppel (issue preclusion) effect of that judgment.
See 28 U.S.C. § 1738; Stephan v. Rocky Mountain Chocolate
Factory, Inc., 136 F.3d 1134, 1136 (7th Cir. 1998); Lara-
Unzueta v. Monica, 2004 WL 856570 *5 (N.D. Ill. April 20, 2004).
Thus federal preclusion law determines the effect of the federal
criminal proceeding and Delaware preclusion law determines the
effect of the Delaware proceeding. A federal criminal conviction
may be used offensively to preclude issues in a civil proceeding
in which the criminal defendant is a party. Instituto Nacional
De Comercializacion Agricola (Indeca) v. Continental Ill. Nat'l
Bank & Trust Co., 858 F.2d 1264, 1271 (7th Cir. 1988); In re

Edgewater Med. Ctr., 332 B.R. 166, 173 (Bankr. N.D. Ill. 2005).
Collateral estoppel applies based on the federal criminal
proceeding if (1) the issue sought to be precluded is identical
to one decided in the prior action; (2) that issue was actually
litigated in the prior action; (3) the determination of the issue
was essential to the final judgment in the prior action; and
(4) the party against whom estoppel is invoked had a full and
fair opportunity to litigate the issue in the prior action.
Universal Guar. Life Ins. Co. v. Coughlin, 481 F.3d 458, 463
(7th Cir. 2007); Havoco of America, Ltd. v. Freeman, Atkins &
Coleman, Ltd., 58 F.3d 303, 307 (7th Cir. 1995); Edgewater,
332 B.R. at 173; International Star Registry of Ill., Ltd. v.
Bowman-Haight Ventures, Inc., 2003 WL 21640473 *4 (N.D. Ill.
July 10, 2003). The basic collateral estoppel requirements under
Delaware law are similar: "(1) The issue previously decided is
identical with the one presented in the action in question,
(2) the prior action has been finally adjudicated on the merits,
(3) the party against whom the doctrine is invoked was a party or
in privity with a party to the prior adjudication, and (4) the
party against whom the doctrine is raised had a full and fair
opportunity to litigate the issue in the prior action." Betts v.
Townsends, Inc., 765 A.2d 531, 535 (Del. 2000) (quoting State v.
Machin, 642 A.2d 1235, 1239 (Del. Super. 1993)); Jackson v.
Pikulik, 2007 WL 5006531 *2 (Del. Com. Pleas Dec. 18, 2007).

- 8 -

Like the federal standard, the facts precluded must have been
essential to the judgment. Jackson, 2007 WL 5006531 at *1
(quoting Tyndall v. Tyndall, 238 A.2d 343, 346 (Del. 1968)).

As to both the federal and Delaware judgments, the burden
is on the SEC to show that each applicable requirement is
satisfied. Havoco, 58 F.3d at 307; Jackson, 2007 WL 5006531
at *1. "This includes 'establishing which issues were actually
determined in [the SEC's] favor in the prior action.' Appley v.
West, 832 F.2d 1021, 1025 (7th Cir. 1987) (quoting Gilldorn
Savings Association v. Commerce Savings Association, 804 F.2d
390, 393 (7th Cir. 1986)). 'If a court does not make specific
findings, the party must introduce a record sufficient to reveal
the controlling facts and pinpoint the exact issues litigated in
the prior action. Necessary inferences from the judgment,
pleadings and evidence will be given preclusive effect. If there
is doubt, however, collateral estoppel will not be applied. If
the decision could have been rationally grounded upon an issue
other than that which the [SEC] seeks to foreclose from
consideration, collateral estoppel does not preclude relitigation
of the asserted issue.' PaineWebber, Inc. v. Ras, 767 F. Supp.
930, 932 (N.D. Ill. 1991)." Petit v. City of Chicago, 2001 WL
629306 *3 (N.D. Ill. May 25, 2001), aff'd, 352 F.3d 1111 (7th
Cir. 2003). See also Gilldorn, 804 F.2d at 395. Additionally,

> [w]hen a party seeks summary judgment based on
> the doctrine of collateral estoppel, the
> nonmoving party may not defeat the motion simply
> by establishing that it has evidence that
> conflicts with the factual conclusions of the
> trier of fact in the previous case. Even if the
> nonmoving party produces evidence that
> contradicts a prior judgment, collateral estoppel
> bars the party from relitigating facts decided in
> the previous case. Prochotsky v. Baker &
> McKenzie, 966 F.2d 333, 334 (7th Cir. 1992);
> Boim v. Quranic Literary Inst., 340 F. Supp. 2d
> 885, 900 (N.D. Ill. 2004). The moving party
> bears the burden to show that collateral estoppel
> applies in the first instance. The nonmoving
> party may oppose the motion by arguing that the
> moving party has not met all elements of
> collateral estoppel. But if collateral estoppel
> does apply, it forecloses litigation of issues
> that the prior court actually and necessarily
> decided. Havoco v. Freeman, Atkins & Coleman,
> Ltd., 58 F.3d 303, 307-08 (1995).

In re Reyes, 2008 WL 2020501 *2 (Bankr. C.D. Ill. May 9, 2008).

As to the facts established by the criminal proceeding,

Black raises the general contention that the facts set forth in

the trial court's denial of postjudgment motions--and

concomitantly the Seventh Circuit's affirmance--cannot be relied

upon because they are based on the factual standard applicable to

such review in that the evidence is reviewed in the light most

favorable to the prosecution and a conviction must be upheld if

there is sufficient evidence to support it even if the evidence

would also support other conclusions. See United States v.

Spells, 537 F.3d 743, 747 (7th Cir. 2008). See, e.g., Criminal

Appeal, 530 F.3d at 599. It is correct, as Black contends, that

collateral estoppel cannot be based on facts set forth in the
court rulings unless those facts were essential to the judgment
that was entered. See Petit, supra. There is no merit, however,
to Black's further contention that construing facts in favor of
the prosecution in the criminal proceeding is inconsistent with
the summary judgment standard of resolving all genuine material
facts in favor of the nonmovant and therefore cannot be a basis
for applying collateral estoppel in the present case. See Reyes,
supra. If fact x was a necessary element for Black's conviction
on a particular count, fact x had to have been found by the
jury--by beyond a reasonable doubt in a criminal case--in order
to convict on that count. When the trial court and Seventh
Circuit rejected Black's sufficiency of the evidence arguments
and related contentions, they held that the jury properly found
fact x. Since Black's convictions were upheld, all facts
necessary to his convictions have been conclusively determined.
The standard of review only comes into play if the jury could
have found Black guilty of a particular charge based on either
fact x or fact y. In that situation, if the court in the
criminal proceeding held the evidence could support a jury
finding as to both fact x and fact y, for collateral estoppel
purposes, it cannot be concluded that fact x has been established

because the jury may have instead found only fact y.[7]  In that situation, if either fact x or fact y would satisfy the pertinent element of one of the SEC's present claims, collateral estoppel would still conclusively establish that element of the SEC's claim.  However, if fact x were a necessary element of one of the SEC's present claims, that element of the claim could not be conclusively established based on collateral estoppel.  Another possible scenario is that the jury is instructed that either fact x or fact y would satisfy an element of a particular charge and the reviewing court determines that fact y is not supported by the evidence or otherwise legally insufficient, but upholds that particular element solely based on fact x.  In that situation, fact x is conclusively established for collateral estoppel purposes.

### III.  CRIMINAL PROCEEDING

With the above standards in mind, it must be determined which facts were necessarily established by Black's mail fraud convictions and what facts are sufficient to establish the SEC's claims in this civil lawsuit.

---

[7]The result could also be the same if the court held that fact x was sufficiently supported while leaving open the question of whether fact y was sufficiently supported.

## A. **Established Facts**

Black was found guilty on Counts One, Six, and Seven of the Superseding Information. All three of those counts were based on the same alleged scheme which is alleged in ¶¶ 1 to 33 of Count One of the Information.[8] The following general scheme is alleged in the Information.

> 2. Beginning no later than in or about January 1999 and continuing thereafter until at least in or about May 2001, at Chicago, in the Northern District of Illinois, Eastern Division and elsewhere,
>
> CONRAD M. BLACK,
> JOHN A. BOULTBEE,
> PETER Y. ATKINSON and
> MARK S. KIPNIS,
>
> defendants herein, along with others known and unknown to the grand jury, devised, intended to devise, and participated in a scheme to defraud International and International's public shareholders of money, property and their intangible right of honest services, and to obtain money and property from these victims by means of materially false and fraudulent pretenses, representations, promises and omissions, in connection with the U.S. Community Newspaper Asset Sales. This scheme is further described below.
>
> 3. It was part of the scheme that, in connection with the U.S. Community asset sales, Ravelston and its agents, including BLACK, BOULTBEE, ATKINSON and Radler, repeatedly abused

___

[8]The alleged scheme included other transactions besides the Forum, Paxton, and APC transactions. The Information refers to all the transactions as the "U.S. Community Newspaper Asset Sales." The additional transactions are referred to as the "CNHI I," "Horizon," and "CNHI II" transactions. The mailings that are the bases for Counts One and Six related to the APC transaction and the mailing that is the basis of Count Seven related to the Forum and Paxton transactions.

their authority and fiduciary obligations as
managers of International in order to
fraudulently benefit themselves at the expense of
International and its public shareholders.  On
multiple occasions, Ravelston's agents
fraudulently inserted themselves and Inc. as
recipients of non-competition fees that should
have, and otherwise would have, been paid
exclusively to International.  Ravelston and its
agents failed to disclose their self-dealing to
International's Audit Committee, thereby enabling
Ravelston and its agents to conceal the scheme,
continue as International's managers, and quietly
siphon away International assets.  Ravelston's
agents also abused their positions as
International's managers by fraudulently causing
International to mischaracterize bonus
compensation payments to them as non-competition
fees, in order to receive a tax benefit in
Canada.  KIPNIS aided and abetted this scheme by
implementing the directives of Ravelston's agents
and by failing to disclose this misconduct to
International's Audit Committee.  As a result of
this scheme, defendants and their co-schemers
fraudulently diverted over $32 million from
International, and fraudulently deprived
International of its right to receive their
honest services.

Information Count 1 ¶¶ 2-3.

As to the Supplemental Payments, it is alleged that,
after the Forum and Paxton transactions closed, it was realized
that anticipated individual non-compete agreements had not been
made part of those transactions nor had any such individual
payments been made.  It was then determined that $600,000 still
being held in reserve from those transactions could be designated
as non-competition payments.  Such payments were then made to
Black and his co-schemers.  Id. ¶ 20-21.

- 14 -

Regarding the APC transaction, the following is alleged, which is also consistent with the SEC's allegations.

28. It was further part of the scheme that, in February 2001, BLACK, BOULTBEE, ATKINSON, Radler, and KIPNIS fraudulently mischaracterized bonus payments to the four International officers as non-competition payments. The four International officers decided that they would pay themselves, purportedly on behalf of International, a bonus of $5.5 million. The four International officers further decided to label these payments as non-competition payments, rather than bonus compensation, in order to take advantage of the potential tax benefits that genuine non-competition payments received under Canadian tax laws.

29. It was further part of the scheme that KIPNIS helped implement this decision by preparing non-competition agreements between American Publishing Company (an International subsidiary) and each of the four International officers, and then signing the agreements on behalf of American Publishing Company. In the agreements, which were backdated to December 31, 2000, BLACK, BOULTBEE, ATKINSON and Radler each promised not to compete with American Publishing Company for three years after he left International's employ. These agreements were a contrivance created for the purpose of facilitating favorable tax treatment from the Canadian tax authorities. American Publishing Company was the subsidiary through which International had owned its United States community newspapers outside the Chicago area. By the time these agreements were signed, however, International had sold all of these newspapers but one--a small weekly newspaper in Mammoth Lake, California. International was in the process of attempting to sell that newspaper and had no intent of re-entering the community newspaper business in the United States, and defendants knew that there was no legitimate justification for those non-competition agreements. BLACK, BOULTBEE, ATKINSON and Radler had signed a $5.5 million agreement not to

compete in the newspaper business with a company
that was, for all intents and purposes, no longer
in the newspaper business.

Id. ¶¶ 28-29.

The mailing alleged in Count I is an envelope sent to
Atkinson on February 8, 2001. It contained APC non-competition
agreements to be signed by officers involved in the scheme and
checks representing a portion of the non-competition payments.
Id. ¶ 34. The mailing alleged in Count Six is an envelope sent
to Kipnis on March 1, 2001. It contained copies of the APC
non-competition agreements executed by the scheming officers.
Information Count 6 ¶ 2. The mailing alleged in Count Seven is
an envelope sent to Kipnis on April 9, 2001. It contained
$600,000 in Supplemental Payments that were payable to Black and
his co-schemers. Information Count 7 ¶ 7. See also Information
Count 1 ¶ 21.

Black's criminal jury was instructed that three elements
of mail fraud had to be proven beyond a reasonable doubt:
(1) "that the defendant knowingly devised or participated in a
scheme to defraud or to obtain money or property by means of
materially false pretenses, representations or promises, as
described in the Information;" (2) "with the intent to defraud;"
and (3) the mails were used in furtherance of the scheme to
defraud. Jury Instr. 15166-67. See also United States v. Black,

- 16 -

2007 WL 3254452 *4, 7 (N.D. Ill. Nov. 5, 2007) ("<u>Criminal</u>
<u>Postjudgment Ruling</u>").  As to the first element, the jury was
further instructed that this could be based on one of two
theories, either (1) Black obtained money or property by means of
materially false pretenses, representations, or promises or
(2) Black deprived International and its public shareholders of
their intangible right to the honest services of International's
officers, directors, and/or controlling shareholders.[9]  Jury
Instr. 15167-68.  <u>See also</u> 28 U.S.C. § 1346; <u>Criminal Appeal</u>,
530 F.3d at 600; <u>Criminal Postjudgment Ruling</u>, 2007 WL 3254452
at *4, 7.  As to the dishonest services theory, the jury was
additionally instructed that the government must prove that Black
"misused his position for private gain for himself and/or a
co-schemer."  Jury Instr. at 15168.  <u>See also</u> <u>Criminal Appeal</u>,
530 F.3d at 600; <u>Criminal Postjudgment Ruling</u>, 2007 WL 3254452
at *4, 7.

        Regarding the second mail fraud element, the jury was
instructed:  "The phrase 'intent to defraud" means that the acts
charged were done knowingly, with the intent to deceive or cheat
Hollinger International and its public shareholders, in order to
cause a gain of money or property to the defendants or others;

_____

        [9]The first theory will be referred to as the
"conventional" theory and the second as the "dishonest
services" theory.

and the potential loss of money or property to another; or, to deprive the corporation and its shareholders of their right to the honest services of their corporate officers." Jury Instr. at 15172.

As to Counts One, Six, and Seven, the trial court held that the evidence was sufficient to support Black's convictions on both the conventional and dishonest services theory. Criminal Postjudgment Ruling, 2007 WL 3254452 at *6, *7-8. On appeal, the Seventh Circuit did not find it necessary to expressly discuss every issue raised on appeal. See Criminal Appeal, 530 F.3d at 600, 606. The principal issue addressed regarding Black's mail fraud convictions was whether the dishonest services theory "private gain" instruction allowed the jury to convict Black based on a nonexistent crime. It was held that the evidence at trial compellingly supported that Black had obtained money or other property of International which satisfied either the conventional theory or the private gain aspect of the dishonest services theory. Id. at 600. The private gain instruction, however, did not state that the gain must come out of the pocket of International. Black argued that this permitted the jury to convict him based on finding that his gain was the Canadian tax benefit of having the payments characterized as non-competition payments instead of being additional management fees which he contended was the actual reason for receiving the non-competition

payments. He contended a conviction on that basis would be improper because the gain must come from the party--in this case International--being deprived of honest services. See id. This contention was rejected on various grounds, including that there is no requirement that the gain come from the party being deprived of honest services and that International could still be deprived of money because--even assuming the payment of management fees was legitimate--International may have paid lower management fees if Black had been open about the tax benefits of calling such payments non-competition fees. Id. at 601-02. More pertinent to the collateral estoppel issues presently before the court, it was held that the jury could not have convicted based on the private gain being the Canadian tax benefit because that theory was not presented to the jury at trial. Id. at 602. Black's mail fraud convictions, therefore, necessarily required finding that money or property was deceptively obtained from International, whether the jury based its finding of guilt on the conventional theory, the dishonest services theory, or both.

The Count One and Count Six mailings related to the APC transaction. Therefore, the convictions on these counts necessarily required that the jury find that, as part of this transaction, Black deceptively obtained money or property of International. On the evidence and theories (including defense theories) presented to the jury, this necessarily meant that the

jury found that one or more of the APC non-competition payments
made to Black and his co-schemers was neither a legitimate non-
competition fee nor a legitimate management fee. While a
conviction of Black could have been based on the jury finding
that the non-competition agreement and payment to only one of the
co-schemers was illegitimate, the parties do not point to
evidence that would have allowed the jury to distinguish between
the separate agreements and payments. The trial court and
Seventh Circuit viewed the evidence as proving all the APC non-
competition agreements and payments were illegitimate. See
Criminal Appeal, 530 F.3d at 599; Criminal Postjudgment Ruling,
2007 WL 3254452 at *4-6. That is a fact that will be taken as
having been conclusively established by the criminal
proceeding.[10] Collateral estoppel precludes Black disputing this
fact in the present proceeding.

     Even taking the above fact as established, Black contends
his scienter for securities fraud purposes is not established
because the criminal convictions were not for securities fraud.
Evidence of the securities filings and representations that

_____

          [10]Even if it may only be assumed that the jury found one
agreement and one payment to be illegitimate, that would be
sufficient--along with proof of other elements--to support
liability based on the APC transaction. On summary judgment, the
SEC is not attempting to establish the precise amount of the
monetary loss that might be subject to disgorgement or other
monetary relief.

- 20 -

underlie the present securities fraud allegations was presented at the criminal trial as support for the intent to defraud element of the criminal mail fraud charges. The government used evidence that the transactions were misrepresented in the securities filings to bolster its contention that Black and his co-schemers had not forthrightly disclosed the non-competition payments to International's Board nor been legitimately receiving the payments as mislabeled management fees. See Criminal Appeal, 530 F.3d at 599; Criminal Postjudgment Ruling, 2007 WL 3254452 at *5. There was other evidence supporting that Black had an intent to defraud. See id. It was not necessary to the mail fraud convictions that the jury find that the securities filings that underlie the securities fraud allegations contained misrepresentations or that any particular person was responsible for any misrepresentations contained in such filings. It was essential to the jury's verdict that it find that Black knowingly engaged in a scheme to defraud International, which necessarily includes that Black knew the non-competition agreements and payments were not legitimate and had not been approved by International's Board. That aspect of knowledge and intent is conclusively established. Collateral estoppel precludes Black disputing such facts in the present proceeding. In order to fully succeed on its summary judgment motion, the SEC must also present sufficient, undisputed evidence as to the contents of any

securities filings or other representations that are the basis of its securities fraud claims as well as evidence adequately supporting Black's responsibility for the statements.

Turning to Count Seven of the Superseding Information, the mailing underlying that count concerned the Supplemental Payments out of the reserves of the Forum and Paxton transactions. As with the APC transaction, the jury was instructed as to both the conventional theory and dishonest services theory. Under either theory, however, it necessarily had to find that money or property taken from the reserves was deceptively obtained from International; the Supplemental Payments made to Black and his co-schemers were not legitimate non-competition fees or management fees nor approved by the Board; and Black knew this and intended it. Evidence supported such findings by the jury. See Criminal Postjudgment Ruling, 2007 WL 3254452 at *7-8, 11-12.

Independent of the facts determined by collateral estoppel based on the criminal proceeding, the following facts are undisputed and taken as true for purposes of ruling on the SEC's summary judgment motion. On the SEC's motion, the entire record is considered with all reasonable inferences drawn in favor of Black and all factual disputes resolved in favor of Black. Scott v. Harris, 127 S. Ct. 1769, 1774, 1776 (2007); Fischer v. Avanade, Inc., 519 F.3d 393, 401 (7th Cir. 2008);

Scaife v. Cook County, 446 F.3d 735, 738-39 (7th Cir. 2006). The
burden of establishing a lack of any genuine issue of material
fact rests on the SEC. Hicks v. Midwest Transit, Inc., 500 F.3d
647, 651 (7th Cir. 2007); Creditor's Comm. of Jumer's Castle
Lodge, Inc. v. Jumer, 472 F.3d 943, 946 (7th Cir. 2007);
Outlaw v. Newkirk, 259 F.3d 833, 837 (7th Cir. 2001). Black,
however, must make a showing sufficient to establish any
essential element for which he will bear the burden of proof at
trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986);
Hicks, 500 F.3d at 651; Jumer, 472 F.3d at 946.

International is a Delaware corporation and its shares
are registered under the Exchange Act. Until November 19, 2003,
Black was the CEO of International. Until January 17, 2004, he
was International's Chairman of the Board and a member of the
Board's Executive Committee. Through Ravelston, Black has a
controlling interest in Inc. which has a controlling interest in
International.[11]

_____

[11]It is disingenuous for Black (through his attorneys) to
simply deny facts in the SEC's Local Rule 56.1(a)(3) Statement
[129] as unsupported by the cited material even though such facts
are admitted in Black's Answer to the First Amended Complaint
and/or facts that can readily be conclusively established by
public documents. Compare Black's Loc. R. 56.1(b)(3)(b) Stmt.
[138] ¶ 5 with Black's Answer to 1st Am. Compl. [70] ¶ 16. Also,
responding that certain statements are only admitted to the
extent they are consistent with a cited document does not satisfy
Local Rule 56.1(b)(3) which requires that the responding party
specifically identify the controverted facts. See N.D. Ill.
Loc. R. 56.1(b)(3)(C); Ammons v. Aramark Uniform Serv., Inc.,

- 23 -

International's 2001 Form 10-K, filed on April 1, 2002,

disclosed the following:

> In connection with the sales of United States
> newspaper properties in 2000, to satisfy a
> closing condition, the Company, Lord Black and
> three senior executives entered into non-
> competition agreements with the purchasers to
> which each agreed not to compete directly or
> indirectly in the United States with the United
> States businesses sold to purchasers for a fixed
> period, subject to certain limited exceptions,
> for aggregate consideration paid in 2001 of $0.6
> million. These amounts were in addition to the
> aggregate consideration paid in respect of these
> non-competition agreements in 2000 of $15
> million. Such amounts were paid to Lord Black
> and the three senior executives. The Company's
> independent directors have approved the terms of
> these payments.

Essentially the same disclosure also appears in International's

2002 Form 10-K, filed on March 31, 2003. Black signed both of

the Forms 10-K as International's Chairman, CEO, and a Director

and also certified the 2002 Form 10-K in accordance with the

---

368 F.3d 809, 817-18 (7th Cir. 2004); Howard v. United Parcel
Serv., 2006 WL 642575 *7 (N.D. Ill. March 8, 2006); Austin v.
Cole Taylor Bank, 2000 WL 1047216 *2 (N.D. Ill. July 27, 2000).
Cf. Beard v. Banks, 548 U.S. 521, 527 (2006) (W.D. Pa. Loc. R.
56(E)). Like lengthy briefs arguing points that have such little
merit that they need not be specifically discussed in rulings,
see, e.g., Criminal Appeal, 530 F.3d at 606; Delaware Appeal,
872 A.2d at 567, Black's disingenuous factual contentions can be
counterproductive as the court attempts to discern the wheat
among the excess of chaff. Cf. Fleming v. County of Kane,
855 F.2d 496, 497 (7th Cir. 1988) (per curiam) (quoting United
States v. Keplinger, 776 F.2d 678, 683 (7th Cir. 1985)); In re
DeMert & Dougherty, Inc., 271 B.R. 821, 829 n.1 (Bankr. N.D.
Ill. 2001).

Sarbanes-Oxley Act of 2002. He reviewed each form before
signing it.

The SEC also points to a statement Black made in response
to a question at a May 2002 International shareholder meeting
regarding whether he would be taking any non-compete payments in
the future. See SEC Sum. Jmt. Exh. 17 at 17-18. In answering
that question, he referred to purchasers requesting assurances
there would not be competition through other publications. "In
those papers, they wanted some assurance that we wouldn't come
back with shoppers, which is always a threat to those small
newspapers . . . ." It is unclear whether the reference to
"those papers" is a reference to a sale of Canadian newspapers
(including the CanWest transaction) that he references, or a
reference to the "American Community" sales that he also
mentions. The American Community sales included Forum, Paxton,
and other transactions. Even if "those papers" means ones
included in the American Community sales, he could have meant
other transactions involving non-competition payments that, on
the present motion, have not been shown to be improper. The
statement at the shareholder meeting will not be considered
further.

The criminal judgment against Black included that he be
jointly and severally liable with co-defendants to forfeit
$6,100,000 representing the APC payments and Supplemental

Payments. The imposition of a forfeiture order was determined by

the trial judge in ruling on disputed motions, but the potential

forfeiture amount related to each transaction was not in dispute.

See United States v. Black, 526 F. Supp. 2d 870, 881 (N.D. Ill.

2007).[12] It is unclear whether the SEC contends this ruling is a

basis for conclusively establishing the amount of the payments

based on collateral estoppel. Compare Appley, 832 F.2d at 1026

(amount of restitution imposed was not a basis for collateral

estoppel because the amounts were not actually litigated). In

any event, undisputed evidence establishes that the payments from

the Forum/Paxton reserves totaled $600,000 and that Black

received $285,000 of that amount.[13] Undisputed evidence also

---

[12]This ruling was appended to and made part of Black's
criminal judgment. See Pl. Sum. Jmt. Exh. 21 at 6.

[13]Copies of the checks for the payments are provided as
Exhibit 8 to the SEC's summary judgment motion. In ¶ 17 of its
Loc. R. 56.1(a)(3) Statement, the SEC asserts that these are
accurate copies of the checks. Black does not respond to this
assertion; he only responds to the other sentences of this
paragraph as being descriptions of the First Amended Complaint
and not being affirmative statements of fact. As has previously
been indicated, Black's responses are often disingenuous attempts
to avoid focusing on undisputed facts. The SEC, however, could
have made determining the appropriate facts for summary judgment
an easier task if it had directly asserted certain facts which
likely cannot be contested--the contents of documents, ownership
interests in the corporations, corporate positions of the
schemers, and the amount of payments to the schemers--and
provided documents establishing those facts. Instead, the SEC
devotes much of its Loc. R. 56.1(a)(3) statement to describing
the allegations of its First Amended Complaint--unnecessary for
the statement of facts since the pleadings are otherwise before
the court--and seeks to establish many of these facts with

establishes that the purported APC non-competition payments

totaled $5,500,000 of which Black received $2,612,500.[14]

On January 31, 2002, Black completed International's 2002

Questionnaire for Directors and Executive Officers ("Proxy

Questionnaire" or "2002 Proxy Questionnaire"), which covers

calendar year 2001.  It is stated on the Proxy Questionnaire that

it is being used to obtain information to prepare International's

Proxy Statement for the May 2002 annual stockholders meeting and

International's 2001 Form 10-K.  Black reviewed the Proxy

Questionnaire before signing it.  The non-competition payments

from APC and the Forum/Paxton reserves are not disclosed in the

Proxy Questionnaire.[15]  Black contends the Forum/Paxton payments

are disclosed on the Proxy Questionnaire, pointing to the

following disclosure:  "I also received . . . three (3)

---

statements in opinions or purported jury findings that were not
always essential to the prior judgments.  In any event, within
¶ 17, the SEC does assert the checks accurately represent the
payments and Black has not denied that fact nor disputed the
authenticity of the checks.  Also, in his Answer, Black admits
that he and Radler each received $285,000.  Answer to 1st Am.
Compl. ¶ 129.

[14]As with the Forum/Paxton payments, the SEC asserts
checks provided as Exh. 10 to its motion show the amounts of the
payments and Black does not dispute this assertion nor the
authenticity of the checks.  See Black Loc. R. 56.1(b)(3) Stmt.
¶ 19.

[15]The SEC also points to a failure to disclose these
payments on the Questionnaire covering fiscal year 2000.
However, none of the payments at issue were made in that year.
It is only contended that certain checks were backdated to 2000.

- 27 -

noncompete payments in connection with the Community Group sale, and Osprey I and Osprey II transaction. Please check the Company's audit committee meeting minutes and the Company's corporate files related to these transactions for further details." Black contends the "Community Group sale" refers to the Supplementary Payments related to the Forum and Paxton transactions. The criminal proceeding, however, conclusively establishes that the payments had not been disclosed to the Audit Committee, so that reference would not have provided more detail. It is also conclusively established that the payments were not actually for agreeing not to compete and there is no evidence that Black ever signed a non-competition agreement regarding the Forum and Paxton transactions. Even if, for purposes of the SEC's summary judgment motion, this statement can be deemed a reference to Black receiving a payment from the Forum/Paxton reserves, labeling it as a "noncompete payment" does not accurately describe it and searching Audit Committee minutes and corporate files would not have produced details of the payment.

International's proxy statement for its May 2002 annual stockholders meeting ("2002 Proxy"), which was signed on March 28, 2002 and filed on April 2, 2002, contains essentially the same disclosure as that contained in the Forms 10-K. It again discloses that, in 2000 and 2001, a total of $15,600,000 was paid to Black, Radler, Atkinson, and Boultbee under non-

competition agreements with purchasers of newspaper properties. There is no representation that the independent directors approved the transactions. The 2002 Proxy was completed by others, but reviewed and signed by Black. The 2002 Proxy includes a solicitation, signed by Black, to appear at the meeting to vote for directors or to sign a proxy to vote for the nominated directors.

The statements in the Forms 10-K and 2002 Proxy are inaccurate regarding the $5,500,000 of APC payments and $600,000 of Supplemental Payments to Black and his co-schemers because: (a) the payments from APC were not in connection with the sale of a newspaper;[16] (b) none of the payments was necessary to satisfy a closing condition of any newspaper sale; (c) none of the payments was actually for agreeing not to compete; (d) the 2001 payments totaled $6,100,000, not $600,000; and (e) the independent directors did not approve the payments.

As was previously discussed, the mail fraud convictions conclusively establish that Black knew (a), (b),(c), and (e). In order to find Black guilty of mail fraud, the jury was not required to find a specific amount was involved in each

---

[16]It need not be decided whether, well after a sale has closed, distributing proceeds sitting in unallocated reserves can be accurately described as "in connection with the sales" of the newspapers that were involved in the Forum and Paxton transactions.

transaction. The convictions, however, necessitated that the
jury find that Black knowingly participated in the scheme. Part
of that knowledge would be knowing the structure of the payments.
Since separate evidence conclusively establishes the amount
involved, on summary judgment, the only reasonable inference is
that Black knew the amount of the payments. Therefore, on
summary judgment, it is also established that Black knew (d).

Black contends that the jury's findings are limited to
the time period of the scheme for which he was convicted which he
contends concluded with the Supplemental Payments being made in
April 2001, whereas the false filings occurred between January
2002 and March 2003. As the SEC points out, it was also alleged
that the scheme included continuing to conceal the nature of the
transactions. Information Count 1, ¶ 33. The Information
alleged that the scheme continued "until at least in or about May
2001." Information ¶ 2. As previously discussed, it was not
essential to the jury's verdict that it find later
misrepresentations regarding the transactions. The SEC also
contends that ratification by the International Board or Audit
Committee would be a complete defense, that Black raised this
defense,[17] and the jury necessarily rejected it in finding Black
guilty on three mail fraud counts. Ratification, however,

_____

[17]The SEC implies the defense was based on post-April
2001 conduct.

concerns the duty of loyalty which goes to the dishonest services theory. See Jury Instr. 15169, 15170-71. The jury instructions did not necessarily require that the jury acquit Black under the conventional theory if there was a subsequent ratification. But even if ratification is a complete defense on both theories and therefore the jury necessarily rejected it, the jury could have rejected ratification based on there being no later approval, without also finding a continuing attempt to conceal.

But even if it must be assumed that the mail fraud scheme found by the jury ended in April 2001, it is not a reasonable inference that, in less than one year, Black would have forgotten the facts for which he had criminal knowledge nor have foregone his intent to continue to fraudulently deceive International regarding the payments. The only reasonable inference is that, at the time additional false statements were made, Black continued to know, or at least recklessly disregarded, that the payments were not proper, non-competition payments requested by purchasers of newspapers, that the payments had not been properly approved by International, and that the APC payments involved distributing millions of dollars in 2001.

Black points to evidence that accountants and lawyers performed the initial drafts of the Forms 10-K and 2002 Proxy without any input from him. It is undisputed, however, that Black reviewed the documents before signing them. He also

provided the misleading 2002 Proxy Questionnaire. The only reasonable inference is that Black was aware of or recklessly disregarded the false statements contained in the documents.

Having determined the facts assumed to be true for purposes of summary judgment, it must be considered whether those facts support all the elements of any of the SEC's securities claims.

## B. Count I

Count I alleges violations of § 10(b) and Rule 10b-5. The elements of those claims are that Black: "(1) made a false statement or omission (2) of material fact (3) with scienter and (4) in connection with the purchase or sale of securities." McConville v. SEC, 465 F.3d 780, 786 (7th Cir. 2006); SEC v. Black, 2005 WL 1498893 *3 (N.D. Ill. June 17, 2005) ("Dismissal Ruling").[18] A misstatement or omission is material if there is a substantial likelihood that disclosure of the accurate or omitted fact would be viewed by a reasonable investor as significantly altering the total mix of information available. Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); In re Guidant Corp. Sec. Litig., 536 F. Supp. 2d 913, 927 (S.D. Ind. 2008). Scienter is "a mental state embracing intent to deceive, manipulate, or

---

[18]This is the ruling on Black's and his then codefendants' motions to dismiss the SEC's First Amended Complaint.

defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2507 (2007). See also Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 756 (7th Cir. 2007). This may be demonstrated by knowledge of the statement's or omission's falsity, "reckless disregard of the truth," or "deliberate ignorance." Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 704 (7th Cir. 2008); Pugh v. Tribune Co., 521 F.3d 686, 693 (7th Cir. 2008); Higginbotham, 495 F.3d at 756; SEC v. Jakubowski, 150 F.3d 675, 681-82 (7th Cir. 1998); SEC v. Kelly, 545 F. Supp. 2d 808, 811 (N.D. Ill. 2008).

As is discussed above, it is conclusively established that the Forms 10-K, 2002 Proxy, and 2002 Proxy Questionnaire contained false statements or omissions. The undisputed facts are both that Black reviewed and signed these statements and was responsible for concealing and mischaracterizing the true nature of the pertinent payments, which makes him responsible for the false statements or omissions in the documents. See McConville, 465 F.3d at 786-87; SEC v. Enterprises Solutions, Inc., 142 F. Supp. 2d 561, 575 (S.D.N.Y. 2001). As is discussed above, it is also conclusively established that Black knew of or at least recklessly disregarded the false statements or omissions, which satisfies the scienter requirement. The undisputed facts also satisfy materiality. A reasonable factfinder could only conclude

that it is substantially likely that a reasonable investor would view $6,100,000 in unauthorized payments to officers and directors as significantly altering the total mix of information available. Cf. SEC v. Pace, 173 F. Supp. 2d 30, 33 (D.D.C. 2001); SEC v. Kalvex Inc., 425 F. Supp. 310, 315 (S.D.N.Y. 1975). See also Dismissal Ruling, 2007 WL 1498893 at *6. Black does not contend that the "in connection" element is not satisfied. It is satisfied. See SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); SEC v. C. Jones & Co., 312 F. Supp. 2d 1375, 1381 (D. Colo. 2004).

The SEC is entitled to summary judgment as to liability on Count I limited to statements in the 2001 Form 10-K, 2002 Form 10-K, 2002 Proxy, and 2002 Proxy Questionnaire related to the APC payments and Supplemental Payments. Although no additional relief can be obtained thereby, the SEC also moves for summary judgment on the remaining counts so those counts will also be considered.

## C. Count II

Count II alleges violations of § 14(a) and Rules 14a-3 and 14a-9. Section 14(a) prohibits soliciting or permitting the use of one's name to solicit a proxy with respect to any registered security in violation of SEC rules and regulations. 15 U.S.C. § 78n(a). Rule 14a-3 requires that each solicited person receive a proxy statement containing the information

specified in Schedule 14A, including, for officers seeking election, related party transactions as described in Regulation S-K. See 17 C.F.R. § 240.14a-3(a); 17 C.F.R. § 240.14A-101, Item 7(b); 17 C.F.R. § 229.404(a); Western Dist. Council of Lumber Prod. & Indus. Workers v. Louisiana Pac. Corp., 892 F.2d 1412, 1417 n.2 (9th Cir. 1989). For solicitations subject to the regulation, Rule 14a-9 prohibits using proxy statements containing materially false or misleading statements. 17 C.F.R. § 240.14a-9(a). The government bases its § 14(a) claim on the 2002 Proxy being used when Black stood for election as a Director at the 2002 annual meeting.

One element of the SEC's claimed § 14(a) violation is that the proxy contained false or misleading statements of material fact or omitted to state material facts necessary to make the statements not misleading or false. Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007). Information is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976); Tracinda, 502 F.3d at 228. This is the same materiality standard that applies under § 10(b). See Basic, 485 U.S. at 231-32 (applying TSC's § 14(a) materiality standard to § 10(b)); In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 1331 (3d Cir. 2002); Levie v. Sears Roebuck & Co., 2006 WL 756063 *5

- 35 -

(N.D. Ill. March 22, 2006). As with Count I, materiality is satisfied. Cf. Kalvex, 425 F. Supp. at 315.

A second element is that the proxy was an essential link in accomplishing the proposed corporate action, Tracinda, 502 F.3d at 228, which, in this case, is the election of directors. Black concedes that this element is satisfied. See Weisberg v. Coastal States Gas Corp., 609 F.2d 650, 654 (2d Cir. 1979); Bender v. Jordan, 439 F. Supp. 2d 139, 169-70 (D.D.C. 2006), appeal dismissed, 2007 WL 117831 (D.C. Cir. Jan. 11, 2007).

Black also contends that scienter is an element of a § 14(a) claim. The Supreme Court has left this question open and the Seventh Circuit has not yet resolved it.[19] It appears that the majority of more recent cases hold that scienter is not an element of a § 14(a) claim. For present purposes, it is unnecessary to determine if scienter is a necessary element. Even if it is, scienter is satisfied for the § 14(a) claim just as it is satisfied for the 2002 Proxy aspect of the § 10(b) claim.

---

[19]Black contends that Dasho v. Susquehanna Corp., 461 F.2d 11, 29 & n.45 (7th Cir. 1972), holds that scienter is an element of a § 14(a) claim. As is being done in the present case, however, Dasho, 461 F.2d at 29, only holds that "[t]o the extent that intent is relevant, the evidence is adequate."

The SEC is entitled to summary judgment as to liability on Count II limited to statements in the 2002 Proxy related to the APC payments and Supplemental Payments.

## D.  Count III

Count III alleges control person liability for violations of § 13(a) and Rules 12b-20, 13a-1, and 13a-13 based on International's Forms 10-K being materially inaccurate regarding the APC payments and Supplemental Payments.  Section 13(a) requires the filing of accurate Forms 10-K, including accurate reporting of the payments at issue.  See 15 U.S.C. § 78m(a)(2); 17 C.F.R. §§ 229.10(a)(2); 17 C.F.R. 229.404(a) (2003); SEC v. Hilsenrath, 2008 WL 2225709 *6-7 (N.D. Cal. May 29, 2008). Section 13(a) does not itself have a scienter requirement. Hilsenrath, 2008 WL 2225709 at *7.  The undisputed evidence establishes that the APC payments and Supplemental Payments were misleadingly reported on the Forms 10-K.  That constitutes a violation of § 13(a).

Black's liability for the § 13(a) violation, however, is based on control person liability.  In addition to establishing International's violation of § 13(a), it must be established that Black exercised general control over the operations of International and that he possessed the power or ability to control the reporting of the pertinent payments in the Forms 10-K, whether or not that power was actually exercised.

Dismissal Ruling, 2005 WL 1498893 at *7 (quoting Harrison v. Dean Witter Reynolds, Inc., 79 F.3d 609, 614 (7th Cir. 1996)). Black does not contend that the SEC fails to establish these elements. As to control person liability, Black instead argues it "is foreclosed . . . if Black can establish he acted in good faith and did not directly or indirectly induce the alleged violation." Black's Memo. [137] 16. He asserts this type of issue should be determined at trial by the trier of fact. This aspect of control person liability, however, is an affirmative defense on which Black bears the burden. Harrison, 79 F.3d at 614; 766347 Ontario Ltd. v. Zurich Capital Mkt., Inc., 274 F. Supp. 2d 926, 932 (N.D. Ill. 2003). In response to summary judgment, he must present sufficient evidence to support the applicability of this defense, which he does not. In any event, as previously discussed, the only reasonable inference from the facts established by collateral estoppel is that Black acted with scienter not in good faith.

The SEC is entitled to summary judgment as to liability on Count III limited to statements in the 2001 and 2002 Forms 10-K related to the APC payments and Supplemental Payments.

### E. Count IV

Count IV alleges violations of sections 13(b)(2)(A) and 13(b)(2)(B) which require that International "make and keep books, records, and accounts, which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of [its] assets," 15 U.S.C. § 78m(b)(2)(A), and "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and (II) to maintain accountability for assets; [and] (iii) access to assets is permitted only in accordance with management's general or specific authorization," id. § 78m(b)(2)(B)(ii)-(iii).

The SEC does not point to any particularized evidence of International's recordkeeping practices and no evidence of its internal controls. It contends that the fact that the Forms 10-K contained misleading statements necessarily means that subsection 2(A) is violated and the fact that Black and his co-schemers misreported the two types of payments necessarily means the internal controls were deficient. The misstatements contained in the Forms 10-K establish a violation of § 13(b)(2)(A)'s recordkeeping requirement. See Ponce v. SEC, 345 F.3d 722, 736 (9th Cir. 2003); SEC v. Patel, 2008 WL 781912 *16 (D.N.H. March 24, 2008); SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724, 748-49 (N.D. Ga. 1983). As to subsection (b)(2)(B), however, determining that there are deficient internal controls is a fact-intensive inquiry. See World-Wide Coin, 567

F. Supp. at 750-51; Patel, 2008 WL 781912 at *17; Marsden v.
Select Med. Corp., 2006 WL 891445 *15 (E.D. Pa. April 6, 2006),
vacated in part on other grounds, 2007 WL 518556 (E.D. Pa.
Feb. 12, 2007). Since the SEC does not provide such factual
support, it is not entitled to summary judgment based on a
§ 13(b)(2)(B) violation.

The SEC has sufficiently established a violation of
§ 13(b)(2)(A). As to Count IV, the parties raise the same
control person contentions and arguments as for Count III. For
the reasons previously discussed regarding Count III, Black's
control person liability for the § 13(b)(2)(A) violation is
sufficiently established.

The SEC is entitled to summary judgment as to liability
on Count IV limited to statements in the 2001 and 2002 Forms 10-K
related to the APC payments and Supplemental Payments and limited
to a violation of § 13(b)(2)(A) of the Exchange Act. As to the
§ 13(b)(2)(B) claim, the SEC is entitled to summary judgment that
it is conclusively established that the 2001 and 2002 Forms 10-K
contain inaccuracies related to the APC payments and Supplemental
Payments.

### F.  Counts V and VI

Counts V and VI allege that Black falsified books and
records of International. Count V is based on Rule 13b2-1 which
prohibits directly or indirectly falsifying or causing to be

falsified books and records subject to § 13(b)(2)(A). Count VI
is based on § 13(b)(5) which prohibits knowingly falsifying books
and records subject to § 13(b)(2)(A). As was discussed,
regarding Count IV, violations of § 13(b)(2)(A) are established.
Causation is satisfied in that it is conclusively established by
collateral estoppel that Black knowingly provided inaccurate
information in his 2002 Proxy Questionnaire and knowingly failed
to disclose to the Audit Committee accurate information about the
pertinent payments.

Count VI also alleges that Black violated § 13(b)(5) by
evading internal controls. Since the SEC does not present
evidence regarding internal controls, this claim is not
established. Summary judgment as to liability will not be
granted as to this aspect of Count VI. As with the § 13(b)(2)(B)
claim discussed above, summary judgment is established as to
specified facts.

The SEC is entitled to summary judgment as to liability
on Counts V and VI limited to statements in the 2001 and 2002
Forms 10-K related to the APC payments and Supplemental Payments
and limited to violations of § 13(b)(2)(A)'s recordkeeping
requirement. As to the aspect of Count VI based on circumventing
the internal control requirements of § 13(b)(2)(B), the SEC is
entitled to summary judgment that it is conclusively established
that the 2001 and 2002 Forms 10-K contain inaccuracies related to

the APC payments and Supplemental Payments and that Black caused those inaccuracies to be on the Forms.

## G.  Count VIII

In Count VIII, the SEC alleges that Black violated Rule 13a-14(b) which, in accordance with Sarbanes-Oxley, required that Black, as International's CEO, certify as to the 2002 Form 10-K that:  "Based on his or her knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report." 17 C.F.R. § 240.13a-14(b)(2) (2003).  The parties agree that Black signed such a certification for the 2002 Form 10-K.[20]  As previously discussed, it is established that this certification was knowingly false in that Black knew the APC payments and Supplemental Payments were misleadingly reported or omitted.

Black contends a violation of the certification requirement of Rule 13a-14(b) does not support a separate cause of action.  He contends such conduct is only actionable if it violates some other actionable provision of the securities laws. Two district court cases have so held, see In re Intelligroup Sec. Litig., 468 F. Supp. 2d 670 706-07 (D.N.J. 2006) (no private

---

[20]The certification requirement was not in effect at the time the 2001 Form 10-K was filed.

right of action for violation of certification requirement); In re Silicon Storage Tech., Inc., Sec, Litig., 2007 WL 760535 *17 (N.D. Cal. March 9, 2007) (no independent claim for a false certification), and the SEC so indicated at the time it first proposed Rule 13a-14, see SEC Release No. 8124, 2002 WL 3170215 *9 (Aug. 28, 2002) ("An officer providing a false certification potentially could be subject to Commission action for violating Section 13(a) or 15(d) of the Exchange Act and to both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."); 67 Fed. Reg. 57,276, 57,280 (Sept. 9, 2002) (same). The SEC contends cases have held that the SEC may base enforcement actions directly on violations of Rule 13a-14. The two cases cited by the SEC, however, hold that sufficient facts are alleged to state the Rule has been violated by a false certification, but neither addresses whether a false certification can stand as an independent claim. See SEC v. Brady, 2006 WL 1310320 *5 (N.D. Tex. May 12, 2006);[21] SEC v. Sandifur, 2006 WL 538210 *8 (W.D. Wash. March 2, 2006).[22] Many

---

[21]The entire discussion in Brady directly addressing the certification claim is the following. "SEC asserts that Brady and Beecher are directly liable under . . . SEC Rule 13a-14, 17 C.F.R. § 240.13a-14 (2008)." Brady, 2006 WL 1310320 at *2. "As to the books-and-records claims, SEC has adequately pleaded . . . that Beecher committed a primary violation of Rule 13a-14." Id. at *5.

[22]The entire discussion in Sandifur, 2006 WL 538210 at *8, is: "The tenth claim alleges that Defendant Ness signed a

cases have held that a violation of the certification requirement

may be considered in determining whether scienter is adequately

alleged or proven, though cases differ as to the weight of such

allegations or evidence. See In re Intelligroup Sec. Litig.,

527 F. Supp. 2d 262, 356-57 (D.N.J. 2007); In re Proquest Sec.

Litig., 527 F. Supp. 2d 728, 742-43 (E.D. Mich. 2007); In re

BearingPoint, Inc. Sec. Litig., 525 F. Supp. 2d 759, 773 (E.D.

Va. 2007).

     Consistent with the SEC Release and the two cases that

have addressed the issue, it is held that a false Sarbanes-Oxley

certification does not state an independent violation of the

securities law. Therefore, summary judgment will not be granted

as to Count VIII. Instead, Count VIII will be dismissed for

failing to state a claim.

---

false Sarbanes-Oxley certification that was included in
Metropolitan's 2002 10-K. (Compl. ¶ 94.) In addition to this
specific allegation, the claim also relies on and incorporates
the complaint's other preceding allegations. As in the first,
second and sixth claims, the Court finds that the allegations
adding up to the tenth claim provide the who (Defendant Ness),
what (false certification), when (filed December 31, 2002), where
(in the 2002 10-K), and how (by signing it) necessary to allow
Defendant Ness to prepare his defense. Therefore, the tenth
claim is pled with sufficient particularity and Defendant Ness's
motion as to this claim is DENIED."

## IV. DELAWARE PROCEEDING

Still to be considered is whether the collateral estoppel effect of the Delaware proceeding supports entering summary judgment in favor of the SEC on Count I to the extent it is based on Black joining in a November 17, 2003 press release regarding the Restructuring Proposal. The SEC contends that Black falsely represented in the press release that he had a present intent to comply with the Restructuring Proposal including by devoting his time and attention to the Strategic Process for selling International's assets and by refraining from engaging in transactions for his own benefit that would undermine the Strategic Process. In the Delaware proceeding, the Chancery Court entered a final judgment for monetary and injunctive relief based on, inter alia, fiduciary violations and breaching the Restructuring Proposal.[23] Similar to an argument made regarding

[23]It is unnecessary to separately address the holdings of the Supreme Court of Delaware. Without a discussion as to specific findings and holdings, the Supreme Court of Delaware affirmed all the essential findings and holdings of the Chancery Court, stating: "To the extent the Court of Chancery made findings of fact, those findings are amply supported by the evidentiary record and are the result of a logical and orderly deductive process. To the extent the Court of Chancery made determinations of law that were based upon those findings, and that were essential to resolving the claims and counterclaims of the parties, we find those conclusions to be free from legal error. The rationale for the rulings of the Court of Chancery are set forth in its extensive Opinion of February 26, 2004 and its bench ruling, and no useful purpose is served by further discussing those rulings in a separate opinion. We therefore uphold the judgment(s) on the basis of the Court of Chancery's

the collateral estoppel effect of the federal convictions, Black

contends that a representation in the press release being

intentionally false was not an essential element of any claim in

the Delaware proceeding so there cannot be a sufficient basis for

establishing a § 10(b) violation. The question, however, is

whether essential findings made in the Delaware proceeding are

only consistent with statements in the press release being

knowingly false at the time they were made. It does not matter

whether having a false representation in the press release was

itself an essential element of any claim in the Delaware

proceeding.

Essential to the Chancery Court's finding of a breach of

contract, were findings that Black breached promises in the

Restructuring Proposal that he would devote his principal time

and energy to the Strategic Process and that he would not enter

into transactions that would interfere with the Strategic

Process. Delaware Ruling, 844 A.2d at 1063. He breached these

promises by attempting to sell to the Barclay Brothers his

interest in Inc., which would also be a controlling interest in

International. The Barclay Brothers had initially contacted

well-reasoned Opinion and bench ruling. Our affirmance of those
judgments, however, should not be viewed as approval or
disapproval of statements that are dictum, i.e., rulings that
were not essential to a resolution of the claims before the Court
of Chancery and to the award of the judgment(s) affirmed by this
Court." Delaware Appeal, 872 A.2d at 567.

Black in an attempt to purchase The Daily Telegraph, one of International's premier newspaper properties. While this would be a collateral estoppel basis for conclusively establishing that these breaches occurred, the breach of contract claim did not require any finding of intent, including whether Black intended to breach the agreement when he first entered into it. Instead, the SEC must primarily rely on findings regarding the breaches of fiduciary duty.

The Chancery Court summarized the breaches of fiduciary duty as follows:

> Black concealed from the International board the Barclays' intense interest in acquiring [the Telegraph]. Letters sent to Black by the Barclays seeking to purchase the Telegraph were never given to the International board. Rather, Black took it upon himself to first reject that opportunity and later to divert that opportunity to Inc. The fact that Black mentioned to Lazard [International's financial advisor under the Strategic Process] that the Barclays were a possible purchaser with an interest in the Telegraph did not fulfill his obligation to be candid to his fellow directors. Rather, as previously detailed, Black used his knowledge that the Strategic Process would take several months and involve a market canvass to induce the Barclays to deal through him outside of the Strategic Process as a "means" to their "end" of controlling the Telegraph. Black compounded this improper behavior by giving false assurances that he was honoring his obligations to International and not shopping Inc. Adding to his misconduct, Black used confidential information about International to deal for himself and Inc. without disclosing that to the International board.

Thus, Black violated his fiduciary duty
of loyalty by, among other acts, (1) purposely
denying the International board the right to
consider fairly and responsibly a strategic
opportunity within the scope of its Strategic
Process and diverting that opportunity to
himself; (2) misleading his fellow directors
about his conduct and failing to disclose his
dealings with the Barclays, under circumstances
in which full disclosure was obviously expected;
(3) improperly using confidential information
belonging to International to advance his
own personal interests and not those of
International, without authorization from his
fellow directors; and (4) urging the Barclays to
pressure Lazard with improper inducements to get
it to betray its client, International, in order
to secure the board's assent to the Barclays
Transaction.  In sum, Black intentionally
subverted the International Strategic Process he
had pledged to support through a course of
conduct involving misleading and deceptive
conduct toward his fellow directors, all
designed with the goal of presenting them
with a "fait accompli."  Most critically, the
Restructuring Proposal did exist and constricted
Black's, and therefore Inc.'s, range of action.
It is difficult to conceive of a meaningful
definition of the duty of loyalty that tolerates
conduct of this kind.

Delaware Ruling, 844 A.2d at 1061-62.

The Chancery Court found that Black had rebuffed initial

overtures from Barclay regarding purchasing the Telegraph,

including as late as November 3, 2003. Id. at 1035-36, 1039. It

was also found that International was not informed of this

opportunity. Id. at 1036. In late October 2003, a Special

Committee of International's Board initially concluded that there

had been $15,600,000 in improper non-competition payments and

Black was aware of this. Id. at 1036, 1038. In a letter dated November 6, 2003, Black and the others were informed in writing and given until November 10 to respond and provide evidence the payments had been approved. Id. at 1038. In his November 10 response, Black proposed selling off assets, which led to the negotiation process that resulted in the Restructuring Proposal. See id. at 1038-39. As found by the Chancery Court, actual negotiations began on November 13 and an agreement was reached on November 15. Id. at 1040-41. The Restructuring Proposal was first made public in the November 17, 2003 press release which Black participated in crafting, reviewed, and specifically approved. Id. at 1043, 1076. Between the November 10 letter and beginning formal negotiations on November 13, the Chancery Court found that, on November 11, Black "reached out to the Barclays" by informing David Barclay that Black had a "thought worthy of discussion." Id. at 1039-40. As to the discussions with the Barclays, it was further found:

> Knowing that International's time frame for the Strategic Process was not an expedited one and knowing that the International board was relying upon the contractual commitments he had made in ¶¶ 6 and 7 of the Restructuring Proposal, Black used this breathing room to pursue transactions in violation of the Restructuring Proposal. Most notably, on November 17, 2003, Black began to turn the Barclays away from their interest in a direct purchase of The Daily Telegraph and towards a purchase of Inc.

Id. at 1044-45.

Essential to the Chancery Court's findings of fiduciary violations were its findings that Black purposefully misled International's Board by hiding the Barclay discussions from members of the Board.  The discussions with the Barclays and the deception occurred both before and after the November 15 agreement to the Restructuring Proposal and the November 17 date of the press release.  The Chancery Court does not specifically find when the press release was finally approved.[24]  It would have been sometime between reaching agreement on the Restructuring Proposal on November 15 and the release being issued on November 17.  While it could be inferred that approval would have occurred closer to the 17th than the 15th, Black can only be estopped from contending the approval occurred any earlier than November 15.

The Chancery Court found that Black had undisclosed discussions with the Barclays through November 3.  It was not until November 11 that Black became interested in what the Barclays might have to offer.  On November 17, Black first tried to interest the Barclays in purchasing Inc. instead of the Telegraph.  Before and after the November 15 date on which it is presently assumed Black agreed to the press release, Black was

---

[24]Neither party points to the evidence that was before the Chancery Court on this issue.

intentionally hiding the Barclays discussions from the Board. It is established that Black was deceptively engaging in violations of his fiduciary duties. It is also established that Black engaged in such a violation and also breached the Restructuring Proposal on the same day that the press release was issued. Treating these facts as established,[25] could a reasonable finder of fact only conclude that, two days before soliciting the Barclays' interest, Black already had no intention of upholding the promises at issue? In other words, could a factfinder reasonably find that Black had a sincere change of intent for the couple days that the Restructuring Proposal was being negotiated?

---

[25]The Restatement provides that, absent changed circumstances, collateral estoppel may be directly applied to situations that are close in time, for example, a finding that a person was incompetent on one day may conclusively establish that he or she was incompetent a week later. See Restatement (Second) Judgments § 27 cmt. c, illus. 7-8 (1982). In a criminal case, however, the Supreme Court of Delaware has held that a person being found not guilty by reason of insanity does not conclusively establish that he was insane at the time he allegedly committed a different crime a few hours earlier, because a finding as to the earlier crime and time period was not essential to the judgment in the other case. See Taylor v. State, 402 A.2d 373, 375-76 (Del. 1979) ("Taylor I"). But see United States ex rel. Taylor v. Redman, 500 F. Supp. 453, 455-58 (D. Del. 1980) (granting habeas corpus relief to the defendant in Taylor I based on collateral estoppel as incorporated in the Double Jeopardy provision of the federal Constitution). Following the Delaware Supreme Court precedent, collateral estoppel may not be directly applied to conclusively establish that Black had a particular intent on November 15. As discussed in the text, however, the only reasonable inference from the established facts is that he had the pertinent scienter on November 15.

The Chancery Court found that Black acted with the knowledge that the Strategic Process gave him "breathing room." See id. The only finding that would be consistent with essential facts established by the Chancery Court's finding is that Black intended to continue his improper conduct with the Barclays even while agreeing otherwise in the Restructuring Proposal and agreeing to publicly declare otherwise in the press release. Based on the established facts, the only reasonable inference is that Black had the necessary § 10(b) scienter at the time he agreed to issue the pertinent statements in the press release.

Black makes passing reference to the materiality of the press release not being sufficiently shown, but does not provide any argument in support of this assertion. In any event, it can only be found that his representations in the press release regarding cooperating with the Strategic Process would be viewed by a reasonable investor as significantly altering the total mix of information available.

Black's other contention regarding the collateral estoppel effect of the Delaware proceeding is that the offensive use of nonmutual collateral estoppel should be applied in a strictly limited manner. Delaware precedents support that whether to permit the offensive use of collateral estoppel is a discretionary determination. Krigstein v. Krigstein, 2000 WL

145823 *1 (Del. Super. Feb. 3, 2000); Boone v. Oy Partek Ab,
724 A.2d 1150, 1154 (Del. Super. 1997), aff'd by unpublished
order, 707 A.2d 765 (Del. 1998). Factors to consider include
fairness; intervening changes in the law; whether judicial
economy is promoted; whether the defendant had incentive to
vigorously defend the prior lawsuit; whether there are other
inconsistent judgments; and whether the defendant would have
procedural opportunities in the latter suit that were not
available in the prior suit. Krigstein, 2000 WL 145823 at *1;
Boone, 724 A.2d at 1154; Chrysler Corp. v. New Castle County,
464 A.2d 75, 82 (Del. Super. 1983) (citing Parklane Hosiery
Co. v. Shore, 439 U.S. 322 (1979)).

Black had strong incentive to litigate the Delaware
proceeding which not only concerned his ability to control
International and sell Inc., but also involved a large amount of
money. The monetary judgment entered totaled nearly $30,000,000
plus interest. While the hearing on the matter was initially for
preliminary relief, there is no contention that Black had an
inadequate opportunity for discovery or to present his case
before the court entered a final judgment, in part based on
summary judgment. Neither party points to other inconsistent
judgments or pertinent changes in the law. Black does not point
to any procedural opportunity in the present case that he did not

have in the Delaware proceeding. It is fair to permit the offensive use of collateral estoppel.

The SEC is entitled to summary judgment as to liability on Count I based on Black's representations in the November 17, 2003 press release that he had a present intent to comply with the Restructuring Proposal including by devoting his time and attention to the Strategic Process for selling International's assets and by refraining from engaging in transactions for his own benefit that would undermine the Strategic Process.

## V. INJUNCTIVE RELIEF

The SEC seeks the entry of an injunction consistent with the findings of liability. It seeks a permanent injunction and an officer and director bar.

Section 21(d)(1) of the Exchange Act authorizes the SEC to seek a permanent injunction prohibiting a person from committing future violations of the securities laws. 15 U.S.C. § 78u(d)(1).

> [A]ctions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisdiction. "[O]nce a violation is demonstrated, the moving party need only show that there is some reasonable likelihood of future violations." SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982). The court must consider the following factors in determining the likelihood of future violations: (1) the gravity of harm caused by the offense;

- 54 -

> (2) the extent of the defendant's participation
> and degree of scienter; (3) the isolated or
> recurrent nature of the infraction and the
> likelihood that the defendant's customary
> business activities might again involve him in
> such transactions; (4) the defendant's
> recognition of his own culpability; and (5) the
> sincerity of his assurances against future
> violations. Id.

SEC v. Randy, 38 F. Supp. 2d 657, 672 (N.D. Ill. 1999).

Section 21(d)(2) permits a court to prohibit a person

from serving as an officer or director of a public company if

violations of § 10(b) show the person is unfit for such service.

15 U.S.C. § 78u(d)(2). "In determining whether to order the bar,

a court may consider: '(1) the 'egregiousness' of the underlying

securities law violation; (2) the defendant's 'repeat offender'

status; (3) the defendant's 'role' or position when he engaged in

the fraud; (4) the defendant's degree of scienter; (5) the

defendant's economic stake in the violation; and (6) the

likelihood that misconduct will recur.'" SEC v. First Pac.

Bancorp, 142 F.3d 1186, 1194 (9th Cir. 1998) (quoting SEC v.

Patel, 61 F.3d 137, 141 (2d Cir. 1995)). Accord SEC v. Koenig,

532 F. Supp. 2d 987, 994 (N.D. Ill. 2007).

Black contends that neither form of relief should be

granted because it has not been established that he knowingly

engaged in any securities law violation. As is discussed above,

there are sufficient facts to establish a number of knowing

misrepresentations that violated § 10(b). Black also contends that the requested relief is unnecessary because he is 63 years old and, absent his conviction being overturned by the Supreme Court, will be in prison until he is 70. He contends this means he is not likely to commit any future violations or again serve as an officer or director.

Substantial and knowing securities laws violations have been shown, including misrepresentations in two Forms 10-K, a proxy statement, a proxy questionnaire, and a press release. These violations involved substantial amounts of money. This is not Black's first violation. It is undisputed that, in 1982, he consented to entry of a permanent injunction in a different SEC enforcement action. Black points to nothing supporting that he has acknowledged his culpability nor anything indicating a sincere desire to act properly in the future. Black's current imprisonment is not sufficient reason to deny an injunction. See SEC v. Blackwell, 477 F. Supp. 2d 891, 911-12 (S.D. Ohio 2007); SEC v. Patterson, 2006 WL 770626 *3 (N.D. Okla. March 23, 2006).

The two forms of injunctive relief will be granted. Other than the order for injunctive relief, which is a judgment, no judgment will be entered at this time. See generally Fed. R. Civ. P. 54(b). The government shall submit a proposed order for injunctive relief that is consistent with the actual violations

upon which summary judgment has been held appropriate. Prior to submitting the proposed order, the government shall provide Black with sufficient opportunity to suggest modifications.

Black's pending motions for entry of a proposed discovery schedule will be denied without prejudice. Prior to the next status hearing, the parties shall confer regarding what discovery may be necessary to resolve the remaining issues in this case. The parties shall submit a joint proposed discovery plan.

IT IS THEREFORE ORDERED that defendant's motions for entry of proposed discovery plan [120, 124] are denied without prejudice. Plaintiff's motion for summary judgment [127] is granted in part and denied in part. Count VIII of the First Amended Complaint is dismissed. By October 20, 2008 the parties shall submit a joint proposed discovery schedule and plaintiff shall submit a proposed order for injunctive relief. A status hearing will be held on October 22, 2008 at 11:00 a.m.

As to the following issues, plaintiff is entitled to summary judgment as to liability:

(1) Count I based on (a) statements in the 2001 Form 10-K, 2002 Form 10-K, 2002 Proxy, and 2002 Proxy Questionnaire related to the APC payments and Supplemental Payments and (b) Black's representations in the November 17, 2003 press

release that he had a present intent to comply with the
Restructuring Proposal including by devoting his time and
attention to the Strategic Process for selling International's
assets and by refraining from engaging in transactions for his
own benefit that would undermine the Strategic Process;

(2) Count II based on statements in the 2002 Proxy
related to the APC payments and Supplemental Payments;

(3) Count III based on statements in the 2001 and 2002
Forms 10-K related to the APC payments and Supplemental Payments;

(4) Count IV based on statements in the 2001 and 2002
Forms 10-K related to the APC payments and Supplemental Payments
and limited to a violation of § 13(b)(2)(A) of the Exchange Act;
and

(5) Counts V and VI based on statements in the 2001 and
2002 Forms 10-K related to the APC payments and Supplemental
Payments and limited to violations of the recordkeeping
requirement of § 13(b)(2)(A) of the Exchange Act.

Additionally, (6) as to the Count IV § 13(b)(2)(B) claim,
plaintiff is entitled to summary judgment that it is conclusively
established that the 2001 and 2002 Forms 10-K contain
inaccuracies related to the APC payments and Supplemental

Payments; and (7) as to the aspect of Count VI based on circumventing the internal control requirements of § 13(b)(2)(B) of the Exchange Act, the SEC is entitled to summary judgment that it is conclusively established that the 2001 and 2002 Forms 10-K contain inaccuracies related to the APC payments and Supplemental Payments and that Black caused those inaccuracies to be in the Forms.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED: SEPTEMBER 24, 2008