

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECURITIES AND EXCHANGE      )
COMMISSION,                  )
                             )
          Plaintiff,         )
                             )
     v.                      )     No. 04 C 7377
                             )
CONRAD M. BLACK,             )
                             )
          Defendant.         )

## OPINION AND ORDER

This is a civil enforcement action brought by the
Securities and Exchange Commission ("SEC") alleging violations of
the Securities Exchange Act of 1934 ("Exchange Act") and Rules
issued thereunder.  From 1999 through 2003, defendants Conrad
Black and David Radler allegedly engaged in a fraudulent and
deceptive scheme to divert cash and assets from Hollinger
International, Inc. ("International")[1] to themselves and others,
both directly and through defendant Hollinger, Inc. ("Inc.").
Radler and Inc. have each settled with the SEC and have entered
into separate consent judgments.  Discovery as to the claims
against Black was stayed while a related criminal proceeding was
pending against Black before a different judge of this court.

---

[1]International is now known as the Sun-Times Media Group.

Following a jury trial in the criminal proceeding, Black was found guilty on three mail fraud charges in violation of 18 U.S.C. § 1341 and one obstruction of justice charge in violation of 18 U.S.C. § 1512(c). Black's conviction and sentence were affirmed by the Seventh Circuit and a petition for certiorari is pending. See United States v. Black, 530 F.3d 596 (7th Cir. 2008), cert. filed, 77 U.S.L.W. 3432 (Jan. 9, 2009). In a proceeding in the Delaware Chancery Court, International successfully obtained injunctive, declaratory, and monetary relief against Black based on conduct that overlaps with allegations contained in the SEC's Complaint in this case. See Hollinger Int'l, Inc. v. Black, 844 A.2d 1022 (Del. Ch. 2004), aff'd, 872 A.2d 559 (Del. 2005).

In the present case, primarily relying on the collateral estoppel effect of the judgments in the criminal and Delaware proceedings, summary judgment was granted against Black, but limited to particular counts and based on particular statements. See SEC v. Black, 2008 WL 4394891 *22 (N.D. Ill. Sept. 24, 2008) ("Estoppel Ruling"). As to those liability determinations,[2] the parties now seek a determination as to the amount of disgorgement

---

[2]The SEC represents that it still intends to pursue additional aspects of its claims that were not resolved in the Estoppel Ruling, including claims related to criminal counts on which Black was acquitted.

and related civil penalties.[3] They primarily rely on facts contained in a recent stipulation of the parties and the factual determinations contained in the Estoppel Ruling, as well as some additional documents. The parties have agreed that the court can decide this issue based on the stipulation and documentary submissions.

All the violations that were determined to have occurred involved Non-Competition Payments to Black by American Publishing Company ("APC") and "Supplemental Payments" to Black related to the "Forum" and "Paxton" transactions. See Estoppel Ruling, 2008 WL 4394891 at *1. The violations are based on statements contained in the following documents: Black's 2002 Proxy Questionnaire dated January 31, 2002, see id. at *10; International's 2001 Form 10-K filed April 1, 2002, see id. at *9; International's 2002 Proxy Statement filed April 2, 2002, see id. at *10; International's 2003 Form 10-K filed March 31, 2003, see id. at *9; and a press release dated November 17, 2003, see id. at *17. Black committed violations of the following Exchange Act provisions: § 10(b) and Rule 10b-5, see id. at *13;

---

[3]A judgment for injunctive relief based on the Estoppel Ruling has already been entered. See Docket Entry [170]. Black is enjoined from committing further violations of specified securities laws and from acting as an officer or director of an issuer of securities registered under the Exchange Act.

§ 14(a), see id. at *14; § 13(a), see id.; and §§ 13(b)(2)(A)-
(B), see id. at *15, 16.

The SEC does not seek disgorgement of the Non-Competition
and Supplemental Payments since those were previously repaid
pursuant to rulings in other cases. Instead, the SEC presently
seeks disgorgement of compensation Black received directly or
indirectly from International from 2001 through 2003. As to most
of the compensation, International paid management fees to
Ravelston and other corporations controlled by Black and Black
received compensation directly from those corporations (or
through subsidiaries of those corporations) representing
management fees paid by International. Based on the parties'
stipulation, the SEC contends the compensation directly or
indirectly paid to Black from International totals
$10,817,191.60.[4] The SEC's theory is that, had Black not covered
up the Non-Competition and Supplemental Payments in late 2000, by
early 2001, International's Board of Directors would have
terminated Black's positions and relationship with International
and discontinued any further direct or indirect compensation as
it promptly did following a November 2003 determination that

_____

[4]The payments were in Canadian funds and the parties have
stipulated to the appropriate conversion rates for United States
funds. Except where noted, the dollar amounts stated in today's
ruling are all in United States dollars.

Black had improperly received the Non-Competition and Supplemental Payments. Black disputes what portion of the $10,817,191.60 should be considered compensation from International or causally linked to the found violations, particularly whether any 2001 payments can be causally linked to statements made in 2002 and 2003. Black also contends that, even if some compensation is causally linked to his securities violations, he should not be required to return all the compensation since International benefitted from the services he provided for the compensation.

Disgorgement is an equitable remedy designed to deprive a wrongdoer of unjust enrichment and also to deter others. SEC v. Alanar, Inc., 2008 WL 1994854 *4 (S.D. Ind. May 6, 2008) (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989)); SEC. v. Michel, 521 F. Supp. 2d 795, 830 (N.D. Ill. 2007); SEC v. Jakubowski, 1997 WL 598108 *2 (N.D. Ill. Sept. 19, 1997) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996)). The district court has broad discretion in determining whether to award disgorgement and in setting the amount. Alanar, 2008 WL 1994854 at *4; Michel, 521 F. Supp. 2d at 830; SEC v. Collins, 2003 WL 21196236 *5 (N.D. Ill. May 21, 2003). Disgorgement of salaries and other forms of compensation may be an appropriate remedy. See SEC v. Koenig, 557 F.3d 736,

744-45 (7th Cir. 2009); SEC v. Church Extension of Church of

Church, Inc., 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005); SEC v.

Conaway, 2009 WL 902063 *20 (E.D. Mich. March 31, 2009).

As to the proofs required:

> . . . The SEC is required to show that the amount of disgorgement is a "reasonable approximation" of the profits the defendant reaped from the wrongful conduct. See First City Financial Corp., 890 F.2d at 1231; SEC v. Randy, 38 F. Supp. 2d 657, 673-74 (N.D. Ill. 1999). The burden then shifts to the defendant to show that this approximation is inaccurate. First City Financial Corp., 890 F.2d at 1232; Randy, 38 F. Supp. 2d at 674. Any ambiguity in the calculation should be resolved against the defrauding party. SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996); SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995); SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 214 n.21 (E.D. Mich. 1991)[, aff'd, 12 F.3d 214 (6th Cir. 1993)]. However, disgorgement is not a punitive remedy. Rowe v. Maremont, 850 F.2d 1226, 1241 (7th Cir. 1988).
>
> Courts do not require the SEC to trace every dollar of a defendant's ill-gotten gains. SEC v. First Pacific Bancorp., 142 F.3d 1186, 1192 n.6. (9th Cir. 1998). Where the defendants have commingled the money, the SEC is not required to identify the misappropriated money. Great Lakes Equities Co., 775 F. Supp. at 214 n.21. "Since calculating disgorgement may at times be a near-impossible task, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id., citing First City Fin. Corp., 890 F.2d at 1232.

Alanar, 2008 WL 1994854 at *4. In making its showing of a

reasonable approximation, the SEC must sufficiently show that

amount is causally related to the violation shown. Michel,

F. Supp. 2d at 830-31 (quoting First City, 890 F.2d at 1231) ("amount of disgorgement 'need only be a reasonable approximation of profits causally connected to the violation'"); Church Extension, 429 F. Supp. 2d at 1050 (quoting SEC v. Drexel Burnham Lambert Inc., 837 F. Supp. 587, 612 (S.D.N.Y. 1993), aff'd sub nom., SEC v. Posner, 16 F.3d 520 (2d Cir. 1994)) (same); SEC v. Homa, 2004 WL 1474580 *1 (N.D. Ill. June 28, 2004) (same); Collins, 2003 WL 21196236 at *5 (quoting SEC v. Patel, 61 F.3d at 139) (same).

The SEC includes compensation paid in 2001 because the Forum and Paxton transactions were entered into in Fall 2000 and Black failed to make proper disclosures at the December 2000 International Board meeting approving those transactions, as well as during 2001. The misrepresentations that support the violations found in the Estoppel Ruling, however, occurred in 2002 and 2003. The SEC's disgorgement theory is that Black would have been promptly discharged if he had made proper disclosures. The earliest improper disclosure that supports the violations found is the 2002 Proxy Questionnaire dated January 31, 2002. Had a proper disclosure been made on the 2002 Proxy Questionnaire, the earliest International would have terminated its relationship with Black would have been early 2002.[5] There

---

[5]The SEC makes no contention regarding the possible effect of International being aware of the contents of this

is no contention by the SEC that, had International discharged

Black following a proper disclosure, it would have demanded

return of compensation (other than the Non-Competition and

Supplemental Payments themselves which are not presently at

issue) from a time period prior to the discharge. Any

disgorgement ordered based on the violations that have been

found will not include 2001 compensation.

Following the November 2003 finding that Black had

improperly arranged for the Non-Competition and Supplemental

Payments, International forced Black out and terminated its

relationship with him within two months. It is a reasonable

inference therefrom that International would have promptly

terminated its relationships with Black had he, as required by

the securities laws he violated, made a full and accurate

disclosure of the transactions in the 2002 Proxy Questionnaire.

Therefore, the burden shifts to Black to show that would not have

occurred. Black presents no evidence to the contrary.

Therefore, the issue is whether the SEC has adequately shown how

much compensation International paid for Black's benefit in 2002

and 2003.

---

document during its drafting stage, which could have occurred
prior to January 31. On the other side, Black makes no attempt
to identify any early 2002 compensation that he could have earned
prior to any possible termination that would have resulted from a
proper disclosure on this form.

It has been stipulated that certain management fees paid by International to Ravelston--$1,588,566.50 in 2002 and $1,245,318.00 in 2003 for a total of $2,833,884.50--were payments to Black as compensation. Stip. ¶¶ 9, 15. Also, directly from International newspaper the Daily Telegraph, Black received payments for being the Chairman of Telegraph Group: $462,460 in 2002 and $523,345 in 2003 for a total of $985,805.[6] Id. ¶¶ 14, 15. Thus, there are $3,819,689.50 in payments by International in 2002 and 2003 that the parties agree was compensation paid to Black (the "Stipulated Payments").

Black disputes whether other 2002 and 2003 payments to him from Ravelston derived from management fees International paid to Ravelston. Ravelston paid "dividends" to Black-controlled CBCC, which CBCC paid to Black. Those totaled $1,845,074.60 in 2003. Id. ¶ 10. Argent Corporation, a Ravelston subsidiary, paid Black a total of $1,351.40 in 2002 and 2003. Id. ¶ 11. In 2002, Ravelston paid CBCC $92,321.50 for "executive and staff compensation." Id. ¶ 12. In 2002 and 2003, there were "repayments" between Ravelston and Black that netted Black $297,545.00. Id. ¶ 13.

Except for the $3,819,689.50 of Stipulated Payments, the SEC does not point to any management fees that International paid

---

[6]The payment from Hollinger Digital need not be further considered since it occurred in 2001. See Stip. ¶ 14,

to Ravelston or any other Black-controlled entity during 2002 and 2003.[7] The SEC concedes that management fees represented a little more than half of Ravelston's total receipts for the 1997 to 2005 time period: $273,148,000 (Cdn) out of $510,180,000 (Cdn.). The SEC notes that most of the other receipts were non-revenue receipts such as loan repayments and share redemptions. But even assuming the source of virtually all the net distributions of Ravelston was management fees from International, when International paid the management fees is a necessary component of the SEC's disgorgement contentions. International terminating further management fees in early 2002 would not have stopped Ravelston from distributing to Black in

---

[7]In its opening brief, at 7, the SEC cites to ¶ 8 of the stipulation as setting forth more than $9,000,000 in payments to Black "from International through Ravelston." That paragraph of the stipulation and the chart referenced therein, however, refer only to payments received by Black. While the stipulation and/or chart refer to the payments coming from Ravelston, CBCC, and Argent, there is no stipulation (except ¶ 9) that any of the funds for those payments came to those entities from International. The SEC fails to recognize that, under its disgorgement theory of Black's relationship with International being terminated in early 2002, the key timing issue is when International made payments for Black's services (before or after the assumed early 2002 termination), not when Black received distribution of payments from one of the entities he controlled. It is stipulated that "International's Form 10-K for the year ended December 31, 2003, states that, according to information supplied by Ravelston to International, Mr. Black's interest in the management fees paid to Ravelston by International for . . . 2002 was . . . $6,485,439." Stip. ¶ 25. The SEC, however, disavows relying on this information from the Form 10-K as conclusively establishing 2002 payments potentially subject to disgorgement. See Opening Brief at 9 n.5; Reply at 7.

Ravelston from distributing to Black in 2002 and 2003 management fees that Ravelston had received prior to 2002, but not yet distributed. It would also not prevent Ravelston from having used pre-2002 management fees to provide loans to others and have those loans repaid in 2002 or later and then distributed to Black. Since, other than the Stipulated Payments, the SEC provides no reliable evidence that 2002 and 2003 Ravelston distributions to Black were derived from post-2001 management fees of International, the proven International compensation of Black that is potentially subject to disgorgement is limited to the $3,819,689.50 of 2002 and 2003 Stipulated Payments, which includes management fees paid through Ravelston and direct payments from the Daily Telegraph .

The last disgorgement issue to consider is Black's contention that he should not be required to disgorge the entire $3,819,689.50 because International benefitted from services he provided for those payments. To the extent Black sufficiently shows that he provided real and valuable services for those payments and sufficiently shows the value of the services he provided, it may be appropriate to reduce disgorgement of his compensation by that amount. See Church Extension, 429 F. Supp. 2d at 1050. Black, however, mostly relies on services he performed prior to 2002 and strong company performance that preceded 2002. During 2002 and 2003,

International had net losses of, respectively, $230,629,000 and $74,308,000. Rather gallingly, Black points to the 2004 sale of the Telegraph Group to the Barclays for $1.3 billion. Black, however, attempted to usurp that sale for his own benefit. The sale was accomplished despite Black's 2003 conduct, not because of him. See Estoppel Ruling, 2008 WL 4394891 at *17-19. No offset will be made for work Black performed for the Telegraph Group or any other International entity.

Based on the foregoing, disgorgement of $3,819,689.50 will be ordered. The SEC has made no attempt to show that it would be appropriate to enter a partial judgment at this time. See generally Fed. R. Civ. P. 54(b). No judgment will be entered at this time. Black does not dispute that prejudgment interest should be included in the judgment at the time it is entered. At the time for entry of judgment, the SEC will be required to provide a new prejudgment interest calculation.[8]

Pursuant to 15 U.S.C. §§ 77t(d) and 78u(d)(3)(A), the SEC requests imposition of the maximum third-tier civil penalty. The maximum that can be imposed for a third-tier penalty committed by a natural person after February 2, 2001, but before February 15,

---

[8]Based on the methodology and calculations provided by the SEC through November 30, 2008, prejudgment interest through that date would be $887,697.62 on the 2002 payments of $2,051,026.50 and $648,612.60 on the 2003 payments of $1,768,663.00 for a total of $1,536,310.22 of prejudgment interest through November 30, 2008.

2005, is the higher of $120,000 or the gross amount of pecuniary gain to the defendant. See 17 C.F.R. §§ 201.1002, 201.1003; 17 C.F.R. Pt. 201, Subpt. E, Tbl. II. Prejudgment interest is included in determining the amount of pecuniary gain that sets the maximum limit. Koenig, 557 F.3d at 744-45. The amount of disgorgement plus prejudgment interest (through November 30, 2008) is $5,355,999.72. Black's pecuniary gain from these violations also includes the $2,897,500.00 of Non-Competition and Supplemental Payments that Black received.[9] The SEC also seeks to include $120,000.00 based on the misrepresentation in the press release related to the Restructuring Proposal for International. That misrepresentation related to Black's attempt to usurp the sale of the Telegraph Group to the Barclays. Black was not able to consummate that deal for himself, so he made no direct pecuniary gain. However, including Black's compensation from the Daily Telegraph in the disgorgement amount is, in large part, based on the misrepresentation in the Restructuring Proposal. Therefore, more than $120,000.00 has already been included in the potential amount for a third-tier penalty related to the misrepresentations in the press release. No additional amount will be added. As to the violations found in the Estoppel Ruling, Black faces a maximum penalty of $8,253,499.72, plus an

_____

[9]This amount is not included in the disgorgement because Black previously repaid these amounts.

amount equal to the additional prejudgment interest that will accrue from December 1, 2008 through the entry of judgment.

Third-tier penalties may be applied if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii); Alanar, 2008 WL 199854 at *6; Church Extension, 429 F. Supp. 2d at 1050. Such findings are supported by the Estoppel Ruling. The imposition of a penalty is a discretionary determination to be made in light of the particular facts and circumstances of the case. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B); SEC v. Daly, 572 F. Supp. 2d 129, 134 (D.D.C. 2008); SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007). Factors that may be considered include the egregiousness of the violations, defendant's intent, whether the violations were recurring, whether defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, any cooperation defendant provided to enforcement authorities, and the imposition of other remedies or penalties. Alanar, 2008 WL 199854 at *7; Church Extension, 429 F. Supp. 2d at 1050-51.

The SEC indicates that it still intends to seek to prove additional securities violations that could not be resolved on

summary judgment based on the collateral estoppel effect of the other rulings, including allegations related to the CanWest and CHNI II transactions, which involved non-competition payments much larger than those ruled upon in the Estoppel Ruling. As previously noted, no basis has been presented for entering a Rule 54(b) partial judgment at the present time. Any civil penalty imposed should be made in light of all the pertinent facts and circumstances, including other violations that have occurred and other remedies and penalties to be imposed. A determination as to an appropriate penalty can more properly be made after all the claims against Black have been resolved. At the present time, the court declines to determine an appropriate penalty to be imposed in relation to the violations presently at issue. Cf. SEC v. Liberty Capital Group, Inc., 75 F. Supp. 2d 1160, 1164 (W.D. Wash. Feb. 18, 1999). Such a determination will be made after all the claims against Black that have been raised in the present case have been resolved.

Prior to the next status hearing, the parties shall submit a joint written status report setting forth all remaining claims the SEC is still pursuing and proposing a discovery plan regarding any remaining discovery the parties expect to engage in.

IT IS THEREFORE ORDERED that plaintiff's motion for partial findings [171] is granted in part and denied in part. It

is found that defendant Black will be required to disgorge $3,819,689.50, plus prejudgment interest, related to the violations found in the "Estoppel Ruling."  A status hearing will be held on June 4, 2009.  By June 2, 2009, the parties shall submit a joint status report.

ENTER:

_____
UNITED STATES DISTRICT JUDGE

DATED:  APIL  30, 2009