**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

v.

CONRAD M. BLACK, F. DAVID RADLER
AND HOLLINGER INC.,

    Defendants.

C.A. No. 04 CV 7377

Judge William T. Hart

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MOTION FOR SETTING OF CIVIL PENALTIES AND
PREJUDGMENT INTEREST AND ENTRY OF FINAL JUDGMENT
AGAINST DEFENDANT CONRAD M. BLACK**

In this motion, the SEC moves for a final determination of the amount of civil

penalties against defendant Conrad M. Black and submits a calculation of

prejudgment interest pursuant to this Court's order. Based on the undisputed facts

established by Black's criminal convictions for mail fraud in *U.S. v. Black, et al.*, No. 05

CR 727 (N.D. Ill.) ("Criminal Matter"), the SEC previously moved for partial

summary judgment under the collateral estoppel doctrine on its claims regarding the

purported non-competition payments that Black received in connection with APC,

Paxton and Forum transactions.[1] (Docket No. 127) Based on the Delaware court of

---

[1] Based upon subsequent proceedings in the Criminal Matter, the collateral estoppel effect of Black's convictions is limited to the Paxton and Forum payments. That modification is reflected in this Court's Judgment and Order, dated April 19, 2012. (Docket No. 219)

chancery's findings in *Hollinger International, Inc. v. Conrad M. Black*, 844 A.2d 1022, 1045 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. Supr. 2005) ("Delaware Proceeding"), the SEC also previously sought summary judgment concerning Black's participation in the false November 17, 2003 Press Release. (Docket No. 127)

The Court substantially granted the motion and permanently enjoined Black from violating Sections 10(b), 13(b)(5), and 14(a) of the Exchange Act and Rules 10b-5, 13b2-1, 14a-3 and 14a-9 thereunder and, as a control person, Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder. *See SEC v. Black,* 2008 WL 4394891, at *20-21 (N.D. Ill. Sept. 24, 2008).[2] The Court also barred Black from acting as an officer or director of a public company. *Id.*

The SEC thereafter moved for certain monetary relief including disgorgement, prejudgment interest, and civil penalties. (Docket No. 171). After the matter was fully briefed, the Court awarded the Commission disgorgement of Blacks' ill-gotten compensation from 2002 until his forced resignation in November 2003, amounting to $3,819,689.50. *See SEC v. Black,* 2009 WL 1181480, at *5-6 (N.D. Ill. Apr. 30, 2009). The Court held: "It is a reasonable inference [that] International would have promptly terminated its relationships with Black had he, as required by the securities laws he violated, made a full and accurate disclosure of the transactions…" *Id.* at *4. The court further held that the SEC was entitled to prejudgment interest and ordered the SEC to submit a prejudgment interest calculation at the appropriate time. *Id.* at *12.

---

[2] The Court dismissed Count VIII, for violation of Section 302 of the Sarbanes-Oxley Act of 2002, holding that a violation of the "certification requirement" of Rule 13a-14(b) does not constitute an independent cause of action. *Id.* at *16-17.

The SEC's complaint also alleges other improper transactions and malfeasance by Black that have yet to be adjudicated. If proven, these allegations could have altered the remedies imposed, including increased disgorgement, which in turn could have increased civil penalties. Given this reality, this Court found that – while Black's conduct warranted third-tier penalties – it was premature to calculate civil penalties until "after all the claims against Black that have been raised in the present case have been resolved." *Id.* at *6. At the last hearing, the SEC advised the Court that it will not pursue any unadjudicated matters alleged in its complaint Accordingly, the only remaining issues to be resolved in this matter are the calculation of penalties (**Section A below**) and a current, final calculation of prejudgment interest (**Section B below**).

## ARGUMENT

The SEC previously articulated its entitlement to penalties and prejudgment interest. (See Docket No. 173) Here, the SEC endeavors to prove-up and quantify appropriate penalties and prejudgment interest. In **Section A**, the SEC requests that the Court impose as third-tier penalties Black's adjudicated ill-gotten compensation and the Forum and Paxton "non-compete" payments. In **Section B**, the SEC requests prejudgment interest of $2,321,220 on the previously-ordered disgorgement. These requests are reflected in the proposed final judgment attached as Exhibit A.

**A.    The SEC is Entitled to Third-Tier
        Civil Penalties Exceeding $4 Million.**

This Court previously noted that, when considering appropriate civil penalties, "Factors that may be considered include the egregiousness of the violations, defendant's intent, whether the violations were recurring, whether defendant has

admitted wrongdoing, the losses or risks of losses caused by the conduct, any cooperation defendant provided to enforcement authorities, and the imposition of other remedies or penalties." *Black*, 2009 WL 1181480, at *4.

The Court has already found that applying these factors, Black's conduct warranted third-tier penalties: "Third-tier penalties may be applied if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement' and the violation 'directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.' Such findings are supported by the *Estoppel Ruling*." *Id.* at *5 (citations omitted).

The Court's conclusion is supported by myriad adjudicated facts, including:

- The jury necessarily found the violations to be substantial and knowing. (Docket No. 166, p. 56)

- Black's malfeasance was part of a wide-ranging scheme resulting in the diversion of millions in corporate assets. (*Id.*, pp. 25-27)

- The jury verdict constituted a finding that Black knew the payments were neither legitimate nor approved by International's Board. (*Id.*, pp. 21-22)

- Black is a recidivist, having previously been permanently enjoined from further violations of the antifraud and tender offer provisions of the Exchange Act in connection with a tender offer. (*Id.,* p. 56)

- Black is unrepentant, having "point[ed] to nothing supporting that he has acknowledged his culpability nor anything indicating a sincere desire to act properly in the future." (*Id.*)

These findings are as true today as they were when the Court made them. Black's lack of repentance and continued unwillingness to accept responsibility for his actions justifies the imposition of third-tier penalties. Black's misconduct reflects greed

and an abuse of power. He exposed shareholders to enormous actual and potential harm. A substantial third-tier penalty approximating his disgorgement is necessary to provide a strong financial deterrent to corporate executives who may be tempted to steal from their own shareholders. There is ample precedent for awarding sizeable civil penalties approximating a defendant's pecuniary gain. *See, e.g., Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007) (imposing civil penalty of $831,500, equal to amount of disgorgement); *SEC v. Asset Recovery and Management Trust, S.A.*, 2008 WL 4831738, at *10 (M.D. Ala. Nov. 3, 2008) (imposing civil penalty of $1.2 million, equal to amount of ill-gotten gains); *SEC v. Halligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007) (imposing $15 million penalty, one time amount of ill-gotten gain, joint and severally on president and CEO of hedge fund); *SEC v. Maxxon*, 2005 WL 6090229, at *8 (N.D. Okla. Mar. 11, 2005) (imposing $433,228.52 civil penalty, equal to amount of ill-gotten gain), *aff'd*, 465 F.3d 1174 (10th Cir. 2006); *SEC v. Rosenfeld*, 2001 WL 118612, at *4 (S.D.N.Y. Jan. 9, 2001) (imposing civil penalty equal to ill-gotten gain of $1,093,189); *SEC v. Alliance Leasing Corp.*, 2000 WL 35612001, at *14 (S.D. Cal. Mar. 20, 2000) (imposing civil penalty against individual defendants equal to their pecuniary gain of $477,467), *aff'd*, 28 Fed. Appx. 648 (9th Cir. 2002).

Remarkably, Black has grown even less contrite with time. In his book "A Matter of Principle" Black casts himself as an innocent "degraded beyond recognition in this ghastly sequence of outrages" and "dangle[d] on a string like a hooked trout, awaiting the pleasure of the notoriously aggressive and devious U.S. prosecutors." (*See* Ex. B hereto, Excerpts from "A Matter of Principle," pp. 269, 291) He fashions

himself a victim of the "fetid, ward-heeling political bazaar of the Chicago Federal

Courthouse, made no less sinister by the Little Red Riding Hood demeanor of [Judge]

St. Eve and the sterterous and insolent biases of [Judge] Posner." (*Id.,* p. 519)

Notwithstanding such perceived indignities, Black magnanimously offers to "forgive

America for wrongly imprisoning me and victimizing my shareholders." (*Id.,* p. 524)

Impenitence of this magnitude is deserving of significant penalties. The SEC

submits that such a penalty should include at least the following components:

(a) A one-time penalty capturing Black's ill-gotten compensation of $3,819,690, which this Court previously ordered Black to disgorge. *Black,* 2009 WL 1181480, at *5-6; and

(b) A one-time penalty capturing the Forum and Paxton "non-compete" payments of $285,000 (which the Court did not require Black to disgorge because he had previously repaid them in other litigation). *Black,* 2009 WL 1181480, at *2.[3]

**B.     The SEC is Entitled to Prejudgment Interest of $2,321,220.**

To prevent a defendant from profiting from their illegal activities, courts

routinely require the payment of prejudgment interest on disgorged amounts. *See, e.g.,*

*SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001), *aff'd*, 278 F.3d 656 (7th Cir.

2002); *SEC v. Randy*, 38 F. Supp. 2d 657, 674 (N.D. Ill. 1999); *SEC v. Jakubowski,*

1997 WL 598108 at *1 (N.D. Ill. Sept. 19, 1997). "This prevents a defendant from

obtaining the benefit of what amounts to an interest free loan procured as a result of

---

[3] The SEC also seeks a third-tier penalty amounting to $120,000 for the misrepresentations in the November 17, 2003 press release. *See Black,* 2008 WL 4394891, at *18. The Court previously that such a penalty would be duplicative of any penalties derived from Black's ill-gotten compensation. *Id.* at 5. While the SEC maintains that such a penalty is appropriate, in light of that ruling no such penalty is included in the proposed final judgment attached as Exhibit A hereto.

illegal activity." *Id.* at *2 (citation omitted). Prejudgment interest is generally calculated according to the underpayment rate published by the Internal Revenue Service ("IRS"), which courts typically use in connection with disgorgement in SEC cases. *See SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007); *Randy*, 38 F. Supp. at 674; *Jakubowski*, 1997 WL 598108 at *2.

This Court previously found that Black did not dispute the propriety of prejudgment interest, and directed the SEC to provide an updated prejudgment interest calculation in conjunction with its request for a final judgment. *See SEC v. Black,* 2009 WL 1181480, at *5. The SEC does so in this submission.[4] It seeks prejudgment interest on the disgorgement of Black's ill-gotten compensation of $3,819,690. That amount, in turn, is comprised of two "buckets" of Black's compensation:

    (a)   $2,051,026.50 from his 2002 compensation, the interest of which the SEC calculated from December 31, 2002 through June 30, 2012, and

    (b)   $1,768,663.00 from his 2003 compensation, calculated from December 31, 2003 through June 30, 2012.

The SEC utilized the interest rate, adjusted quarterly, used by the IRS for computation of interest on underpayment of taxes, pursuant to SEC Rule of Practice § 201.600(b). *See* 17 CFR § 201.600(b). Interest has been compounded quarterly on each amount beginning on first day of the month following December 31, 2002 and

---

[4] The SEC will soon be filing an executed declaration of John Kustusch, an SEC accountant, detailing the calculations of prejudgment interest, similar to the declaration of Mr. Kustusch that the SEC previously filed in support of prejudgment interest. (*See* Docket No. 173-3) The SEC has, contemporaneous with the filing of this submission, emailed Black's counsel an unexecuted copy of the declaration it anticipates filing.

December 31, 2003, respectively. The resulting interest amounts to $2,321,220.06 – of which approximately $1.32 million corresponds with Black's 2002 compensation and approximately $1 million corresponds with Black's 2003 compensation.

## CONCLUSION

For these reasons, plaintiff Securities and Exchange Commission respectfully requests that this Court enter the final judgment substantially similar to Exhibit A hereto, constituting: (a) the Judgment and Order, entered on April 19, 2012 (Docket No. 219), in addition to (b) civil penalties against Black of at least $4,104,690 and (c) prejudgment interest of $2,321,220.

Dated: July 26, 2012

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

By: /s/ Jonathan S. Polish

Jonathan S. Polish
Rebecca R. Goldman
U.S. Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, Illinois 60604
(312) 353-7390



**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | C.A. No. 04 CV 7377 |
| v. | Judge William T. Hart |
| CONRAD M. BLACK, *et al.* | |
| Defendant. | |

## [PROPOSED] FINAL JUDGMENT AS TO
## DEFENDANT CONRAD M. BLACK

This matter coming to be heard on plaintiff United States Securities and Exchange Commission's ("SEC") Motion for Civil Penalties and Prejudgment Interest Against Defendant Conrad M. Black ("Mr. Black" or "Defendant") (Docket No. 225), the parties having fully briefed the matter, and the Court being advised of such in the premises, it is **HEREBY ORDERED** that final judgment is entered as to Mr. Black as follows:

<u>Summary Judgment on Liability</u>

A.      Summary judgment is entered for the SEC and against Mr. Black on liability for Count I of its Complaint based on (1) statements in the 2001 Form 10–K, 2002 Form 10–K, 2002 Proxy, and 2002 Proxy Questionnaire related to the "Supplemental Payments" to Mr. Black for the "Forum" and "Paxton" transactions; and (2) Mr. Black's representations in the November 17, 2003 press release that he had a present intent to comply with the Restructuring Proposal including by devoting his time and attention to the Strategic Process for selling International's assets and by refraining from engaging in transactions for his own benefit that would undermine the Strategic Process;

B.      Summary judgment is entered for the SEC and against Mr. Black for Count II based on statements in the 2002 Proxy related to the Supplemental Payments;

C.      Summary judgment is entered for the SEC and against Mr. Black for Count III based on statements in the 2001 and 2002 Forms 10–K related to the Supplemental Payments;

D.      Summary judgment is entered for the SEC and against Mr. Black for Count IV based on statements in the 2001 and 2002 Forms 10–K related to the Supplemental Payments and limited to a violation of § 13(b)(2)(A) of the Exchange Act;

E.      Summary judgment is entered for the SEC and against Mr. Black for Counts V and VI based on statements in the 2001 and 2002 Forms 10–K related to the Supplemental Payments and limited to violations of the recordkeeping requirement of § 13(b)(2)(A) of the Exchange Act;

F.      As to Count IV's § 13(b)(2)(B) claim, the SEC is entitled to summary judgment that it is conclusively established that the 2001 and 2002 Forms 10–K contain inaccuracies related to the Supplemental Payments;

G.      As to the aspect of Count VI based on circumventing the internal control requirements of § 13(b)(2)(B) of the Exchange Act, the SEC is entitled to summary judgment that it is conclusively established that the 2001 and 2002 Forms 10–K contain inaccuracies related to the Supplemental Payments and that Mr. Black caused those inaccuracies to be in the Forms.

H.      Count VIII of the complaint is dismissed.

## Injunctive Relief

I.   Defendant and defendant's agents, servants, employees, attorneys and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j (b)] and Rule 10b-5 promulgated thereunder [17 C.P.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

   (1)  to employ any device, scheme, or artifice to defraud;

   (2)  to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   (3)  to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

J.   Defendant and defendant's agents, servants, employees, attorneys and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from, directly or indirectly, falsifying any book, record or account subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] in violation of Rule 13b2-1 promulgated thereunder [17 C.F.R. § 240.13b2-1].

K.   Defendant and defendant's agents, servants, employees, attorneys, and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 13 (b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly falsifying any book, record or account described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b) (2)].

L.   Defendant and defendant's agents, servants, employees, attorneys and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from directly or indirectly violating Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rules 14a-3 and 14a-9 [17 C.F.R. §§ 240.14a-3 and 240.14a-9] thereunder, by, among other things, using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate

in the public interest or for the protection of investors, to solicit or to permit the use of such person's name to solicit proxies, consents, authorizations or notices of meetings in respect of an issuer's securities which contain statements which are false and misleading with respect to material facts or omit to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading or which fail to furnish information required under Exchange Act Rule 14a-3.

M.  Defendant and defendant's agents, servants, employees, attorneys and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from, directly or indirectly, as a control person under Section 20(a) of the Exchange Act, violating Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. 240.12b-20, 240.13a-l and 240.13a-13] thereunder, by failing to file with the Commission, in accordance with such rules and regulations as the Commission may prescribe, such annual and quarterly reports containing the information required to be included in such reports and, in addition to the information expressly required to be included in such reports, such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made not misleading.

N.  Defendant and defendant's agents, servants, employees, attorneys and assigns who receive actual notice of this Judgment by personal service or otherwise are permanently restrained and enjoined from, directly or indirectly, as a control person under Section 20(a) of the Exchange Act, violating Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§78m(b)(2)(A)], by, among other things, failing to make and keep books, records and accounts, which in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

O.  Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Mr. Black is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 781] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## Monetary Relief

P.       Mr. Black is ordered to disgorge $3,819,689.50, constituting Mr. Black's compensation as calculated in this Court's Order, dated April 30, 2009 (Docket No. 182)

Q.      Mr. Black is ordered to pay prejudgment interest amounting to $2,321,220.

R.      Mr. Black is ordered to pay third-tier penalties amounting to $4,104,690.

*** 

S.      This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE

DATED: AUGUST __, 2012



**EXHIBIT B**

CONRAD BLACK

A MATTER OF PRINCIPLE

McCLELLAND & STEWART

ALSO BY CONRAD BLACK

Render Unto Caesar: The Life and Legacy of Maurice Duplessis

A Life in Progress

Franklin Delano Roosevelt: Champion of Freedom

The Invincible Quest: The Life of Richard Milhous Nixon

Copyright © 2011 by Conrad Black Capital Corporation

All rights reserved. The use of any part of this publication reproduced, transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, or stored in a retrieval system, without the prior written consent of the publisher – or, in case of photocopying or other reprographic copying, a licence from the Canadian Copyright Licensing Agency – is an infringement of the copyright law.

Library and Archives Canada Cataloguing in Publication

Black, Conrad
A matter of principle / Conrad Black.

ISBN 978-0-7710-1670-7

1. Black, Conrad. 2. Newspaper publishing – Canada – Biography.
3. Capitalists and financiers – Canada – Biography. 4. Businessmen –
Canada – Biography. I. Title.

PN4913.B56.A3 2010    070.5092    C2008-901956-3

We acknowledge the financial support of the Government of Canada through the Book Publishing Industry Development Program and that of the Government of Ontario through the Ontario Media Development Corporation's Ontario Book Initiative. We further acknowledge the support of the Canada Council for the Arts and the Ontario Arts Council for our publishing program.

Library of Congress Control Number: 2011535307

Typeset in Electra by M&S, Toronto
Printed and bound in the United States of America


ANCIENT FOREST
FRIENDLY

This book is printed on acid-free paper that is
100% recycled, ancient-forest friendly (100% post-consumer recycled).

McClelland & Stewart Ltd.
75 Sherbourne Street
Toronto, Ontario
M5A 2P9
www.mcclelland.com

2 3 4 5    15 14 13 12 11

To Barbara, my indomitable, unofficial co-defendant, and my daughter Alana and sons Jonathan and James; to my dear friends June Black, Dan Colson, Midge Decter, David and Murray Frum and Nancy Lockhart, Roger and Susan Hertog, Laura Ingraham, George Jonas, Roger Kimball, Seth Lipsky, Joanna MacDonald, Joan Maida, Brian Mulroney, Norman Podhoretz, Andrew Roberts, William Shawcross, Brian Stewart, Bob Tyrrell, and Ken Whyte; and to Rob Jennings, and other friends in the prison to which I and many of them were unjustly sent; and to all others who have sustained and encouraged me in this difficult time, including thousands of strangers in many lands. All in their different ways have been magnificent. I will never forget their encouragement and will try to repay, or at least justify, their kindness.

to the metastasizing litigation. Facing and rebutting criminal charges might be the only way to retrieve my reputation. I had known almost from the start, after he crossed me on the Restructuring Agreement in November 2003, that this was Breeden's fervent ambition, and except for the nonsense about racketeering, he had won every round. He might again find a co-operating judge, this time in Chicago, where any criminal case against me would be heard, by a judge influenced by, and perhaps even named on the advice of, Jim Thompson. But convincing a jury beyond a reasonable doubt that I had committed a crime that did not occur and in circumstances of which I knew nothing, when faced with a barrister of the ferocity and skill of Brendan Sullivan, aided by Eddie Greenspan and Bill Jeffress, would turn out to be, I thought, at least a tougher challenge than poisoning the shallow wells of the media, the cross-border lower courts, and the easily misled regulators. At some point, I prayerfully reasoned, due process would have to intrude on this *ex parte*, bloodless dismemberment.

It would be hellfire and dead cats, but it would be the turning point. We should win, and then the momentum would be broken decisively. Breeden had apparently pushed the Chicago prosecutor into action, but he was gambling almost as much as I was.

I was shaken but not demoralized. The prospect of *United States of America vs. Conrad Black* would have been too horrifying to imagine in my previous life. But as the crisis gradually deepened, one disappointment succeeded another, more people betrayed me and more crowded into the ranks of my enemies, pandering to the basest of the media and one another, it became difficult to be horrified. I would be upholding vital principles, I told myself – honest capitalism and impartial law, both of which had been degraded beyond recognition in this ghastly sequence of outrages.

As I began to accept the likelihood of a criminal trial, I felt like Koestler's Rubashov. The fear of the event had been more torturing than the reality. I would return to Chicago, a city I had romanticized as a younger man because of its writers, architects, lore, and general muscularity, to be wrongfully prosecuted by the U.S. Department of Justice. My decades of love of America would come to this absurd dead end.

In the two years since the Special Committee had been created, it had become necessary to cast this fight as one for principles – a fight that

the judicial bus in exchange for a very light sentence for himself and retention of the private community newspaper groups whose acquisition Breeden had attacked.

Valukas had always been a problem. He claimed to be concerned about my "lifestyle" and image and as an ex-prosecutor knew how to amplify such concerns. Early on, he had asked Greg Craig whether I was another Dennis Kozlowski, the eventually jailed head of Tyco, who had received a $17 million apartment from the company; spent millions of the company's money on a party in Sardinia in honour of his wife, including much-publicized ice statues urinating champagne; and had borrowed hundreds of millions of dollars from the company, allegedly on the verbal approval of a deceased director. I don't know if Kozlowski was guilty or not, but he left a great deal hanging out in public relations terms.

Contemplations of this kind enabled me to see how the prosecutors and Breeden had worked to kill the privatization of Inc. I assumed he had told them, as he had everyone apart from me, from October 2003 on, that crimes had been committed. Even the grandstanding hypocrites of the OSC would not scuttle the interests of the public shareholders out of malice or cowardice alone.

I finally faced up to the full gravity of the likelihood that once Breeden was in the frame, a desperate struggle was inevitable. He was determined to exact complete submission and had sufficient knowledge of the official spider web, and had built such a corporate governance brand for himself that he was a far more formidable adversary than he first appeared, in all his ponderousness. All that had happened since he drove off the private equity investors to get undisturbed access to his financial prey, tore up the restructuring agreement, and easily sold Strine a story to continue gorging himself and destroying our companies and using them as platforms to torment their builders, was inexorable. So was his management of the same tactic again with what he must have regarded (with reason in this case) as the wool-hatted, corn-cobbing yokels of the OSC. The shareholders were doomed, and would only be rid of him by going through the legal morass until we got to a court of law, and not just another pseudo-legal raising heavenwards of the moist official fingers of bias and psephology.

Once privatization was strangled in its cradle, there was no visible end

had at least a historical precedent of victory. A rich businessman being unjustly stripped of the proceeds of his work of thirty-five years, his possessions, and reputation is not a sympathetic figure in our society. I was no Dreyfus or Solzhenitsyn. But it inspired me that they both survived terrible persecution. My fate was not going to be physical torture or solitary exile but, incredibly, I was fighting for my freedom, for the right to live out my remaining years with my wife and family. Injustice on the scale I had experienced, even in a society that has abandoned the rack and Devil's Island, is painful beyond measure, particularly when you alone seem to be singled out.

As I was acclimatizing myself to this new test of nerves and fibre, I called Brendan Sullivan, who assured me that the prosecutors were incapable of laying a charge, that they were engaging in a standard tactic to try to shake loose parties ready to cop a plea and inculpate others. He thought they would have a problem cracking David Radler, and that if Radler didn't roll over, they could not charge me. If he did, they would, but they wouldn't win. He thought that the U.S. attorney had not really looked at the evidence and was simply responding to the badgering of Breeden. His firm had recently cross-examined Breeden as an expert witness and judged him lacking.

It soon came to light that that Kent's antics were motivated by a concern about the statute of limitations closing out his right of action (only months were left on the five years since the questioned transactions). And that Nate Eimer, Hollinger Inc.'s amiable Chicago counsel, who had presumably been selected as the recipient of the intelligence from the assistant U.S. attorney, because of his excitability, was running around as if his hair were on fire, exclaiming that we were all about to be indicted – as Kent had doubtless intended.

THE ELEGANT LITTLE BUILDING at 10 Toronto Street with its Greek-columned stone façade, which had been built in 1851 and was for many years a post office before Argus Corporation had bought it in 1959 was to be off-limits to me as of May 31, courtesy of Farley's order. There was an order from his like-minded colleague, Campbell, prohibiting removal of documents from the building without the agreement of the

inspector and a further order from Farley prohibiting the removal of anything but personal papers. Still, I had to move my office, and remove personal papers. There were a good many boxes that had been returned from England to Greenspan's office (having already been examined), and Joan Maida had some of them brought over to 10 Toronto Street to see what she ought to move to my new office, which was to be in her home.

My files in the U.K. had all been gone through, copied, and sent off to the SEC before the move. The faithful Rosemary had sent my personal ones (also all gone through in the U.K.) to Greenspan's office while Barbara had sent most of her staggering number of boxes to our home in Toronto, where counsel examined, copied, and sent all relevant material.

By now, all my papers in 10 Toronto Street had been examined for more than a year and photocopied for the SEC, the inspectors, and the Special Committee as well as the new regime. Even annual reports were photocopied, to the distinct irritation of Joan, who saw this sort of thing as a pure make-work effort for the law firms' billings. She was engaged in a constant battle to keep the voluminous material organized after files were taken out, copied, and dumped back in great piles on her desk or returned in the (dreaded) boxes. By now Joan doubted that there was a telephone message or Post-It that had not been photocopied and numbered. (And deliberately misplaced. Much of my most valued correspondence simply vanished, as part of the services furnished by the Toronto Street usurpers to the prosecutors. Letters from a great many interesting people (including every prime minister of Canada from Louis St. Laurent to Jean Chrétien, except Ms. Campbell, and even the letters I received on the deaths of my parents in 1976 disappeared.)

Joan sat in an outer office surrounded by filing cabinets. My inner office had been taken over by a law firm that had access to every scrap of paper and computer record and spent their days sifting constantly through all her files, which were never locked.

On May 20, six working days before we would be expelled from a building I technically still owned, I was working at home, hoping to avoid seeing the packing up of my office. Joan asked a security guard to move thirteen boxes to her car. The inspector representative on-site asked that they be

extravagant; overly interested in Napoleon (a subject I had not referred to five times in my entire acquaintance with him); and a poseur who knew little about business, other than having good connections and some knowledge of deal making. Radler had "built our EBITDA [earnings before interest, taxes, depreciation and amortization – that is, operating profit] to $400 million," he told the Special Committee, as if none of the rest of us had had anything to do with it. He had played a vital role in taking over the *Daily Telegraph* by "encouraging" me to do it, as if any encouragement from him were necessary.

There were also little outbursts of megalomania. Thus his statement, "You'll have a hard time across the street if I am de-balled." Across the street meant the *Sun-Times*, where his departure was greeted with stentorian glee, and where the escalators he had shut down because of their cost were restarted. Even before there were any suggestions of unapproved payments, he was urging Breeden, who, he conceded, now ran the company, not to emasculate him, for the sake of the morale of *Sun-Times* employees. The statement was both false and self-emasculating.

"I know how to handle Hamas," he had grandly stated when explaining to the committee the management aircraft policy relating to the avoidance of terrorist threats. Such insights would doubtless have been gratefully received by the prime minister of Israel and by the Palestinian Authority.

All this material was released to us while I was in Europe, and when I read Radler's comments on my return, it was obvious that he was cranking up to try to lay responsibility for perceived wrongdoing at my door, even though, at that point, the only wrongdoing there could have been was his.

All that was clear apart from that was the inattentiveness of the legal staff, which Mark Kipnis allegedly tried to sidestep by complaining to the Special Committee that a few of the non-compete payments were "silly," though Kipnis later volunteered that he had said nothing of the kind. Atkinson's testimony to the Special Committee was especially feeble, as he glazed over his own responsibilities to assure that all legalities were exactly in place, in inter-corporate transactions and elsewhere. Jack Boultbee, who, though impenetrably enigmatic and monosyllabic, is a man of principle, calmly rebutted every one of Breeden's and his chief attack dog Jonathan Rosenberg's questions.

A good deal more upsetting was the news that my son Jonathan, having located a hard lump on the top of his collarbone, had gone to an emergency room at a Toronto hospital and was told this needed further investigation. When I was advised of this by his mother, who was resigned to the leisurely timetable of Ontario socialized medicine, I managed to accelerate the timetable. Jonathan went promptly for a scan at Orchard Park, New York, at half the Canadian cost. He had Stage Two Hodgkins. This is distinctly treatable but a horrid setback just as he was starting to get his career going. Barbara asked if we had now been spared anything except the proverbial plagues of frogs and locusts. We were both full of admiration for Jonathan's stoicism. He would come through the treatments with flying colours.

AUGUST IN TORONTO IS ALWAYS PLEASANT, whatever the distractions. We enjoyed our property, with the soothing sound of fountains in the walled library garden, and watched the deer and foxes and less graceful wildlife (raccoons, groundhogs, and skunks) from our terrace in the early evening, often with a glass of fine white wine in hand. I was continuing intensive research on Richard Nixon.

The massive and spurious Hollinger International case against us was getting to the point where discoveries were being demanded. The U.S. attorney's office in Chicago had finally revealed in the spring that it was investigating, and it was assumed that if their investigation passed a certain point, they would demand a stay of civil proceedings.

The fact that they had not, and that no suspect or target letter had been received, together with Brendan Sullivan's and Greg Craig's civilized interview with Robert Kent and Eric Sussman in June, had provided some hope that charges were not a foregone conclusion, even eventually. In response to Hollinger International's insolent and belligerent demands for weeklong depositions, I told Baker Botts to carpet-bomb the other side with such demands and to emphasize we would be questioning Richard Breeden for at least two weeks. This would smoke out the Justice Department. They would not want us revealing Breeden's shallow allegations if they were planning to prosecute us on his story. I was not prepared to dangle on a string like a hooked trout, awaiting the pleasure of the notoriously aggressive and devious U.S. prosecutors.

However vulnerable my position, I was still ahead of the wolves financially. I still had excellent counsel, and I was, in fact, innocent. I had been horribly defamed but had so far, though by a narrow margin at times, managed an orderly retreat from the extremely overexposed position I had held when the onslaught against me began, in November 2003.

However, the U.S. attorney soon demanded stays in all civil proceedings, which signalled imminent indictments. It also showed they would not bother with the niceties of suspect or target letters and implied they were getting what they thought would be effective evidence incriminating me from Radler. Unfortunately it shook loose my own counsel, as Greg Craig, while appearing in Chicago, told the press that it was not clear his firm would be acting for me in the event of a criminal trial. Brendan Sullivan's evaluation was of my credit, not my case, but I needed strong counsel to make my case.

I made extensive summaries of all the evidence given to the Special Committee and was able to anticipate some of Radler's inculpations. I felt that Radler was going to have to engage in a version that would be vulnerable under cross-examination. All our colleagues would side with me; there would be no corroborative evidence. And Radler, uncertain and inarticulate even when telling the truth, could be easily disembowelled under heavy and skillful questioning.

It turned out that Radler's telephoned wedding anniversary greetings to us in London, on July 21, 2005, were the last contact I would have with him. It was shortly after this that his counsel had told us that they "were no longer pursuing the same objective" we were but were happy to continue in the joint defence agreement otherwise. The suggestion was extraordinary. Their participation in the joint defence group – an arrangement that has lawyers pooling information – had continued for some fifteen months while Radler and his lawyers played footsie with the prosecution. Surely that was a stretch of time that long surpassed the decency guidelines, even of the U.S. Bar. They had doubtlessly been relaying the thoughts of co-defendants' counsel to the prosecutors. I had been bankrolling a data collection system, since one of the major burdens in the case was the hundreds of thousands of documents that were now "evidence," and Radler had been getting a free ride on this. He also had the

benefit of knowing some of the exculpatory evidence we had turned up. We expelled his counsel from the group.

On August 18, to put it in in Rooseveltese, "The hand that had for so long held the dagger, struck it into the back of its neighbor." Dan Colson and Williams & Connolly both called to say that indictments were about to be handed down by the grand jury in Chicago. Lynda Schuler, Brendan Sullivan's understudy, called back a few minutes later to say that Radler, Mark Kipnis, and Ravelston had been indicted on seven counts of fraud and that Radler would plead guilty to at least one of the charges and would be a cooperating witness.

At the customary press conference at which American prosecutors announce important indictments and try to conclude the first phase of the media pre-trial with a mass conviction and maximum sentence of public prejudice, the U.S. attorney, Patrick Fitzgerald, a notorious headline-seeking zealot, had two charts showing the "scheme." As the New York Times wrote, "Lord Black was clearly identified on the top of one chart." On the other chart was only the word "chairman." Fitzgerald said: "I'm not going to say who the chairman was but you can check the public record." Not since Groucho Marx used to ask guests on his quiz show, "Who's buried in Grant's tomb?" has there been a less challenging public guessing game. Fitzgerald continued: "The investing public has the right to expect that officers and directors of publicly traded companies are managing, not stealing the shareholders' money. The insiders at Hollinger made it their job to steal and conceal. This was a systematic fraud on the shareholders."

There was a scheme, but Breeden was the author of it. And to a degree, Fitzgerald, having been convinced by Breeden, was a victim of the real scheme too, as he was now formally throwing the authority of the U.S. Justice Department behind it. Sullivan and Craig had confirmed in their visit to Kent in the spring that the Breeden Report was all that Kent and Sussman knew of the case. Breeden had gone to the highest level of escalation and Fitzgerald had committed to convict on what he must have had some idea was very thin, and in fact, no, evidence. It was unnerving, but I was buoyed by the knowledge that every word and every letter of every word of Fitzgerald's harangue were false. The spectacle of this mindless urge to lynch, to mock justice and due process, recklessly to deploy the power and

Attorney General, but who have only just reduced the disparity. The disparity between crack and powder cocaine offenses from 100 to 1 to 18 to 1, which is still outrageous. Drug laws are being used to extend the history of the unequal treatment of blacks in America into a fifth century.

The American black problem is showing a satanic tenacity and ingenuity. And it must be said that this is due to the failings of the whites. There is too much black victimhood and no shortage of black racism; and there has been great progress, but the legacy of slavery is fiendishly persistent. And the even larger Latin population fares little better.

It is indicative of official American arrogance at its most inflated and obtuse that instead of suppressing drug appetites among its dilettantish bourgeois youth and degraded underclass, or using its immense military strength to secure its borders without strangling legitimate commerce and tourism, it has purported to require other countries to eliminate supply. This is a potentially terminal hubris. The United States has reduced Mexico to a state of virtual civil war and escalated the wars in Colombia and Afghanistan, claiming to fight drugs at their source, rather than in domestic U.S. demand.

The drug war has been a perfect illustration of the strength of supply-side economics, as the price has come generally down through greater supply, improved product quality, and rising demand, despite the imprisonment of more than one million small fry which are easily replaced by the drug trade kingpins. The War on Drugs has cost $1 trillion, and within America has almost nothing to do with violence. Drugs are involved in one-third of property crimes, but only 5 per cent of violent crimes. People growing a thousand marijuana plants get mandatory life sentences. Now that the methamphetamine drugs can be concocted by amateurs without importing or growing anything, alternative policy options will *finally* have to be considered. But all the current administration's senior appointments in drug enforcement discourage any optimism that more enlightened policies await.

The Congress declined money requested by the Clinton administration for more methadone treatment, though it is fifteen times more effective than imprisonment for reducing drug use, and hugely less expensive. The War on Drugs has been a complete failure, except for the beneficiaries of

the proliferating prosecution, prison industries, and the principal drug suppliers and traffickers themselves.

Marijuana is the largest cash crop in California, and 42 per cent of Americans use it at some point in their lives. Prohibition was a howling success compared with this, and Al Capone and other great liquor profiteers of that era were pacifistic Sunday school teachers compared with the leading Mexican and Colombian drug lords.

## MANIPULATING THE SYSTEM

WHAT WAS UNUSUAL ABOUT OUR CASE was not the brutality of the U.S. prosecutors and their trans-border accomplices, or of the legal and judicial personnel they infected for their purposes. It was that instead of settling on the target themselves, they allowed Richard Breeden to do the targeting for them, and he was on a mission and thought the battle won when he set the cross-border legal and regulatory apparatus on our backs. No one made any allowance for the fact that we were not guilty; that it would not be possible to seize or strangle my ability to pay for a legal defence from assets situated outside the United States; that Radler's crimes had not been concerted with the rest of us; or that we would have counsel able (Miguel Estrada and David Debold) to raise the constitutionality of the government's habitual procedure and evoke the issue to the country's highest court, far from the fetid, ward-heeling political bazaar of the Chicago Federal Courthouse, made no less sinister by the Little Red Riding Hood demeanor of St. Eve and the stertorous and insolent biases of Posner.

It followed the normal pattern for several years, as more and more people were cajoled or dragooned into the swelling lynch mob, gorging themselves on the hundreds of millions of dollars that erupted from the Hollinger piñata when they had ruptured it. As has been recounted, Strosberg, who didn't need any instruction from the Americans about how to stuff himself like an Alsatian goose (financially and otherwise), paid himself more than $1 million for four months of unsuccessful legal work, approved mechanically by his local Windsor Law Society. Walker, after

nine months at $100,000 a month for non-executive meddling and diddling, took another $600,000, which he brazenly demanded from Peter White in face-to-face straightforward negotiation for his vote for approving the privatization for which the shareholders had been clamouring, after having feverishly tried to sabotage it for many months. Richter, the Ravelston receiver, having insanely responded to the U.S. charges, eagerly accepted the yoke of Sussman's despotism like the others, milked Ravelston for $8 million, pledged $7 million to the U.S. government and unspecified restitution (of which the United States will never see a brass farthing), promised questionable evidence that was ultimately not admitted, and even deprived the small-income pensioners of a large chunk of their accumulated pensions, which I hope to make good from my own resources when I dispose of the accursed idiocy of the Mareva. Voorhies drained Hollinger Inc. of more than $5 million as he drove it toward and into bankruptcy, and was re-elected by Richter on Sussman's orders a few months before the rich company we had left was capsized into the bankruptcy they had so wantonly engineered, against all their and their legal sponsors' promises at the time of their engagement, not to mention their duty to the stakeholders, and the spun sugar candy of the Law Society's ethical standards.

Of course this was just an hors d'oeuvre compared to the orgy of wickedness in America. O'Melveny & Myers mined the Breeden lode in Hollinger International for more than $150 million, had the effrontery to bring in one of their partners as an expert witness in our trial, then po-facedly piggy-backed on our appeal to the Supreme Court, where they represented Geoffrey Skilling and gave him, as they had at trial, a half-hearted argument, to avoid too great a solidarity with us, in defence of the fact that they had raped Hollinger for five times as much as they were able to wring from the writhing financial corpse of the former Enron boss.

Having championed honest services against us, when receiving $150 million for acting for the Hollinger International Special Committee, O'Melveny's didn't raise it at the Supreme Court, though honest services was the only reason they got to that court, following us. Finally, since the petition from Skilling had been accepted on the honest service issue, the bench asked the O'Melveny partner who was arguing the case about that statute, and received a rather underwhelming response. When we won,

O'Melveny launched a public relations blitz claiming credit for it. This is not entirely atypical of the ethics of the profession that is responsible for keeping the rule of law alive and prosperous and respected in America.

In the zeal of its agents to crucify me, the U.S. government brought financial sorrow to scores of thousands of homes in all parts of the United States and Canada. It showed no concern for those whose innocence was never in question, and is the principal author of their loss of $2 billion. But even as the continental official scorched-earth policy destroyed the small shareholders' interest, I had partially rebuilt my means from the large gains on the value of my homes, and, ironically, from the gains generated by ruthless Radlerian management of the private newspaper companies that had been accumulated fraudulently by him but approved of as untainted in the deal the prosecutors made in exchange for his inculpatory perjury against my co-defendants and me.

Of course I had lost my biggest asset with the ruination of the Hollinger companies, but not so much that I could not pay to fight my way through the case and to restore my financial and moral position when the war was over, provided some public curiosity persisted about my side of the case, and my liberty and other non-Hollinger resources substantially survived the trial. They did. Punishment before trial was never contemplated by America's founding fathers.

When I adjusted from my precipitate downfall from my previous position and accepted the inevitability of criminal prosecution and the possibility of imprisonment after Strine and the OSC stopped my efforts to salvage something for all the shareholders, I discovered my new, involuntary midlife vocation. If I could resist the tyranny and corruption of the U.S. prosecution service, I might be able to show, regrettably, but more persuasively if unjustly imprisoned, that the plea bargain system has become, in Brendan Sullivan's phrase, "evil and repulsive." The almost universal practice of exchanging false testimony against targeted victims for relative leniency will rot the judicial soul of America.

While I was at it, I could get in a pretty good shot at the short-comings of the corporate governance movement. Chris Browne, who had held a continuous press conference celebrating his great victory over me for eighteen months, revealed in occasional grumpy interviews later that he

Michael Milken, Alfred Taubman, Martha Stewart – go quiet[ly] prison, like children to be thrashed at the woodshed, and return [to] but say nothing of the system that assaulted them. Whatever might I resolved that the same would not be said of me.

It is not the least irony of contemporary American affairs th[at the] United States has successfully and bloodlessly crushed the Comm[is]sion of a command economy, it has delivered its justice system, t[he] centre of any democracy, to a command requirement for more a convicts to fill the prisons that the unjust laws, the stacked deck [cri]nal procedure, the biased judges, the stifling ambiance of prose convict and elect, the bloodthirsty media, and the sucker deals w[ith] cious private prison companies, prison industry suppliers, and the prison workers unions, and the rights-blind police associations, and require. The law, an occupation I almost pursued, is a very r[...] but much-debased profession. The putrefaction of the U.S. justic[e] is rampant and, I repeat, is a mortal threat to the integrity, instituti[on] and historic purpose of America.

In the piping days of my great affair with America, I thought it and-tumble legal system that might have the upside of motiva[ting] sharpening the American elites and workforce. Perhaps it was, on it is just the noisome slough of moral carrion, ruined lives, and brol[...] It inspires no Olympian competition or the splendour of a gre[at] beast, but rather disillusionment, misery, and ultimately, revolt.

Altruistic or meliorist instincts cannot be relied upon to achie[ve] politically in the United States. Fundamental change is accompl[ished] the forces of the economic and political market, harnessed or g[...] talented and often benignly devious leaders, such as Lincoln emancipation into the suppression of the rebels; FDR redefining ity as undeclared war; Martin Luther King holding the reins of the blacks while conquering the consciences of the moderate whites; civil rights ("the idea whose time has come"); Reagan ending the C[...] by raising the poker ante with defensive weapons, the Maginot l[...] worked politically (if not, altogether, militarily).

There is plenty of opportunity to discuss all these subjects [with] knowledgeable people. Bill Buckley and George Shultz, a

[ 523 ]

---

was just as hostile to Breeden and Paris. He had precipitated a disaster for his investors (a loss of more than $150 million from its highest price and $70 million on his cost) and other Hollinger international investors. A war of attrition affects all combatants, not just the party initially attacked.

The great newspapers and renowned commentators, even those most sympathetic to me, said nothing publicly about the rot of the system, though some, including Bill Buckley and George Will, spoke out publicly for me personally. Mark Steyn, Robert Tyrrel (*The American Spectator*), Roger Kimball (*The New Criterion*), and Seth Lipsky (*New York Sun*) were exceptions and warned darkly of where the plea bargain system could lead.

America has witnessed, almost silently, the triumph in its justice system of persecution abetted by denunciation. The Constitution has guaranteed rights that, if exercised, would overload the system, as defendants normally just give up after being treated to the pre-trial antics of prosecutors. And as has been described, most defence lawyers aren't really barristers; they get a slight reduction in sentence by sparing the prosecutors the tedious formality of a trial. The U.S. justice system had many fewer plea bargains and more integrity fifty years ago, apart from in racial matters, and the trend is dangerous for every person in the country.

The executive community of America has been cowed. It may have been unbecoming for J.P. Morgan to say, "The public be damned!" publicly, but so is the mousy, insincere, and platitudinous do-goodism of almost all of America's current leading financiers. The notion of a day in court in matters involving the federal government is illusory, and in criminal matters is, as has been extensively described, a farce, a national rodomontade, in fact. Justice is blind, but not in the sense intended. The law that rules is not the law that is written, much less celebrated, and there are obviously scores of thousands of innocent people in American prisons, and hundreds of thousands of grossly oversentenced convicts.

They are not yet numerous or respectable enough to constitute a strong political constituency, but they will be. The impoverished simply are ground up mechanically by the system, and don't even try to fight it because they don't have the means. The middle-class small business owners and professionals fight according to their means, but almost all are ruined, imprisoned, disgraced, and personally broken. Even the wealthy victims –

[ 522 ]

*My successors violated six of eight clauses of the Restructuring Proposal.*

November 15, 200?

### Restructuring Proposal

1. Hollinger International Inc. (the "Company") will immediately give notice of intent to terminate the Ravelston Management Agreement effective June 1, 2004.

2. The Company and Ravelston will negotiate a new Management Fee applicable to the period January 1, 2004 through June 1, 2004. The new Fee will be reduced from the 2003 Fee in respect of, among other things, the personnel and other changes contemplated by this Restructuring Proposal. The Company may elect to prepay all or a portion of the Management Fee for the period January 1 to June 1, 2004, provided that the Company receives appropriate security ensuring repayment of such prepaid amounts in the event the services related to such Fee are not provided.

3. The investigation presently being conducted by the Special Committee will continue and will not be affected by the restructuring described herein.

4. As used in this Restructuring Proposal, the term "Payments" shall mean the aggregate US$16,550,000 paid to Hollinger Inc. ("HLG"), the aggregate US$7,197,500 paid to each of Messrs. Black and Radler, and the aggregate US$602,500 paid to each of Messrs. Atkinson and Boultbee from 1999 to 2001. The payments were not properly authorized on behalf of the Company. The Payments received by HLG and Messrs. Black, Radler, Atkinson and Boultbee will be repaid to the Company by each such recipient in full, with interest calculated from the date of receipt of the payment to the date of repayment at the applicable Federal rate of interest in effect on the date of receipt of the Payment. Each of Messrs. Black, Radler, Atkinson and Boultbee will make an initial, partial repayment on or before December 31, 2003 in an amount of not less than ten percent (10%) of the total amount of the Payments received by each of them, plus interest. The balance will be evidenced by a promissory note and will be repaid on or before the earlier of a Liquidity Event (as defined below) or June 1, 2004. The Special Committee and the Audit Committee will entertain proposals from HLG with respect to the schedule of repayment by HLG of the Payments it has received, provided that repayment in full is received on or before the earlier of a Liquidity Event and June 1, 2004. As used herein, the term "Liquidity Event" means (i) in the case of HLG, the consummation by the Company of a transaction (or series of related transactions) that result in HLG realizing net proceeds of at least US$50,000,000; (ii) in the case of Messrs. Black and Radler, the consummation by the Company of a transaction (or series of related transactions) that result in either of them realizing net proceeds of at least US$5,000,000; and (iii) in the case of Messrs. Atkinson and Boultbee, the consummation by the Company of a transaction (or series of related transactions) that result in either of them realizing net proceeds of at least US$400,000.

---

Richard Posner, were right, the War on Drugs is a fraud and a failure and should be abandoned.

Always in its history when the United States had to have outstanding leadership, it has emerged: Washington, Lincoln, Franklin D. Roosevelt. It needs it now, and not only for the reasons detailed here. In announcing their result of the Constitutional Convention in 1789, Benjamin Franklin said, "A republic, if you can keep it." The country has faced greater threats since then than it is facing now, but the Constitution has not.

In the end, the United States is always governed from fairly close to the centre. The prison industry is more threatening than the defence industry that President Eisenhower warned the country about in 1961, which at least promoted sophisticated technology, protected national security, and didn't shred the Constitution and tyrannize the people. It will be exposed and tamed. The excesses of the media, endlessly inciting paranoia about crime and the supposedly cowardly mollycoddling of criminals by the politicians, allowing the wrongful and unconscionably prolonged imprisonment of millions of people, all under the tired and fetid mantra of "law and order" — all this will abate or be corrected eventually, as witch-hunting, slavery, industrial feudalism, Prohibition, isolationism, segregation, McCarthyism, and the violent domestic left did or were.

I can forgive America for wrongly imprisoning me and victimizing my shareholders. I now know that the lowest echelons of American society are in some ways more endearing than the highest, an unsuspected insight. I still love the country, though I do not now especially like it. And if, as I hope, I have been able to contribute anything to overcoming this terrible erosion of the justice system, it is my honour.

The treatment of the accused, as Thoreau, among other prominent American intellectuals, wrote, is one of the greatest criteria of the civility, integrity, and moral strength by which societies are themselves judged. When the unanswerable mass of sensible American opinion recognizes this, the United States will no longer feel that test, but much more sorrow and anguish will have been needlessly brought upon the land.

I will return to prison, finish my sentence, and leave the country for the great world beyond as soon as possible.